**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARTY CITY HOLDCO INC., *et al.*,[1] | ) | Case No. 24-90621 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than 10:00 a.m. (prevailing Central Time) on December 23, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on December 23, 2024, at 10:00 a.m. (prevailing Central Time) in Courtroom 400, 4th Floor, 515 Rusk Avenue, Houston, TX 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoTo platform. Connect via the free GoTo application or click the link on Judge Perez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "electronic appearance" link on Judge Perez's home page. Select the case name, complete the required fields, and click "submit" to complete your appearance.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Inc. (1359); Am-Source, LLC (8427); Party City Corporation (3692); Party City Holdings Inc. (3029); PC Intermediate Holdings, Inc. (1229); and Trisar, Inc. (0659). The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"), (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order"). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

3. Venue is proper pursuant to 28 U.S.C. § 1408.

4. The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5. On December 21, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses

and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

6. A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Deborah Rieger-Paganis, Chief Restructuring Officer of Party City Holdco Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.[2]

**The Debtors' Workforce**

7. As of the Petition Date, the Debtors employ approximately 11,200 individuals (collectively, the "Employees"), including approximately 3,600 full-time Employees and approximately 7,600 part-time and seasonal Employees. The Debtors also retain temporary workers who are sourced from various staffing agencies (collectively, the "Staffing Agencies") or employed directly by the Debtors to fulfill ordinary course duties on a short- or long-term basis (collectively, the "Temporary Staff"). Historically, the Debtors retained approximately 300 Temporary Staff. However, the number of Temporary Staff fluctuates based on the Debtors' specific needs at any given time.

8. The Employees and Temporary Staff perform a wide range of functions critical to the Debtors' operations and the administration of these chapter 11 cases. In many instances, the

[2] Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration.

Employees and Temporary Staff include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, possess unique skills and experience, and/or have developed relationships with vendors that are essential to the Debtors' businesses. These individuals are not easily replaced. Without access to the services of the Employees and Temporary Staff, the Debtors' ability to conduct operations and the administration of their estates will be substantially impaired. The Debtors' successful chapter 11 liquidation is dependent upon the remaining Employees, whose knowledge of the Debtors' business is fundamental to efficiently and effectively winding down and administering this case and preserving value for the Debtors' stakeholders.

9. The vast majority of the Employees and Temporary Staff rely on their compensation and benefits to pay their daily living expenses and support their families. These workers will be subject to severe financial constraints if the Debtors are not permitted to continue paying their compensation and providing health and other benefits during the pendency of these chapter 11 cases. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate due to the facts and circumstances of these chapter 11 cases.[3]

**Compensation and Benefits**

10. To minimize the personal hardship the Employees and Temporary Staff could suffer if prepetition Employee-related obligations are not paid when due, and to maintain stability in the Debtors' workforce during the administration of these chapter 11 cases, the Debtors seek authority to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, severance, and other compensation, payroll processing services, federal and state

[3] For the avoidance of doubt, the Debtors only seek authority to pay employee and temporary staff related obligations applicable to the Employees and Temporary Staff of the Debtors. The Debtors do not seek authority to pay employee and temporary staff related obligations of any non-debtor entities.

withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, health insurance, workers' compensation benefits, life insurance, short- and long-term disability coverage, non-insider severance, ordinary course non-insider bonus programs, retirement and savings plans, and certain other benefits that the Debtors have historically provided in the ordinary course, all as more fully described herein (collectively, the "Compensation and Benefits"); and (b) pay all costs incidental to the Compensation and Benefits.

11. Specifically, the Debtors seek authority, but not direction, to make the following payments related to prepetition amounts owed on account of the Compensation and Benefits:

| Relief Sought | Amount | |
|---|---|---|
| **Compensation** | | |
| Unpaid Wages | $ | 5,000,000 |
| Unpaid Temporary Staff Compensation | $ | 3,000,000 |
| Reimbursable Expenses | $ | 325,000 |
| Unpaid Withholding Obligations | $ | 2,000,000 |
| Unpaid Payroll Processing Fees | $ | 500,000 |
| **Employee Benefits Programs** | | |
| Medical Accrual | $ | 7,300,000 |
| Unremitted HSA Amounts | $ | 100,000 |
| Unremitted FSA Amounts | $ | 5,000 |
| Life Insurance and Disability Benefits Program | $ | 200,000 |
| Unpaid Matching Contributions | $ | 100,000 |
| Unpaid 401(k) Fees | | 30,000 |
| Time Off Policies | $ | 1,000,000 |
| Car Allowance Program | $ | 20,000 |
| COBRA Benefits | $ | 15,000 |
| **Incentive Programs** | | |
| Supervisor Incentive Program | $ | 30,000 |
| Retail Incentive Program | $ | 800,000 |
| **WARN & Severance** | | |

| Relief Sought | Amount |
|---|---|
| WARN Notice Payments | $3,500,000 |
| Severance | $300,000 |
| **Total** | **$ 24,225,000** |

12. Additionally, out of an abundance of caution, the Debtors request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis during these chapter 11 cases and without the need for further Court approval, subject to the Bankruptcy Code and applicable law.

13. For the avoidance of doubt, should the Debtors seek to pay prepetition Compensation and Benefits to any Employee in excess of the $15,150 priority wages cap imposed by section 507(a)(4) of the Bankruptcy Code, the Debtors shall seek such relief pursuant to a separate motion.

## I. Compensation

### A. Unpaid Wages

14. In the ordinary course of business, the Debtors incur payroll obligations for wages, salaries, and other compensation owed to their Employees (the "Employee Wages"). Most of the Debtors' Employees are paid on a weekly or biweekly basis. In 2024, the Debtors' paid approximately $257,000,000 in aggregate on account of Employee Wages, net of withholding obligations.

15. As of the Petition Date, the Debtors estimate that they owe approximately $5,000,000 on account of unpaid Employee Wages earned by Employees within 180 days prior to the Petition Date (the "Unpaid Wages"). As described above, loss of the Unpaid Wages could cause the Employees to experience substantial financial hardship. In light of the substantial benefit the Employees provide to the Debtors' estates, the Debtors seek authority to pay their Employees

any Unpaid Wages in the ordinary course of business consistent with past practice and to continue honoring Employee Wages obligations in the ordinary course of business.

**B. Unpaid Temporary Staff Compensation**

16. The Debtors make payments to Staffing Agencies and the Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services important to the Debtors' operations. In the past 12 months, the Debtors have paid approximately $12,000,000 on account of Temporary Staff Compensation, including fees that the Debtors remit to Staffing Agencies in exchange for the services they provide with respect to the Temporary Staff. The Debtors believe the authority to continue paying the Temporary Staff Compensation is critical to minimize disruption of the Debtors' business operations. As of the Petition Date, the Debtors estimate that Temporary Staff and Staffing Agencies are owed approximately $3,000,000 on account of services rendered prior to the Petition Date (the "Unpaid Temporary Staff Compensation").

17. Accordingly, the Debtors seek authority to pay any Unpaid Temporary Staff Compensation in the ordinary course and consistent with past practice and to continue paying the Temporary Staff Compensation in the ordinary course of business on a postpetition basis.

**II. Expense Reimbursement**

18. In the ordinary course of business, the Debtors reimburse Employees for reasonable and necessary business expenses incurred in connection with the performance of authorized business (the "Reimbursable Expenses"). The Reimbursable Expenses include expenses related to business travel (e.g., airfare, in-flight Wi-Fi, luggage fees, car rentals, ground transportation, lodging, meals, laundry service), relocation costs, and other business-related expenses paid directly by Employees. Employees request reimbursement by submitting an expense report to the Debtors directly or through iExpense, a third-party expense reporting application. Once the Debtors have

verified that an Employee's request relates to allowable Reimbursable Expenses, they reimburse the Employee for the submitted expenses.

19. In the past 12 months, the Debtors paid Employees approximately $275,000 per month on account of Reimbursable Expenses. As of the Petition Date, the Debtors estimate that they owe approximately $325,000 on account of Reimbursable Expenses. The Debtors' inability to reimburse Employees for Reimbursable Expenses could impose hardship on Employees who have incurred obligations for the Debtors' benefit. To avoid harming such Employees and to protect against the risk that these Employees may become personally liable for such expenses, the Debtors request authority to pay outstanding Reimbursable Expenses and to continue to pay the Reimbursable Expenses in the ordinary course of business on a postpetition basis.[4]

## III. Payroll Withholding and Processing

### A. Withholding Obligations and Payroll Taxes

20. During each payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions as required by law. The Debtors also deduct other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, contributions under voluntary benefit programs, 401(k) retirement plan contributions, legally ordered deductions, and other miscellaneous deductions (collectively, the "Deductions"). The Debtors forward the Deductions to the appropriate third-party recipients.

[4] The Debtors also operate the Debtors' corporate card program, under which the Debtors provide credit cards to certain employees to make business-related purchases on the Debtors' behalf. The Debtors are seeking relief to pay any amounts due on account of, and to continue in the ordinary course of business, their corporate card program in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms and Books and Records, and (D) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* filed substantially contemporaneously herewith.

21. In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes" and, the Payroll Taxes together with the Deductions, the "Withholding Obligations"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.

22. In the past 12 months, the Debtors paid approximately $7,500,000 per month on account of Withholding Obligations. As of the Petition Date, the Debtors estimate that they owe approximately $2,000,000 on account of the Withholding Obligations (the "Unpaid Withholding Obligations"). Accordingly, the Debtors seek authority to pay any Unpaid Withholding Obligations in the ordinary course of business and consistent with past practice, and to continue to pay Withholding Obligations in the ordinary course of business on a postpetition basis.

**B. Payroll Processing**

23. The Debtors contract with Automatic Data Processing (the "Payroll Processor") to process and administer the Debtors' payroll. For each payroll period, the Payroll Processor may process direct deposit transfers or administer payroll checks to Employees from disbursement accounts funded by the Debtors. In addition, the Payroll Processor may serve as the Debtors' federal W-2 tax form processing vendor and/or administer certain of the Debtors' federal, state, and local payroll tax filings. The Payroll Processor is integral to the Debtors' payroll process and

facilitate the Debtors' accurate payment of compensation based on time worked, performance, and incentives earned.

24. In 2024, the Debtors have paid approximately $1,800,000 in the aggregate on account of payroll processing services, time and attendance systems, benefits administration, recruiting services and related tools. As of the Petition Date, the Debtors estimate that they owe approximately $500,000 to the Payroll Processor for payroll processing services (the "Unpaid Payroll Processing Fees"). The Debtors seek authority to pay any Unpaid Payroll Processing Fees in the ordinary course of business and to continue paying for payroll processing services in the ordinary course of business on a postpetition basis.

## IV. Employee Incentive Programs

25. The Debtors maintain various incentive programs to drive performance among certain of their Employees, including corporate Employees, and Employees with important roles related to the Debtors' supply chain, retail business segment, and consumer products division (the "Employee Incentive Programs").[5] Payments to Employees under the Employee Incentive Programs are made after actual results on performance measures for the previous performance period have been finalized and approved, which typically occurs on or about March 15 each year. To qualify for the Employee Incentive Programs, Employees must be actively employed on the date of payment under an applicable Employee Incentive Program. The Debtors seek authority to continue the Employee Incentive Programs, at their discretion, and in a manner consistent with

[5] In addition to the Supply Chain Incentive Programs and the Retail Incentive Programs discussed below, the Debtor also maintains or has maintained several programs that are tied exclusively to EBIDTA goals, namely the PODs Incentive Program, the Consumer Products Sales Incentive Programs, the Corporate Annual Incentive Program, the Employee Referral Program. Because the entitlement to compensation under these programs is tethered to certain EBIDTA metrics that were not achieved, the Debtors do not require authority to make payments in accordance with these programs and instead mention them for sake of completeness.

prepetition practice to preserve Employee morale and ensure the Debtors maintain a motivated workforce at this critical juncture.

### A. Cash-Based Incentive Programs[6]

26. *Supply Chain Incentive Programs*. The Debtors maintain incentive programs pursuant to which bonuses are awarded to certain eligible non-insider Employees with leadership roles at the Debtors' manufacturing facilities and distribution centers (the "Supply Chain Incentive Programs"). Under the Supply Chain Incentive Programs, the Debtors offer annual bonuses to eligible non-insider Employees based on achievement of (i) the Debtors' annual financial performance objectives and (ii) annual operational performance objectives for one or more of the Debtors' manufacturing facilities or distribution centers at which the Supply Chain Incentive Programs participant has responsibilities. Facility-specific objectives historically have included production targets, in the case of the Debtors' manufacturing facilities, and per-unit efficiency metrics, in the case of the Debtors' distribution centers. As of the Petition Date, approximately 8 non-insider Employees participate in the Supply Chain Incentive Programs. The Debtors believe that no amounts should be owed under this program as of the petition date as EBITDA goals are the threshold in which an employee can qualify for this incentive program. In 2024, a new non-insider "Supervisor Incentive Plan" for the Chester distribution facility (the "Distribution Center") based on certain productivity measures was implemented. As of the Petition Date, approximately 22 non-insider Employees participate in the Supervisor Incentive Plan. The Debtors estimate that approximately $30,000 will be payable to eligible non-insider Employees in March 2025 under this program.

---

[6] The relief sought under this motion with respect to Employee Incentive Programs does not include the payment of any obligation to any "Insider" (as the term is defined in section 101(31) of the Bankruptcy Code). The Debtors may seek separate authority with respect to any "insider," to the extent necessary, and reserve all rights with respect to the "insider" status of any Employee.

27. *Retail Incentive Programs*. To incentivize Employee performance in the Debtors' retail segment, the Debtors maintain incentive programs for eligible Employees involved in the operations and management of the Debtors' specialty retail party supply stores and temporary Halloween stores (the "Retail Incentive Programs"). Under the Retail Incentive Programs, retail field management, district team leaders, and store team leaders (including store team leaders at the Debtors' seasonal Halloween City locations) have the opportunity to receive annual or semiannual bonuses based on achievement of performance objectives approved by members of the Debtors' senior management team. Depending on the participating Employee's position, payouts have historically been based on district- or region-specific sales, store profitability, customer experience, and/or the Debtors' adjusted EBITDA. As of the Petition Date, approximately 755 non-insider Employees participate in the Retail Incentive Programs. The Debtors estimate that a maximum amount of approximately $800,000 will be payable to eligible non-insider Employees under the Retail Incentive Programs in March 2025.

28. The Debtors believe that honoring their obligations under the Supply Chain Incentive Programs and the Retail Incentive Programs (collectively, the "Cash-Based Incentive Programs") with respect to non-insiders constitutes ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, does not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to honor any outstanding obligations under the Cash-Based Incentive Programs in the ordinary course and continue the Cash-Based Incentive Programs in the ordinary course on a postpetition basis with respect to non-insider Employees. Honoring and maintaining the Cash-Based Incentive Programs is integral to maintaining Employee morale and ensuring the Debtors maintain a motivated workforce as it seeks to complete a value-maximizing liquidation of its assets given a

substantial number of the participants in these programs are being asked to remain with the Debtors during the majority of the liquidation process.

## V. Employee Retention Programs

29. In December 2024, the Debtors implemented cash-based retention awards pursuant to a retention program developed in coordination with the Debtors' professionals in light of the immediate and ongoing need to retain key members of the Debtors' workforce (the "December 2024 Retention Program"). The Debtors determined in the sound exercise of their business judgment that implementing the December 2024 Retention Program was necessary to maximize the likelihood that the employees essential to a value-maximizing liquidation of the business remain with the company through each employee's specified retention period.

30. The December 2024 Retention Program contains two components. First, approximately 26 employees received lump-sum prepetition payments that are subject to clawback and/or forfeiture in the event an Employee is terminated for cause or resigns without good reason before the expiration of each employee's applicable. The retention periods range from a period of 129 to 160 days or, in certain cases, through the completion of the Store Closing Sales or closure of the Distribution Center. Second, approximately 104 employees received salary increases that will apply through the last date of employment initially requested by the Debtors. Such increased salary will be paid through the initially determined last date of employment even if the Debtors elect to terminate their employment prior to the initially agreed upon date. All salary payments will cease if the employee voluntarily determines to cease his or her employment with the Debtors.[7]

[7] The salary increases will continue to be paid in the ordinary course of business pursuant to the relief sought under this motion. No "Insider" (as the term is defined in section 101(31) of the Bankruptcy Code) received a salary increase.

31. The Debtors' estimate the aggregate cost of the December 2024 Retention Program, assuming each eligible employee stays through the completion of their applicable retention period, to be approximately $2,337,000.

## VI. Employee Benefits Programs

32. The Debtors offer their Employees the ability to participate in several health and welfare insurance and benefits programs (including, among other programs, medical and dental plans, vision, flexible benefits plans, life insurance, disability plans) and retirement plans (collectively, the "Employee Benefits Programs").

33. The Employee Benefits Programs confer substantial benefits to eligible Employees who rely on the Employee Benefits Programs for their physical and financial well-being. Failure to continue the Employee Benefits Programs could cause Employees to experience severe hardship. In light of the substantial benefit the Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such hardship. Accordingly, the Debtors seek authority to: (a) pay any unpaid amounts due with respect to the Employee Benefits Programs; and (b) continue the Employee Benefits Programs in the ordinary course of business on a postpetition basis.

### A. Health Benefit Plans

34. The Debtors offer their Employees the opportunity to participate in various health benefit plans, including medical and dental plans (collectively, the "Health Benefit Plans"). Specifically, the Debtors provide:

- Healthcare Plans: The Debtors' healthcare plans (the "Healthcare Plans") are fully funded and self-funded medical and prescription drug plans administered by several healthcare management companies, including Lucent Health, Aetna, Kaiser Permanente in California, Quantum, United HealthCare, and CVS Caremark, among others. The Healthcare Plans provide coverage for, among other things, physician and ancillary care, inpatient or outpatient

care, preventative care, and prescription drug services. In 2024, on average, the Debtors pay approximately 75% of the Healthcare Plan premiums and Employees pay the remaining approximately 25%. In 2025, the Debtors pay 70% of the Healthcare Plan premiums and Employees pay the remaining approximately 30%. Spouses, children, and other specified dependents are eligible dependents under the Healthcare Plans. Approximately 2,025 Employees enroll in the Healthcare Plans. The annual cost to the Debtors of the Healthcare Plans is approximately $20,000,000.

- Dental Plans: The Debtors offer their Employees the option of participating in dental plans (the "Dental Plans") administered by Aetna. The Debtors and Employees each pay for approximately 50% of Dental Plan premiums. The annual cost to the Debtors of the Dental Plans is approximately $750,000.

- Vision Plans: The Debtors offer Employees the option of participating in vision plans (the "Vision Plans") administered by United HealthCare. Employees are responsible for the entire amount of Vision Plan premiums and pay approximately $12,500 in aggregate on account of Vision Plan premiums per month.

35. In the aggregate, the Debtors estimate based on the Company's books and records that they owe approximately $7,300,000 on account of the Health Benefit Plans (collectively, the "Medical Accrual"), including claim reimbursement payments and administrative fees owed to Lucent Health, Quantum, CVS Caremark, Aetna, United HealthCare, Kaiser Permanente, and other service providers. In 2025, outside of California, the Company is moving to a single medical plan, which is managed by Anthem Blue Cross / Blue Shield. The Debtors seek authority to honor prepetition obligations on account of the Medical Accrual and to continue the Health Benefit Plans on a postpetition basis in the ordinary course of business.

### B. Health Savings Accounts

36. The Debtors provide certain Employees enrolled in high-deductible Healthcare Plans access to a health savings account ("HSA") administered by HSA Bank. Participating Employees can choose to make pre-tax contributions to their individual HSA through payroll deductions up to the maximum amount permitted by the Internal Revenue Service. Amounts in

HSAs can be used to pay for qualifying medical expenses. The Debtors contribute up to $1,400 to each Employee's HSA, depending on the Employee's Healthcare Plan and completion of annual wellness exams or screenings, in an aggregate amount of approximately $2,000,000 per year. As of the Petition Date, the Debtors estimate that approximately $100,000 of Employee and Debtor contributions to HSAs has accrued but has not yet been remitted to Employee HSAs (the "Unremitted HSA Amounts"). Accordingly, the Debtors seek authority to remit the Unremitted HSA Amounts and continue the HSAs in the ordinary course of business on a postpetition basis.

**C. Flexible Spending Accounts**

37. The Debtors provide Employees with access to three flexible spending accounts that allow Employees to contribute pre-tax dollars to cover eligible expenses for (a) health care, (b) dependent care, and (c) commuting (each, an "FSA"). The Debtors do not contribute to Employees' FSAs and believe the FSA amounts are generally held in trust by the Debtors and are therefore not property of the Debtors' estates. The FSAs are administered by Benefits Resource Inc. ("BRI"). As of the Petition Date, the Debtors estimate that there is approximately $5,000 in unremitted FSA Employee contributions (the "Unremitted FSA Amounts"). The Debtors seek authority to pay any outstanding FSA Fees, remit the Unremitted FSA Amounts, and continue the FSAs in the ordinary course of business on a postpetition basis.

**D. Workers' Compensation Program**

38. The Debtors maintain workers' compensation insurance for Employees in the states and foreign jurisdictions in which the Debtors operate at the statutorily required levels for claims arising from or related to their employment with the Debtors (collectively, the "Workers'

Compensation Program," and the Debtors' obligations related thereto, the "Workers' Compensation Obligations").[8]

39. In most states, the Debtors maintain workers' compensation policies through Travelers Property Casualty Company of America ("Travelers"). The Debtors pay monthly premiums directly to Travelers based on the Debtors' estimated gross payroll for the applicable policy year. In Ohio, North Dakota, and Washington, where the sale of workers' compensation insurance by private insurers is prohibited, the Debtors purchase workers' compensation coverage from government-operated insurance funds.

40. As of the Petition Date, the Debtors estimate based on the Company's books and records that the total amount of reserves under the Workers' Compensation program is approximately $20.3 million. The Debtors must continue the claims assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program, without regard to whether such liabilities were outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these chapter 11 cases. Their businesses' inability to do so may result in adverse legal consequences that could potentially disrupt their chapter 11 process. Accordingly, the Debtors seek authority to pay prepetition amounts owed with respect to the Workers' Compensation Obligations, and to continue the Workers' Compensation Program in the ordinary course on a postpetition basis.

---

[8] The Workers' Compensation Program may change postpetition in the ordinary course of their businesses due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including the authority to make any changes to current policy and practice, as necessary.

**E. Life Insurance and Disability**

41. The Debtors provide life and accidental death and dismemberment insurance (the "Basic Life Insurance") to eligible full-time Employees through The Standard ("The Standard"). The Debtors pay for all expenses on account of the Basic Life Insurance, which historically has cost approximately $17,500 in aggregate per month. Employees also have the option to purchase supplemental life insurance and accidental death or dismemberment insurance (the "Supplemental Life and AD&D Insurance") through The Standard. The Supplemental Life and AD&D Insurance is paid by the Debtors' Employees, and the Debtors do not have any outstanding obligations on account of the Supplemental Life and AD&D Insurance program. By this motion, the Debtors seek authority to pay any prepetition obligations on account of the Basic Life Insurance and to continue providing Basic Life Insurance and Supplemental Life and AD&D Insurance in the ordinary course of business on a postpetition basis.

42. The Debtors provide basic short- and long-term disability benefits to eligible full-time Employees through The Standard (the "Disability Benefits Program"). Under the Disability Benefits Program, eligible Employees are entitled to 60% of their base weekly earnings up to $750 per week for 180 days following a qualified non-work related illness or injury. After 180 days, eligible Employees are entitled to continue receiving 60% of base weekly earnings up to $10,000 per month. By this motion, the Debtors seek authority to pay any prepetition obligations on account of the Disability Benefits Program and to continue offering the Disability Benefits Program to eligible Employees in the ordinary course of business on a postpetition basis.

43. In the year preceding the Petition Date, the Debtors have paid an estimated $2,600,000 for Basic Life Insurance, supplemental life insurance, and short- and long-term disability, with an estimated outstanding amount as of the Petition Date of $200,000.

**F. 401(k) Plan**

44. The Debtors currently maintain a retirement savings plan (the "401(k) Plan"), which is administered by Fidelity Investments Operations Company, Inc. ("Fidelity") for the benefit of (a) full-time Employees who are at least 18 years old, who become eligible to participate on the first day of the month on or after 30 days of employment with the Debtors, and (b) part-time and temporary Employees who are at least 21 years old, who become eligible to participate on the first day of the month on or after the completion of a 1,000-hour year of service. Approximately 2,000 Employees participate in the 401(k) Plan. The Debtors withhold approximately $12,300,000 per year from Employees' compensation on account of Employees' 401(k) contributions to the 401(k) Plan. The Debtors pay Fidelity and other professionals approximately $200,000 in administrative fees per year for administering the 401(k) Plan. As of the Petition Date, the Debtors owe Fidelity and other professionals approximately $30,000 in administrative fees related to the 401(k) Plan (the "Unpaid 401(k) Fees").

45. The Debtors also provide certain matching contributions for the 401(k) Plan (the "401(k) Matching Contributions"). The Debtors match 100% of Employees' contributions up to 3% of eligible compensation and 50% of Employees' contributions between 3% and 5% of an eligible compensation. All 401(k) Matching Contributions become fully vested immediately. In the 12 months leading up to the Petition Date, the Debtors paid approximately $6,000,000 in 401(k) Matching Contributions. As of the Petition Date, the Debtors estimate $100,000 in accrued and unpaid 401(k) Matching Contributions (the "Unpaid Matching Contributions"). The Debtors request authority to (a) pay all Unpaid 401(k) Fees, (b) remit all Unpaid Matching Contributions, and (c) remit all amounts contributed by Employees on account of the 401(k).

**G. Time Off Policies**

46. The Debtors provide paid time off to all eligible Employees in the form of vacation time, sick time, and company holidays. The Debtors also permit their Employees to take paid and unpaid time off for other specified reasons, certain of which are required by law (collectively, the "Time Off Policies").

47. For most non-retail Employees, the Debtors have a general PTO Policy (the "General PTO Policy") under which eligible Employees—generally those working full-time or part-time, regular status in corporate or distribution—are granted two (2) to six (6) weeks of annual paid vacation depending on the Employee's position and tenure. Under the General PTO Policy, accrued but unused vacation time may not be carried over from one calendar year to the next (except as required by state law). Employees who resign or are terminated are not eligible to receive payment for accrued but unused vacation time (unless required by law in the state in which the Employee works).

48. For eligible Employees at the Director level and above, the Debtors have an unlimited paid time off policy ("Unlimited PTO Policy") under which eligible Employees are afforded the flexibility to take planned time off for vacation, sickness, or personal reason to the extent the Employee's supervisors or managers have approved such leave. Under the Unlimited PTO Policy, there is no accrual of unused paid time off with respect to Employees and thus Employees do not receive compensation for "unused" paid time off upon leaving the Debtors' employ.

49. The Debtors have a separate paid time off policy for full-time retail store Employees (the "Retail PTO Policy"). Under the Retail PTO Policy, paid time off is earned based on the number of hours worked by an Employee over each pay period during the calendar year. The accrual rate of each eligible Employee is determined by tenure and position with maximum

annual accruals that range from one to four weeks. Up to five (5) days of paid time off may be carried over into subsequent calendar years; provided, that paid time off that is carried over must be used by May 1 (unless otherwise dictated by state law). Similar to the General PTO Policy and the Unlimited PTO Policy, under the Retail PTO Policy, Employees do not receive compensation for "unused" paid time off upon leaving the Debtors' employ (unless required under state law).

50. All eligible, full-time Employees generally receive the equivalent of five (5) days of sick time at the beginning of each calendar year (or an alternate amount of time as directed by state law) to care for their own health, or the health of a relative, child, or other person of significance (the "Sick Time Policy"). The Debtors' part-time Employees may be eligible to receive sick time based on the state in which they work. Sick time does not carry over from one year to the next (unless mandated by state law), and Employees do not receive compensation for "unused" sick time upon leaving the Debtors' employ.[9]

51. The Debtors provide Employees with certain other forms of paid and unpaid time off, including:

- 11 paid holidays per year during which full-time Employees (excluding full-time retail Employees, who receive nine (9) paid holidays per year)[10] are not required to work and are paid their base rate of pay;

- unpaid leave under the Family and Medical Leave Act for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs; and

- other paid leaves of absence, many of which are required by law, including for bereavement, jury or court attendance, time spent voting, and military service, and unpaid leaves of absence, including medical leaves, domestic abuse leaves, and other personal leaves.

---

9 Certain states require the Debtors to restore "unused" sick time to former Employees who have been rehired by the Debtors.

10 Full-time retail store Employees who work on a paid holiday may take the paid holiday on any other day of the calendar month.

These other forms of paid and unpaid time off do not involve incremental cash outlays beyond standard payroll obligations.

52. The Debtors estimate that, as of the Petition Date, total accrued but unpaid liability on account of the Time Off Policies is approximately $1,000,000.[11] The Debtors believe that continuing the Time Off Policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will use paid and unpaid time off in the ordinary course of business, which will not create any material cash flow obligations beyond the Debtors' normal payroll obligations. The Debtors seek authority to allow eligible Employees to use their paid and unpaid time off under the Time Off Policies in the ordinary course of business consistent with past practice.

**H. Car Allowance Program**

53. In the ordinary course of business, the Debtors provide a monthly car allowance to approximately 57 qualifying Employees (the "Car Allowance Program"). In 2024, the Debtors paid approximately $500,000 in aggregate on account of the Car Allowance Program. The Debtors intend to continue the Car Allowance Program in the ordinary course during the pendency of these chapter 11 cases. As of the Petition Date, the Debtors estimate that they owe approximately $20,000 on account of the Car Allowance Program.

**I. Non-Insider Severance Program**

54. The Debtors maintain a discretionary contractual severance program in the ordinary course of business for the benefit of certain non-insider Employees in connection with reductions

[11] This amount reflects amounts attributable to employees located in "payout states," but the total value of paid time off attributable all employees is approximately $3,700,000.

in force or other terminations (the "Non-Insider Severance Program"). Under the Non-Insider Severance Program, upon termination and at the Debtors' discretion, eligible non-insider Employees may receive a lump sum payment or salary continuation depending on the Employee's length of employment and position (collectively, the "Severance Obligations"). Payments on account of the Severance Obligations are typically provided in exchange for entry into release and confidentiality agreements, pursuant to which Employees typically release any and all claims against the Debtors and agree to not disclose confidential information.

55. The Debtors believe that honoring the Severance Obligations is critical to preventing issues related to litigation under certain state laws that create liability for persons acting on behalf of an employer that fails to make contractual severance payments. Accordingly, in the event that Severance Obligations arise after the Petition Date, the Debtors seek authority, but not direction, to make payments pursuant to the Non-Insider Severance Program in the ordinary course consistent with the Debtors' historical practice in the amount of up to $300,000 as required by applicable state law. The Debtors are not seeking to pay Severance Obligations to employees where it is not required by applicable state law. For avoidance of doubt, any payment of severance obligations to any "insider," as that term is defined in section 101(31) of the Bankruptcy Code, would be subject to the limitations of section 503(c)(2) of the Bankruptcy Code.

### J. WARN Act Obligations

56. Unless an exception applies, the Worker Adjustment and Retraining Notification Act (the "Federal WARN Act") generally requires sixty days advance notice to affected employees and governmental entities prior to the implementation of a "mass layoff" or a "plant closing" (the "Federal WARN Act Obligations"). In addition to the Federal WARN Act, the Debtors must comply with various state law equivalent "mini-WARN Acts" (together with the Federal WARN

Act, the "WARN Act Obligations"), which create additional notice obligations (together with the Federal WARN Act Obligations, the "WARN Act Obligations").

57. Prior to the Petition Date, the Debtors served notices under the applicable WARN Acts to each of the Debtors' Employees entitled to receive such notice in connection with the planned closures of the Debtors' corporate office, certain stores in New Jersey, New York, and Maryland, and Distribution closing after the commencement of these chapter 11 cases. The Debtors seek authority, but not the direction, to make payments up to the statutory cap to employees to whom the Debtors owe WARN Act Obligations for a total of $3,500,000.

**K. COBRA Benefits Program**

58. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former employees of the Debtors (the "COBRA Participants") may, in certain cases, continue insurance coverage under the Health Benefit Plans following the termination of their employment with the Debtors (the "COBRA Benefits"). COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to 18 months and, in certain cases, up to 36 months, following termination of employment. The COBRA Participants bear the cost of their insurance coverage subsequent to termination unless otherwise subsidized by the Debtors. The Debtors use the services of HealthEquity to assist in the administration of the COBRA Benefits.

59. As of the Petition Date, the Debtors estimate that they owe approximately $15,000 on account of the COBRA Benefits. The Debtors request authorization to pay the COBRA Benefits, honor any obligations related to the COBRA Benefits that may be outstanding as of the Petition Date, and continue administering COBRA Benefits for all eligible former employees on a postpetition basis.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations

#### A. Certain of the Compensation and Benefits Are Entitled to Priority Treatment

60. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* U.S.C. § 1129(a)(9)(B). To the extent that an Employee receives no more than the statutory prescribed limit of $15,150 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Compensation and Benefits at this time enhances value for the benefit of all stakeholders. Given the expedited timeline of, and goals for, these chapter 11 cases, finding new qualified employees to replace the Employees is likely impossible.

#### B. Payment of Certain Compensation and Benefits Is Required by Law

61. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. *See* 11 U.S.C. § 541(b)(1). Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its

employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

62. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the administration of these chapter 11 cases.

## II. Payment of the Compensation and Benefits and the Relief Sought Herein Is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates

63. Courts have acknowledged that it is often appropriate to authorize the payment of prepetition obligations where it advances Code-related objectives such as protecting and preserving the estate. *See, e.g., Czyewski* v. *Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting the approval of first-day wages orders authorizing the payment of employees' prepetition wages). In authorizing payments of prepetition obligations, courts have relied on several legal theories rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

64. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's

going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

65. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g., Inst. Creditors of Cont'l Air Lines, Inc.* v. *Cont'l Air Lines, Inc.* (*In re Cont'l Air Lines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citation omitted).

66. Section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Courts apply section 105(a) pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and which further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. at 497 (recognizing the "doctrine of necessity"); *see also In re Lehigh*

*& New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation).

67. Here, the requested relief amply satisfies the foregoing standards. Along with their customers and vendors, the Employees are the Debtors' most important asset. Many of the Debtors' Employees expect and require their wages to arrive on a timely basis. Consequently, the Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations to them expeditiously. The Employees understand that the goals for these chapter 11 cases are not based on continued operations and thus may already be incentivized to leave their positions with the Debtors. Should the Employees elect to leave their positions, the Debtors' ability to consummate a liquidating plan will be negatively impacted, to the detriment of the Debtors' creditors and all parties in interest. Further, if this Court does not authorize the Debtors to honor their various obligations under the insurance programs described herein, Employees may not receive health coverage and thus may be obligated to pay certain health care claims that the Debtors have not satisfied. The loss of health care coverage may result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors require the services provided by the Employees. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption until the completion of their chapter 11 liquidation.

68. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, which would not only severely disrupt the Debtors' operations at this critical juncture but is likely cost prohibitive and otherwise impossible at as a practical matter.

69. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Compensation and Benefits and to continue the Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

### III. The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims

70. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

71. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their claims under the Workers' Compensation Program (the "Workers' Compensation Claims") in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Workers' Compensation Claims could have a detrimental effect on Employee financial well-being and morale and lead to the departure of certain Employees who are critical to the Debtors' ability to conduct a value-maximizing winddown process.

### The Court Should Authorize the Debtors' Financial Institutions to Honor and Process the Debtors' Payments

72. The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, and anticipated access to cash collateral. Additionally, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating

to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

## Emergency Consideration

73. Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

74. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

75. Nothing contained herein is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other

party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

76. The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the ABL Agent and counsel thereto; (d) counsel to the Ad Hoc Noteholder Group; (e) the Second Lien Notes Trustee and counsel thereto; (f) the United States Attorney's Office for the Southern District of Texas, Houston Division; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; (j) other regulatory agencies having a regulatory or statutory interest in

these cases; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: December 22, 2024

Respectfully submitted,

By: */s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
Aaron J. Power (TX Bar No. 24058058)
M. Shane Johnson (TX Bar No. 24083263)
Jordan T. Stevens (TX Bar No. 24106467)
Grecia V. Sarda (TX Bar No. 24132092)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
apower@porterhedges.com
sjohnson@porterhedges.com
jstevens@porterhedges.com
gsarda@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kenneth S. Ziman (*pro hac vice pending*)
Christopher Hopkins (*pro hac vice pending*)
Stephanie P. Lascano (*pro hac vice pending*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
kziman@paulweiss.com
chopkins@paulweiss.com
slascano@paulweiss.com

*Proposed Co-Counsel to the Debtors and the Debtors in Possession*

**Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief. This statement is made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Deborah Rieger-Paganis*
Deborah Rieger-Paganis

**Certificate of Service**

I certify that on December 22, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins