**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| PARTY CITY HOLDCO INC., *et al.*,[1] | ) | Case No. 24-90621 (ARP) |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Relief Requested |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) APPROVING (A) PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) PROCEDURES FOR THE DE MINIMIS SALE OF CERTAIN OF THE DEBTORS' ASSETS AND (C) ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) APPROVING (A) THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than 10:00 a.m. (prevailing Central Time) on December 23, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on December 23, 2024, at 10:00 a.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoTo platform. Connect via the free GoTo application or click the link on Judge Perez's homepage. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Inc. (1359); Am-Source, LLC (8427); Party City Corporation (3692); Party City Holdings Inc. (3029); PC Intermediate Holdings, Inc. (1229); and Trisar, Inc. (0659). The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion:[2]

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"):

a. authorizing and approving certain procedures (the "De Minimis Asset Sale Procedures") for the sale or transfer, in any individual transaction or series of related transactions, of certain assets (excluding Contracts (as defined below)) with an aggregate purchase price equal to or less than $2,500,000 (collectively, the "De Minimis Assets" and such sale or transfer, a "De Minimis Asset Sale"), and the form and manner of notice contemplated thereby;

b. authorizing and approving the bidding procedures, substantially in the form attached to the Order as Exhibit 1 (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale(s) of all, substantially all, or any portion of the Debtors' remaining assets that are not sold as De Minimis Assets or through the Store Closing Sales (as defined herein) (collectively, the "Assets");

c. authorizing and approving certain procedures for scheduling the auction(s), if needed, for sale(s) of Assets (each, an "Auction") in the event the Debtors receive one or more Qualified Bids (as defined herein);

d. authorizing and approving certain procedures for scheduling a hearing (a "Sale Hearing") to approve the sale or sales of the Assets to the Successful Bidder(s) pursuant to the terms of the Successful Bid(s) (or, if applicable, to the Backup Bidder(s) pursuant to the terms of the Backup Bid(s)) (each as defined herein);

e. authorizing the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures) and with the prior written consent (not to be unreasonably withheld) of the Directing Cash Collateral Agent (as defined in the Cash Collateral Order (as defined herein)), to (i) select bidder(s) to act as stalking horse bidder(s) (each, a "Stalking Horse Bidder") and enter into an asset purchase agreement with each such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement") and (ii) in connection with any Stalking Horse Agreement, provide appropriate and customary bid protections (including a Break-Up Fee (as defined herein)),

[2] Unless otherwise indicated, capitalized terms used but not defined herein shall have the same meanings as set forth in the Order and/or Bidding Procedures attached as Exhibit 1 to the Order.

subject to notice and later approval by the Court, to the extent the Debtors determine that the provision of such protections would be an actual and necessary cost of preserving the value of the Debtors' estates;

f. approving the Debtors' use of certain forms of notice with respect to the Bidding Procedures, substantially in the forms attached to the Order as Exhibit 2 and Exhibit 3, and the De Minimis Asset Sales, substantially in the form attached to the Order as Exhibit 4;

g. authorizing and approving procedures for the assumption and assignment (the "Assumption and Assignment Procedures") of certain executory contracts and unexpired leases of non-residential real property (the "Contracts") that are selected for assumption and assignment (the "Selected Contracts") in connection with the sale of any of the Assets (a "Sale Transaction"), procedures for the determination of the amount necessary to cure any defaults thereunder (the "Cure Costs"), and the form and manner of notice contemplated thereby; and

h. granting related relief.

2. Following entry of the Order, the Debtors will also seek entry of an order or orders (each such order, a "Sale Order") at a Sale Hearing, authorizing and approving the:

a. sale of the applicable Assets free and clear of liens, claims, encumbrances, and other interests (collectively, the "Encumbrances") other than those permitted by the applicable asset purchase agreement for the relevant Assets (each, a "Purchase Agreement");

b. Debtors' entry into each Purchase Agreement, substantially in the form that shall be attached to a given Sale Order;

c. assumption and assignment of the Selected Contracts in connection with the applicable Purchase Agreement; and

d. granting related relief.

3. The Debtors will file a proposed form of Sale Order and related Purchase Agreement in advance of any Sale Hearing.

## Jurisdiction and Venue

4. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of*

*Texas*, dated May 24, 2012 (the "Amended Standing Order"). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

5. Venue is proper pursuant to 28 U.S.C. § 1408.

6. The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

**Background**

7. On December 21, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On December 21, 2024, the Court entered an order authorizing the joint administration and procedural consolidation of these chapter 11 cases. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

8. A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Deborah Rieger-Paganis, Chief Restructuring Officer of Party City Holdco Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed

contemporaneously herewith and incorporated herein by reference.[3]

**The Debtors' Assets**

9. The Debtors commenced these chapter 11 cases to implement an orderly wind down of their business and to maximize the value of their assets for the benefit of all stakeholders. As set forth in the Store Closing Motion,[4] the Debtors intend to sell all merchandise located at their stores and distribution facilities through streamlined store closings (the "Store Closing Sales"). The Debtors, however, have other assets that may be saleable and could provide additional value to the Debtors' estates and their stakeholders. For one, the Debtors have built a recognizable and valuable brand and website as well as developed other intellectual property. The Debtors also have hundreds of unexpired leases of nonresidential real property (each, a "Lease") in their real estate portfolio.[5] Additionally, through Debtor Trisar Inc., the Debtors own equity interests in AmPro, a piñata manufacturing business based in Mexico. Each of these assets, and others, could potentially be monetized for the benefit of creditors. Given the nature of these cases and the limited window of time available for the Debtors to maximize the value of their assets, it is essential that the Debtors begin marketing these assets pursuant to Court-approved procedures at the very outset of these cases. Accordingly, the Debtors seek approval of the following procedures to facilitate

[3] Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration.

[4] "Store Closing Motion" means the *Debtors' Emergency Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief*, filed contemporaneously herewith.

[5] The Debtors are separately seeking approval of procedures for the assumption and assumption and assignment of their Leases pursuant to the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject, Assume, or Assume and Assign Executory Contracts and Unexpired Leases, and (II) Granting Related Relief*, filed contemporaneously herewith (the "365 Procedures Motion"). While the 365 Procedures Motion requests approval of procedures for Lease assumption and assumption and assignment, the Debtors seek, pursuant to this motion, authority to run a sales process for the Debtors' Leases if such process is likely to result in a value-maximizing transaction.

efficient and fair processes to auction and/or sell their assets for the benefit of their estates and stakeholders.

## The Proposed Procedures

### A. The De Minimis Asset Sale Procedures[6]

10. The Debtors propose to engage in De Minimis Asset Sales to individual buyers or groups of related buyers (each, a "De Minimis Asset Purchaser") for the highest or otherwise best offer received, taking into consideration the circumstances of each such sale or transfer, under the following De Minimis Asset Sale Procedures:

a. **Debtors' Authorization**: The Debtors are authorized to consummate a De Minimis Asset Sale without further order of the Court if (i) the aggregate transaction value, as calculated within the Debtors' reasonable discretion, is less than or equal to $2,500,000 and (ii) the Debtors determine in the reasonable exercise of their business judgment that such sale or transfer is in the best interest of their estates, subject only to the noticing procedures set forth herein;

b. **Free and Clear Sale of a De Minimis Asset**: Any De Minimis Asset Sale shall be, without need for any action by any party, final, fully authorized by the Court, and free and clear of all Encumbrances, with such Encumbrances attaching only to the proceeds of such De Minimis Asset Sale, if any, with the same validity, extent, and priority as had attached to the applicable De Minimis Asset immediately prior to such De Minimis Asset Sale;

c. **De Minimis Asset Sale Notice**: The Debtors shall give written notice of each De Minimis Asset Sale, substantially in the form attached to the Order as Exhibit 4. The content of the De Minimis Asset Sale Notice shall consist of (i) identification of the De Minimis Assets being sold or transferred, (ii) identification of the De Minimis Asset Purchaser and their relationship (if any) to the Debtors, (iii) the purchase price of the De Minimis Asset; and (iv) the significant terms of the De Minimis Asset Sale, if any, including, but not limited to, any payments to be made by the Debtors on account of commission fees to agents, brokers, auctioneers, and liquidators. To the extent any Contract is to be assumed and assigned in connection with such De Minimis Asset Sale, such contract will be subject to the Assumption and Assignment Procedures (as defined herein);

[6] For the avoidance of doubt, the sale of any Contracts will be done pursuant to the Assumption and Assignment Procedures and not the De Minimis Asset Sale Procedures.

d. **De Minimis Asset Sale Notice Parties**: At least ten days prior to the proposed closing of any De Minimis Asset Sale, the Debtors shall cause the De Minimis Asset Sale Notice to be served, by email, if available, or overnight delivery to (i) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases; (ii) the Lender Notice Parties (as defined herein); (iii) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002; (iv) any party known by the Debtors to have an interest in such De Minimis Asset; and (v) those parties requesting notice pursuant to Bankruptcy Rule 2002 (the parties in clauses (ii) through (iv) hereof, collectively, the "De Minimis Notice Parties");

e. **No Objection Timely Filed**: If no written objections to a De Minimis Asset Sale are filed with the Court within ten days after service of a De Minimis Asset Sale Notice, then the Debtors are authorized to immediately consummate such De Minimis Asset Sale; *provided* that in the event a De Minimis Asset Purchaser requests an order of the Court approving the assumption and assignment of a Contract concerning or related to such De Minimis Asset, the Debtors shall be permitted to obtain such order through the filing of a certification of counsel;

f. **Resolved Timely Objection**: If any De Minimis Notice Party files a written objection to any De Minimis Asset Sale with the Court within ten days after service of a De Minimis Asset Sale Notice, then the relevant De Minimis Asset shall only be sold or transferred upon submission of a consensual form of order resolving the objection as between the Debtors and the objecting De Minimis Notice Party or a further order of the Court after notice and a hearing. Any such objections shall be served on the following parties: (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019; (ii) Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002; (iii) the Office of the United States Trustee for the Southern District of Texas; (iv) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases; and (v) the Lender Notice Parties (as defined herein);

g. **Unresolved Timely Objection**: In the event a hearing is required to resolve an objection to a De Minimis Asset Sale, the Debtors may notice the hearing as soon as reasonably practicable and in accordance with the Court's calendar;

h. **Good Faith Purchaser**: Good faith purchasers of assets pursuant to these De Minimis Asset Sale Procedures shall be entitled to the protections of section 363(m) of the Bankruptcy Code; and

i. **Modifications to or Recission of a De Minimis Asset Sale Notice**: The Debtors reserve the right (exercisable in their sole discretion) to remove any

De Minimis Asset from a De Minimis Asset Sale Notice or rescind any De Minimis Asset Sale at any time prior to the consummation thereof.

**B. The Proposed Sale Process and Bidding Procedures**

11. The Debtors are seeking approval of the Bidding Procedures to establish a fair and open process for the solicitation, receipt, and evaluation of bids for the Assets. The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties-in-interest and potential bidders with the need to run an expeditious and efficient sale process. The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids for the Assets.

12. The Debtors believe that the Bidding Procedures and the timelines set forth therein are in the best interests of the Debtors' estates, will establish whether and to what extent any additional market for the Assets exists, and provide interested parties with sufficient opportunity to participate in the sale process. The Debtors will retain the ability to alter the Bidding Procedures based upon the exigencies of a given situation if the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, and in a manner consistent with their fiduciary duties and applicable law, that it is reasonable to do so.

13. The key provisions of the Bidding Procedures are summarized below:[7]

a. **Qualified Bidders**: Only a Qualified Bidder may participate in and make subsequent Bids (each as defined herein) at an Auction. The Debtors shall have the sole right to determine, in the exercise of their reasonable business judgment and in consultation with the Consultation Parties, whether a bidder is a Qualified Bidder. A "Qualified Bidder" must (among other requirements set forth in the Bidding Procedures) (i) deliver to the Debtors by the Bid Deadline (as defined herein) an irrevocable, good faith, and bona

---

[7] This summary is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Order. All capitalized terms used in this motion with respect to describing the Bidding Procedures but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

fide written offer (a "Bid") to purchase the applicable Asset that is a Qualified Bid (as defined in the Bidding Procedures) pursuant to the Bidding Procedures; (ii) demonstrate the financial wherewithal to enter into the proposed transaction to the satisfaction of the Debtors; and (iii) with respect to any Selected Contract, provide adequate assurance of future performance (which the Qualified Bidder agrees may be disseminated to the applicable non-Debtor counterparty ("Contract Counterparty") to such Selected Contract if such Qualified Bidder's Bid is determined to be a Qualified Bid).

b. **Qualified Bids**: No Bid will be a Qualified Bid unless it is made by a Qualified Bidder.

c. **Bids for Individual or Combinations of Assets**: A Qualified Bid must detail which of the Assets available for sale the Qualified Bidder proposes to purchase. The Bidding Procedures contemplate that a single bidder or group of bidders may purchase one Asset or a combination of the Assets that the Debtors designate as available for sale. If a bidder or group of bidders submits an offer for a combination of Assets, such bidder or group of bidders must indicate (i) if it would be willing to purchase any of such Assets if not sold as a group and, if so, (ii) a schedule indicating the Bid as to any individual or sub-group of Assets that such bidder would purchase. The Debtors reserve the right to determine (in consultation with the Consultation Parties) whether to auction any Assets as part of a group or individually up through and including at an Auction, or to conduct an Auction of any Assets both individually and as part of a group in order to determine which option maximizes the value of the Assets.

d. **Committed Financing**: A Qualified Bid must contain documentation acceptable to the Debtors (in the Debtors' reasonable business judgment and in consultation with the Consultation Parties) evidencing that the Qualified Bidder has the financial resources or committed financing sufficient to close the transaction within 21 days after an Auction.

e. **Deposit:** Contemporaneous with the submission of a Qualified Bid, a Qualified Bidder shall tender an earnest money deposit of 10.0% of the proposed purchase price or such other amount as agreed upon in writing by the Debtors.

f. **Markup of the Purchase Agreement**: Each Qualified Bid must include executed transaction documents, including a draft purchase agreement, the form of which will be provided to any potential bidder prior to the Bid Deadline, as well as a "redline" to the form agreement. The draft purchase agreement may not deviate substantially from the terms of the form agreement.

g. **Due Diligence**: Any Qualified Bidder may request diligence from the Debtors, and the Debtors may grant or deny any such request that they deem to be unreasonable in consultation with the Consultation Parties. The Debtors may require such Qualified Bidder to execute a non-disclosure agreement, in form and substance satisfactory to the Debtors in consultation with the Consultation Parties, prior to providing diligence to such Qualified Bidder.

h. **No Contingencies**: A Qualified Bid must contain no contingencies to the validity, effectiveness, and/or binding nature of the Bid, including without limitation, contingencies for due diligence and inspection or financing of any kind.

i. **Irrevocability**: A Qualified Bid, if determined to be the Successful Bid (as defined herein) or Backup Bid, will be irrevocable for a period of 30 days after the conclusion of an Auction.

j. **As-Is, Where-Is**: All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer each Asset to the Qualified Bidder with the highest and/or best Qualified Bid in the Debtors' determination, subject to Court approval (such Qualified Bid, the "Successful Bid" and, such Qualified Bidder, the "Successful Bidder") and the Successful Bidder shall accept the Asset "AS IS, WHERE IS, WITH ALL FAULTS."

k. **Initial Overbid**: Any Qualified Bidder may submit successive Bids in minimum increments, which will be determined by the Debtors in their discretion (in consultation with the Consultation Parties) at each Auction. The minimum increments may be different with respect to each Asset or group of Assets being auctioned.

l. **Closing**: The closing of the sale of the Assets will occur no later than the Sale Closing Deadline (as defined herein) listed in the Auction and Hearing Notice (as defined herein) or such other date as may be agreed upon by the Debtors.

m. **Stalking Horse Bid Protections**: The Debtors will be authorized, but not obligated, in their business judgment and in consultation with the Consultation Parties and subject to the consent (not to be unreasonably withheld) of the Directing Cash Collateral Agent, to (i) select no more than one Qualified Bidder to act as Stalking Horse Bidder in connection with an Auction of each Asset or group thereof and (ii) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, provide a breakup fee (each, a "Breakup Fee") to such Stalking Horse Bidder, which fee will be in an amount not to exceed 3.0% of the proposed purchase price; *provided* that the Debtors shall file and serve a notice of the proposed Breakup Fee that provides parties in interest seven days to object to any Breakup Fee; *provided, further*, that (i) if no Objection to a proposed

Breakup Fee for a Stalking Horse Bidder is filed within such seven-day period, the Breakup Fee will be deemed approved or (ii) if an Objection to a proposed Breakup Fee is timely filed, the Debtors will work in good faith (in consultation with the Consultation Parties) to consensually resolve such Objection or seek an expedited hearing on such Objection with the Court. The Debtors may choose a Stalking Horse Bidder (in consultation with the Consultation Parties). Upon entry into a Stalking Horse Agreement, the Debtors will file and serve notice of the proposed Stalking Horse Agreement on the master service list maintained in these cases no later than two business days after execution of the Stalking Horse Agreement. The notice will include the amount of the Breakup Fee, if any, any modifications or amendments to the Bidding Procedures, a summary of the Stalking Horse Agreement, a copy of the Stalking Horse Agreement, and a copy of the relevant proposed Sale Order. The Stalking Horse Bidder will be deemed to be a Qualified Bidder and the Stalking Horse Bidder's Bid will be deemed a Qualified Bid.

14. Most importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value for the benefit of their estates. The Bidding Procedures therefore preserve the Debtors' right to modify, in consultation with the Consultation Parties, the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates and do not impair the Debtors' ability to consider all potential Bids.

**C. Notice of Sale, Auction, and Sale Hearing**

15. The Debtors propose to utilize these Bidding Procedures for future Auctions by filing on the docket and serving on the master service list and each applicable Selected Contract Counterparty (as defined herein), an auction and hearing notice, substantially in the form attached to the Order as Exhibit 2 (the "Auction and Hearing Notice"). The Auction and Hearing Notice shall include the following:

a. **Dates and Deadlines**: All relevant dates and times, including those related to when: (i) all Bids must be actually received (the "Bid Deadline"), (ii) the Debtors will file with the Court a notice indicating, if applicable, that one or more Qualified Bids have been submitted (a "Notice of Qualified Bids"), (iii) the Auction will occur, (iv) the Debtors will file with the Court a notice identifying the Successful Bidder(s) (a "Notice of Successful Bidders"), (v) a party must file and serve a written objection, if any, to the sale, transfer, proposed assumption and assignment (including the Debtors'

proposed related cure amounts), or the Successful Bidder's proposed form of adequate assurance of future performance (each, an "Objection" and, the latest time a party may properly submit an Objection, as will be set forth in the Auction and Hearing Notice, the "Objection Deadline"), (vi) the applicable Sale Hearing will occur, and (vii) the Debtors and the Successful Bidder must consummate the transfer or sale under the terms of the applicable Purchase Agreement (the "Sale Closing Deadline").

b. **Asset Description**: The list of Assets proposed to be sold at the Auction; *provided, however*, that the Debtors reserve the right to amend or rescind the list of Assets to be sold at any Auction at any time.

c. **Documents Available**: The Auction and Hearing Notice will indicate that copies of the Order and any future sale documents, if applicable, can be obtained on the website of the Debtors' claims and noticing agent, Kroll Restructuring Administration LLC, https://cases.ra.kroll.com/PCHI2024/ (the "Case Website").

d. **Stalking Horse Bidder Selection**: The Auction and Hearing Notice will note that the Debtors are permitted to select a Stalking Horse Bidder.

16. Parties will have the right to object to a proposed Auction (or related dates) with a written objection (such objection that meets the requirements herein, an "Auction Objection"). An Auction Objection, if any, must be (i) filed with the Court and (ii) served on the Objection Notice Parties (as defined herein) so as to actually be received by no later than 5:00 p.m. (prevailing Central Time) ten days after the Debtors file the Auction and Hearing Notice (the "Auction Objection Deadline"). If no Auction Objections are filed and served as set forth herein, an Auction (and related dates) will be deemed authorized and approved without any further order of the Court and the Debtors will be authorized to proceed with such Auction and all applicable related dates. If the Debtors receive any Auction Objections that the parties cannot consensually resolve, the Debtors will set a hearing with the Court to approve such Auction as soon as reasonably practicable; *provided* that the Debtors may continue to conduct such Auction, subject to the Court's later approval.

17. If, following the Auction Objection Deadline, there are any changes to the dates included in the Auction and Hearing Notice, as soon as reasonably practicable following the Auction Objection Deadline, the Debtors will file and serve on the Objection Notice Parties and, to the extent applicable, each applicable Selected Contract Counterparty (and its known counsel) an amended Auction and Hearing Notice.

18. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21-days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any Objections to the relief requested. The Debtors will file any Auction and Hearing Notice at least 21 days prior to the proposed Sale Hearing. The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets. Accordingly, the Debtors request that such notice be deemed sufficient and proper notice of the sales with respect to known interested parties.

19. As soon as reasonably practicable after the conclusion of an Auction, the Debtors will file on the docket and serve on the Objection Notice Parties and any applicable Selected Contract Counterparties a Notice of Successful Bidders, substantially in the form attached to the Order as Exhibit 3, identifying the Successful Bidder(s), identifying the Asset(s), key terms of the agreement, the Backup Bidder(s), and the Assumption and Assignment Information (as defined below).

**D. Assumption and Assignment Procedures**

20. The Debtors propose the following procedures for notifying each Selected Contract Counterparty of proposed cure amounts in connection with the assumption and assignment of any Selected Contract:

a. **Assumption and Assignment Information**: The Notice of Successful Bidders shall set forth, among other things: (i) each Selected Contract to be assumed and assigned; (ii) the names and addresses of the Selected Contract Counterparties; (iii) the identity of the assignee of the Selected Contract (the "Assignee"); (iv) the proposed effective date of the proposed assumption and assignment for each such Selected Contract (the "Assignment Date"); (v) the proposed Cure Costs for each such Selected Contract (if any); and (vi) the deadlines and procedures for filing an Objection, if any, to the proposed assumption and assignment for such Selected Contract (collectively, the "Assumption and Assignment Information").

b. **Notice of Successful Bidders**: The Debtors will cause the Notice of Successful Bidders to be served (a) by email or overnight mail upon the Selected Contract Counterparties listed on the Notice of Successful Bidders (and their counsel, if known, by email) at the address set forth in the notice provision of the applicable Selected Contract and (b) by email or first class mail upon the Objection Notice Parties. The Debtors will provide by email or overnight delivery to the applicable Selected Contract Counterparty (and their counsel, if known, by email), within 24 hours of the Auction, evidence that the Assignee has the ability to comply with the requirements of adequate assurance of future performance required under sections 365(b)(1) or 365(b)(3) of the Bankruptcy Code, as applicable, including audited and unaudited financial statements, tax returns, bank account statements, and a description of the proposed business to be conducted at the premises and/or any other documentation that the Debtors further request (the "Adequate Assurance Package"),[8] on a confidential basis.

c. **Notice of Objection**: Parties objecting to the proposed assumption and assignment of a Selected Contract, a Successful Bidder's proposed form of adequate assurance of future performance, and/or Cure Costs must file an Objection, if any, with the Court by the applicable Objection Deadline and serve such Objection on the Objection Notice Parties.

d. **No Objection**: If no Objection to the proposed assumption and assignment of any Selected Contract is timely filed, each Selected Contract shall be assumed as of the Assignment Date set forth in the applicable Notice of Successful Bidders or such other date as the Debtors, Assignee, and the

[8] The Adequate Assurance Package may (but is not required to) include (a) the proposed assignee's and any guarantor's business plans for the current and subsequent year, including sales and cash flow projections; (b) any financial projections, calculations, and/or financing pro formas prepared in contemplation of purchasing each Asset; (c) audited or, if unavailable, non-audited financial statements and any supplemental schedules for the calendar years ending 2022 and 2023 for the Bidder and any proposed guarantor; (d) any documents regarding the proposed assignee's and any guarantor's experience in operating retail stores; (e) the number of retail stores the proposed assignee and any guarantor operates and the trade names used; and (f) any additional evidence of the proposed assignee's financial wherewithal, including available cash and any debt or equity commitments or other forms of liquidity post-closing.

applicable Selected Contract Counterparties agree, and the Cure Cost shall be binding, as applicable, on the Debtors, Assignee, and the Selected Contract Counterparties and no amount in excess thereof shall be paid for cure purposes; *provided*, *however* that the Assignment Date for a Selected Contract shall not occur earlier than the date the Debtors filed and served the applicable Notice of Successful Bidders.

e. **Failure to Object**: If the Selected Contract Counterparty does not file and serve an Objection in a manner that is consistent with the requirements set forth herein, and, absent a subsequent order of the Court in connection with such Objection establishing an alternative Cure Cost or an agreement between the Debtors and the Selected Contract Counterparty resolving such Objection, (a) the Cure Costs, if any, set forth in the Notice of Successful Bidders shall be controlling, notwithstanding anything to the contrary in any Selected Contract or any other document, and (b) the Selected Contract Counterparty will be deemed to have consented to the assumption and assignment of the Selected Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Selected Contract against the Debtors, the Successful Bidder, and the Assignee or the property of any of them.

f. **Schedule of Assumed and Acquired Contracts**: The inclusion of a Selected Contract on the Notice of Successful Bidders will not: (a) obligate the Debtors to assume and assign any Selected Contract listed thereon or the Successful Bidder to take assignment of such Selected Contract; or (b) constitute any admission or agreement of the Debtors that such Selected Contract is an executory contract. Only those Selected Contracts that are included on a schedule of assumed and acquired contracts attached to a final Purchase Agreement with a Successful Bidder (including amendments or modifications to such schedules in accordance with such Purchase Agreement) will be assumed and assigned to the applicable Successful Bidder. No Selected Contract shall be assumed absent closing on the assignment thereof to the applicable Successful Bidder.

g. **Assignment of Contracts**: With regard to Contracts to be assigned, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the assignment of any Lease shall (a) be free and clear of (i) all Interests (as defined herein) and any Interests shall attach to the proceeds in the same order and priority, as applicable, and subject to all existing defenses, claims, setoffs, and rights and (ii) any and all claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guarantees of or by the Debtors, debts, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, claims and encumbrances (A) that purport to give to any party a right or option to effect any forfeiture, modification, or termination

of the interest of any Debtor or Assignee, as the case may be, in the Selected Contract(s) (but only in connection with the assignment by the Debtor to the Assignee)), *provided* that, in the case of an assignment of a Lease, any such assignment shall not be free and clear of any accrued but unbilled or not due rent and charges under such Lease, including adjustments, reconciliations, and indemnity obligations, liability for which shall be assumed or assumed and assigned by the Debtors or the applicable Assignee, as agreed by and among the Debtors and the applicable Assignee or (B) in respect of any taxes, and (b) constitute a legal, valid, and effective transfer of such Selected Contract(s) and vest the applicable Assignee with all rights, titles, and interests to the Selected Contract (s). For the avoidance of doubt, all provisions of the applicable Selected Contract, including any provision limiting assignment shall be binding on the applicable Assignee.

h. **Notice of Objection**: Parties objecting to approval of the proposed sales (including a Successful Bidder's proposed form of adequate assurance of future performance and/or Cure Costs (as defined below)) must file an Objection so that such Objection is filed with the Court by the date listed in the Auction and Hearing Notice and serve such Objection on the following parties (collectively, the "Objection Notice Parties"): (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019; (b) Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002; (c) the Office of the United States Trustee for the Southern District of Texas; (d) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases; (e) the Lender Notice Parties (as defined herein); and (f) the applicable Successful Bidder(s) and Backup Bidder(s), if known.

## Basis for Relief

### I. The De Minimis Asset Sale Procedures and Bidding Procedures are Fair, Designed to Maximize the Value Received for the De Minimis Assets and the Assets, Respectively, and Represent an Exercise of the Debtors' Reasonable Business Judgment

21. Courts in the Fifth Circuit have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in disposing of an estate's assets.[9] The paramount goal in any proposed disposition of property of the estate is to maximize

[9] *See, e.g., In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.")

the proceeds received by the estate.[10] To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.[11]

22. As the Debtors work to identify monetizable assets that will not be subject to the Store Closing Sales, they may identify De Minimis Assets that are saleable at values that do not justify the additional administrative cost and expense associated with maintaining such assets or conducting a formal Auction process. The De Minimis Asset Sale Procedures will allow the Debtors to monetize such assets fairly and efficiently, with appropriate notice given to key parties in interest and without unnecessarily burdening the Debtors' estates with costs that undermine the Debtors efforts to maximize value for the benefit of all stakeholders.

23. Additionally, the Debtors believe that the Bidding Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best offer available for the Assets offered for sale. The Bidding Procedures will allow the Debtors to conduct the sales in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction. In particular, the Bidding Procedures contemplate an open auction process with minimal barriers to entry and provide potential Auction parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed Bid.

---

[10] *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

[11] *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

24. At the same time, the Bidding Procedures provide the Debtors with a robust, final opportunity to consider competing Qualified Bids and select the highest or otherwise best offer related to the sales, while preserving the Debtors' right to not sell any particular Asset at an amount below its market. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable in light of the circumstances and at or above market value.

25. The Debtors submit that the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this Court.

26. Accordingly, for all of the foregoing reasons, the Bidding Procedures (a) will encourage robust bidding for the Assets, (b) are consistent with other procedures previously approved by bankruptcy courts, and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and should be approved.

## II. The Breakup Fees Have a Sound Business Purpose and Should Be Approved

27. The Debtors are also seeking authority, but not direction, to offer customary bid protections in the form of Breakup Fees. The use of a stalking horse in a public auction process for dispositions pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, and the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."[12] As a result, stalking horse bidders often require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the

[12] *Official Comm. of Unsecured Creditors* v. *Interforum Holding LLC*, 2011 WL 2671254, at *1 (E.D. Wis. July 7, 2011); *see also In re Tama Beef Packing, Inc.*, 321 B.R. 496, 497–98 (B.A.P. 8th Cir. 2005).

floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."[13] Thus, the use of bid protections has become an established practice in chapter 11 cases. Indeed, break-up fees and other forms of bid protections are a normal and, in many cases, necessary, component of dispositions conducted under section 363 of the Bankruptcy Code.[14] Specifically, bid protections may be necessary to convince a white knight bidder to enter the bidding process by providing some form of compensation for the risks that it is undertaking.[15]

28. Courts in the Fifth Circuit analyze the appropriateness of bidding incentives under the "business judgment rule" standard, and the law is well established in this district that courts consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price.[16] Courts routinely approve bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.[17]

29. The Debtors believe that the ability to offer Breakup Fees in their reasonable business judgment is in the best interests of the Debtors' estates, as any Stalking Horse Bidder will

---

13 *Interforum Holding*, 2011 WL 2671254, at *1 (citations omitted).

14 *See In re Integrated Res., Inc.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] dut[y] to maximize value.").

15 *Id.* at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

16 *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule); *In re Integrated Res., Inc.*, 147 B.R. at 657-58 (explaining that to evaluate bid protections, courts should employ the business judgment rule).

17 *See In re Wintz Cos.*, 230 B.R. 840, 847 (B.A.P. 8th Cir. 1999) (holding that bid protections benefitted the estate rather than chilled bidding).

establish a floor for further bidding that may increase the consideration for the Assets. At this time, the Debtors are not requesting authority to pay any Breakup Fee, expense reimbursement, or work fees. Rather, the Debtors are requesting the authority to offer a Breakup Fee and seeking approval of the related notice procedures that will allow the Debtors to grant such protection in their business judgment. If, following notice, a party objects to the proposed Breakup Fee, the Debtors will work to consensually resolve such objection or otherwise bring the matter before the Court for an expedited resolution.

30. If the Breakup Fees are paid following the Debtors' compliance with these procedures, it will likely be because the Debtors received higher or otherwise superior Qualified Bids for an Asset or group thereof. In short, the proposed Breakup Fees are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price"[18] and are "reasonably related to the risk, effort, and expenses of the prospective purchaser."[19] Accordingly, the Debtors should be granted the authority, but not direction, to provide Breakup Fees.

## III. The Sales Should Be Approved as an Exercise of Sound Business Judgment

31. Section 363(b)(1) of the Bankruptcy Code authorizes a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."[20] To approve a use, sale, or lease of property other than in the ordinary course of business, the court must find some "sound business purpose" that satisfies the business judgment test.[21] Courts generally show great deference to a debtor's decisions when

---

[18] *In re Hupp Indus., Inc.*, 140 B.R. at 194.

[19] *In re Integrated Res., Inc.*, 147 B.R. at 662 (S.D.N.Y. 1992).

[20] 11 U.S.C. § 363(b)(1).

[21] *In re Glover*, 2010 WL 5239918, at *3 (Bankr. E.D. Va. Mar. 31, 2010) ("Debtors have been permitted to conduct pre-confirmation sales of their assets provided that a 'sound business purpose' exists for the sale."). *See also*

applying the business judgment standard.[22] Deference to a debtor's business judgment is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice."[23]

32. Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."[24]

**A. A Sound Business Purpose Exists for the Sales**

33. As set forth above, the Debtors have a sound business justification for the sales. *First*, the Debtors believe the sales will maximize the value of the Assets through a competitive marketing and Auction process. Moreover, given the trajectory of these cases, it is essential that the Debtors begin actively marketing their Assets as soon as possible. The sales will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the Successful Bid, after being subject to a further "market check" in the form of an Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any

---

*Lubrizol Enters., Inc.* v. *Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985) (The question for "the bankruptcy court is whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment.").

22 *See In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1).").

23 *Lubrizol Enters., Inc.* v. *Richmond Metal Finishers, Inc.*, 756 F.2d at 1047.

24 *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Integrated Res., Inc.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

known or practicably available alternative.[25] Further, the Debtors are reserving their rights to not enter into a sale if the Debtors believe in their reasonable business judgment that entry into any such sale will not maximize the value of the Assets being considered.

34. Thus, the Debtors submit that any Successful Bid, which may include a Stalking Horse Agreement, will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Assets through an Auction and to enter into a Stalking Horse Agreement will be a valid and sound exercise of the Debtors' business judgment. Therefore, the Debtors request that the Court find that the proposed sale(s) are a proper exercise of the Debtors' business judgment and are rightly authorized.

**B. The Debtors Will Provide Adequate and Reasonable Notice of the Sales**

35. As described above, the Auction and Hearing Notice: (a) will be served in a manner that provides adequate notice of the date, time, and location of the Sale Hearing; (b) informs parties-in-interest of the deadlines for objecting to the sales of Assets; and (c) otherwise includes all information relevant to parties interested in or affected by the sale(s). Significantly, the form and manner of the Auction and Hearing Notice will have been approved by the Court pursuant to the Order after notice and a hearing before it is served on parties-in-interest.

**C. The Sales and Purchase Prices Will Reflect a Fair Market Value Sale**

36. It is well settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value

25 *See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

is exposure to the market.[26] The process proposed here will allow the market to set a value for any sale(s).

**D. The Sales Are Proposed in Good Faith and Without Collusion, and Any Successful Bidder Will Be a Good-Faith Purchaser**

37. The Debtors request that the Court find that the Successful Bidder will be entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale(s).

38. Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.[27]

Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.[28] The Debtors submit that the Successful Bidder will be deemed a "good faith

[26] *See Bank of Am. Nat'l Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 436 (1999) (explaining that the "best way to determine value is exposure to a market"); *see also In re Wintz Cos.*, 219 F.3d 807, 813 (8th Cir. 2000) (holding that an auction procedure for the disposition of the debtor's property can be structured to "maximize the value of estate property").

[27] 11 U.S.C. § 363(m).

[28] *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Paulson*, 276 F.3d 389, 392 (8th Cir. 2002).

purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and any Stalking Horse Agreement, or any marked versions thereof, is a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[29]

39. *First*, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the sales will be substantial, fair, and reasonable. *Second*, any Purchase Agreement with a Successful Bidder will be the culmination of a competitive auction process in which the parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, there will be no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the sales to be avoided under section 363(n) of the Bankruptcy Code.[30] And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Fourth, any Successful Bidder's offer will have been evaluated and approved by the Debtors. Accordingly, the Debtors believe that the Successful Bidder and Stalking Horse Agreement (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

**E. The Sales Should Be Approved "Free and Clear" Under Section 363(f)**

40. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such

---

[29] The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code is appropriate for the Successful Bidder. Pursuant to the Bidding Procedures, the Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

[30] *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147.

a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.[31]

41. Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Debtors' Assets free and clear of Encumbrances, except with respect to any interests related to reciprocal easement agreements or that may be assumed liabilities under a Successful Bidder's assumption and assignment agreement (the "Interests").[32]

42. The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having any such Interest attach to the net proceeds of the sales, as applicable, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the Assets free and clear of all Interests to the fullest extent permitted by the Bankruptcy Code and applicable nonbankruptcy law, with any such Interests to attach to the proceeds of the sales; *provided* that any payment on account of such Interests are subject to further order of this Court.[33]

---

[31] *See* 11 U.S.C. § 363(f).

[32] *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

[33] The Debtors do not seek authority to sell any non-Debtor property free and clear pursuant to section 363(f) of the Bankruptcy Code, but rather will assign such interests consistent with their underlying property documents.

## IV. The Form and Manner of the Auction and Hearing Notice Should Be Approved

43. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any Objections to the relief requested herein.

44. As noted above, if, following the Auction Objection Deadline, there are any changes to the dates included in the Auction and Hearing Notice, as soon as reasonably practicable following the Auction Objection Deadline, the Debtors will file and serve on the Objection Notice Parties and, if applicable, each relevant Selected Contract Counterparty (and its known counsel) an amended Auction and Hearing Notice. The Auction and Hearing Notice will indicate that copies of the Order and any future sale documents, if applicable, can be obtained on the Case Website.

45. The Debtors submit that notice of this motion and the related hearing to consider entry of the Order, coupled with service of the Auction and Hearing Notice and the Assumption and Assignment Procedures, constitute good and adequate notice of the sales and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that the Court approve the form and manner of the Auction and Hearing Notice.

## V. The Assumption and Assignment Procedures Are Appropriate and Should Be Approved

46. As set forth above, the sales may contemplate the assumption and assignment of the Selected Contracts to the Successful Bidder. In connection with this process, the Debtors believe it is necessary to establish a process by which: (a) the Debtors and Selected Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the

Bankruptcy Code; and (b) such Selected Contract Counterparties can object to the assumption and assignment of the Selected Contracts and/or the Debtors' proposed related cure amounts.

47. As set forth in the Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Selected Contract be deemed to consent to the assumption and assignment of the applicable Selected Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the applicable sale order, along with the Cure Costs identified in the Notice of Successful Bidders.[34]

48. The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to the Selected Contract Counterparties, and provide certainty to all parties-in-interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption and Assignment Procedures set forth in the Order.

## VI. The Assumption and Assignment of the Selected Contracts Should Be Approved

### A. The Assumption and Assignment of the Selected Contracts Reflects the Debtors' Reasonable Business Judgment

49. To facilitate and effectuate the sales, the Debtors are seeking authority to assign or transfer the Selected Contracts to the Successful Bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign a Contract, subject to the approval of the court, provided that the defaults under such Contract are cured and adequate assurance of future performance is provided. The Debtors' decision to assume and assign a Contract must only satisfy

---

[34] *See, e.g.*, *Matter of Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *In re Gabel*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.[35]

50. Here, the Court should approve the decision to assume and assign the Selected Contracts in connection with the sales as a sound exercise of the Debtors' business judgment. *First*, the Selected Contracts are essential to inducing the best offer for some or all of the Assets. *Second*, the Selected Contracts will be assumed and assigned through the process approved by the Court pursuant to the Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

51. Accordingly, the Debtors submit that the assumption and assignment of the Selected Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**B. Assumption and Assignment of the Selected Contracts Satisfies the Requirements of the Bankruptcy Code**

52. Upon finding that a debtor has exercised its business judgment in determining that assuming a Contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the

[35] *See, e.g.*, *Grp. of Institutional Invs.* v. *Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp.* v. *Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "'breathing space' afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code.") (citations omitted).

performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."[36]

**C. Defaults Under the Selected Contracts Will Be Cured in Connection with the Sales**

53. The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Assumption and Assignment Procedures require the cure of all defaults associated with, or that are required to properly assume, the Selected Contracts. Because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

**D. Non-Debtor Parties Will Be Adequately Assured of Future Performance**

54. Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. The phrase "adequate assurance of future performance" is "to be given [a] practical, pragmatic construction," based upon the facts and circumstances of each case.[37] Although no single solution will satisfy every case, "the degree of assurance necessary falls considerably short of an absolute guaranty."[38] Among other things, adequate assurance may be given by demonstrating the Assignee's financial health and experience in managing the type of enterprise or property assigned.[39]

---

36 *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

37 *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982); *see In re Alipat, Inc.*, 36 B.R. 274, 277 (Bankr. E.D. Mo. 1984).

38 *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

39 *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

55. The Debtors submit that the information required for any bidder to become a Qualified Bidder satisfies any adequate assurance inquiry. Further, the Bidding Procedures provide that the Debtors may disseminate certain information of a Qualified Bidder to affected landlords to satisfy the requirement of providing adequate assurance of future performance.

**Reservation of Rights**

56. Nothing contained herein is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, assign, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Emergency Consideration**

57. Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of the chapter 11 cases "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors' ability to begin marketing and selling their assets immediately is critical to their goal of maximizing the value of such assets for the benefit of their estates and stakeholders. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

**Notice**

58. The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the ABL Agent and counsel thereto; (d) counsel to the Ad Hoc Noteholder Group; (e) the Second Lien Notes Trustee and counsel thereto; (the parties in clauses (c) through (e) hereof, collectively, the "Lender Notice Parties"); (f) the United States Attorney's Office for the Southern District of Texas, Houston Division; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; (j) other regulatory agencies having a regulatory or statutory interest in these cases; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Reminder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter an Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

December 22, 2024

Respectfully submitted,

By: */s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
Aaron J. Power (TX Bar No. 24058058)
M. Shane Johnson (TX Bar No. 24083263)
Jordan T. Stevens (TX Bar No. 24106467)
Grecia V. Sarda (TX Bar No. 24132092)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
apower@porterhedges.com
sjohnson@porterhedges.com
jstevens@porterhedges.com
gsarda@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kenneth S. Ziman (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Stephanie P. Lascano (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
kziman@paulweiss.com
chopkins@paulweiss.com
slascano@paulweiss.com

*Proposed Counsel to the Debtors*
*and the Debtors in Possession*

**Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief. This statement is made pursuant to Local Rule 9013-1(i).

*/s/ Deborah Rieger-Paganis*
Deborah Rieger-Paganis

**Certificate of Service**

I certify that on December 22, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins