## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| PARTY CITY HOLDCO INC., *et al.*[1], | Case No. 24-90621 (ARP) |
| Debtors. | Jointly Administered |

**LIMITED OBJECTION OF 209-261 JUNCTION ROAD MADISON INVESTORS LLC, 14700 BALTIMORE AVENUE INVESTORS LLC, ABJ GROUP ADVANCEMENT TX, LLC, ARC ASANDSC001, LLC, ARC BBLVSNV001, LLC, ARC CLORLFL001, LLC, ARC MLLOLIN001, LLC, ARC NCCHRN001, LLC, ARC SMWMBFL001, LLC, ARC SRTUKOK001, LLC, ARC TTRALNC001, LLC, ACADIA REALTY TRUST, BMA JOLIET COMMONS LLC, BRIXMOR OPERATING PARTNERSHIP LP, BRIXTON EVERETT, LLC, CR WEST ASHLEY, LLC, CAPITAL MALL LP, COURTYARD E ASSOCIATES, LLC, DFG-CHATTANOOGA, LLC, DANADA SQUARE WEST SHOPPING CENTER, LLC, DEUTSCHE ASSET & WEALTH MANAGEMENT, EDENS, FBG HARRIMAN UPPER RETAIL LLC, FR WESTGATE MALL, LLC, FRIT FLORIDA, LLC, GG REIF I COOL SPRINGS LLC, HVTC, LLC, K-GAM BROADWAY CRAYCROFT LLC, LA ENTRADA ASSOCIATES,  SPG DORAL RETAIL PARTNERS, LLC, SVAP III RIVERDALE COMMONS, LLC, SAVANNAH SQUARE ASSOCIATES, LTD., SHAPELL PROPERTIES, SUNSET HILLS JV LLC/SUNSET HILLS OWNER LLC, THE IRVINE COMPANY LLC, URBAN EDGE PROPERTIES L.P., AND WEITZMAN TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE (A) CASH COLLATERAL AND (B) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

209-261 Junction Road Madison Investors LLC, 14700 Baltimore Avenue Investors LLC,

ABJ Group Advancement TX, LLC, ARC ASANDSC001, LLC, ARC BBLVSNV001, LLC, ARC

CLORLFL001,  LLC,  ARC  MLLOLIN001,  LLC,  ARC  NCCHRN001,  LLC,  ARC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Inc. (1359); Am-Source, LLC (8427); Party City Corporation (3692); Party City Holdings Inc. (3029); PC Intermediate Holdings, Inc. (1229); and Trisar, Inc. (0659). The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

SMWMBFL001, LLC, ARC SRTUKOK001, LLC, ARC TTRALNC001, LLC, Acadia Realty

Trust, BMA Joliet Commons LLC, Brixmor Operating Partnership LP, Brixton Everett, LLC, CR

West Ashley, LLC, Capital Mall LP, Courtyard E Associates, LLC, DFG-Chattanooga, LLC,

Danada Square West Shopping Center, LLC, Deutsche Asset & Wealth Management, EDENS,

FBG Harriman Upper Retail LLC, FR Westgate Mall, LLC, FRIT Florida, LLC, GG REIF I Cool

Springs LLC, HVTC, LLC, K-GAM Broadway Craycroft LLC, La Entrada Associates, SPG Doral

Retail Partners, LLC, SVAP III Riverdale Commons, LLC, Savannah Square Associates, Ltd.,

Shapell Properties, Sunset Hills JV LLC/Sunset Hills Owner LLC, The Irvine Company LLC,

Urban Edge Properties L.P., and Weitzman (collectively, the "Landlords"), by and through their

undersigned counsel, hereby file this limited objection (the "Limited Objection") to *Debtors'*

*Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use*

*(A) Cash Collateral and (B) Grant Liens and Provide Superpriority Administrative Expense*

*Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying*

*the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash

Collateral Motion") [Docket No. 44],[2] and respectfully represent as follows:

## I.     PRELIMINARY STATEMENT

1.     These cases were commenced, in the midst of the holiday season, for the

stated purpose of maximizing value of full chain liquidation sales in store during that crucial

holiday sales period.  As stated by the Debtors' first day declarant, "certain of the Debtors' secured

Prepetition Lenders considered it essential to commence store closing sales before the Christmas

and New Year's selling season to maximize the proceeds of such sales for the benefit of all

stakeholders."  [Docket No. 45 at ¶ 42].  Clearly this post-petition administrative occupancy

Landlords provided the Debtors and their Prepetition Lenders (as defined below) was critical to

---

[2]  Terms not otherwise defined herein shall have the meanings ascribed to them in the Cash Collateral Motion and accompanying documents.

these cases.  So how do the Debtors propose to provide for it?  By delaying the payment of any rent for this crucial period until mid-April—6 weeks after the conclusion of most of the store closing sales in this full chain liquidation case and nearly 4 months after this critical occupancy was provided to these estates—and not until 8 weeks after the lenders with respect to the ABL Revolving Loans, the FILO Loans, and any other obligations (the "Prepetition Lenders") are paid off in full, of course.  And once the Prepetition Lenders are paid in full, the 2L Lenders will step in and will they even be bound by any budget approved by the Prepetition Lenders before they were released from their restrictions under the Intercreditor Agreement?  This provides yet another layer of doubt and uncertainty to any "budgeted" payments beyond the payoff of the Prepetition Lenders here.

2. Despite providing no new money in these cases, the Prepetition Lenders (through the Debtors) are seeking an unequivocal waiver of the Debtors' 506(c) surcharge rights today—the statutory mechanism specifically designed to avoid foisting the risk and costs of liquidation of a secured lenders' collateral onto unsecured creditors, such as landlords—while simultaneously delaying and conditioning payment of administrative stub rent for services provided at the most crucial time of the Debtors' cases.

3. Too many times Landlords have seen cases where the Debtors and their professionals believed the budget would hold and there would be sufficient funding to pay all administrative claims, even those pushed off to the end of the budget (or beyond), only to find out within weeks that the budget was illusory and the cases administratively insolvent.  Landlords should not be forced to shoulder this risk, as involuntary participants in these cases, who have arguably already provided more financing to these cases than the Prepetition Lenders through the Debtors' non-payment of nearly all December rent of up to $18 million.

4. Landlords are entitled to, and require, adequate protection of their interests in these cases, and the Court should not to enter any final cash collateral order that fails to provide such protection.

3

## II.     BACKGROUND FACTS

5.      Party City Holdco Inc. and certain of its debtor affiliates (collectively, the "Debtors"), filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code on December 21, 2024 (the "Petition Date").  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.[3]

6.      The Debtors lease retail space (the "Premises") from the Landlords pursuant to unexpired leases of nonresidential real property (individually, a "Lease," and collectively, the "Leases") at the locations (the "Centers") set forth on the attached Schedule A.

7.      Each Lease is a lease "of real property in a shopping center" as that term is used in Section 365(b)(3).  See In re Joshua Slocum, Ltd., 922 F.2d 1081, 1086-87 (3d Cir. 1990).

8.      On December 22, 2024, the Debtors filed the Cash Collateral Motion seeking inter alia, an interim order allowing use of cash collateral, adequate protection, including a waiver of any of the Debtors' surcharge rights under section 506(c) of the Bankruptcy Code with respect to the Prepetition Lenders upon entry of a final order (the "506(c) Waiver").

9.      On the same day, the Debtors also filed a motion for entry of interim and final orders authorizing store closing sales and approving related procedures [Docket No. 43], (the "Store Closing Motion") to authorize the Debtors to engage Gordon Brothers Retail Partners, LLC and Gordon Brothers Commercial & Industrial, LLC to immediately commence store closing sales (the "Closing Sales") of all of the Debtors' locations, including its 692 stores.  The Store Closing Motion was approved by the Court on an interim basis on December 23, 2024 [Docket No. 66] (the "Closing Sale Order").

10.     In their First Day Declaration [Docket No. 45], the Debtors' asserted, "the Store Closing Procedures provide the best and most efficient means of selling the Store Closing Assets to maximize the value of the Debtors' estates for all stakeholders. Specifically, the

---

[3]  Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

4

Consultant's services will ensure that the liquidation process is seamless and therefore maximizes the value of the salable inventory at the Closing Stores[.]" See First Day Declaration, ¶ 50.

11.     On December 23, 2024, the Court entered an order approving the Cash Collateral Motion on an interim basis [Docket No. 65] (the "Interim Order"). The Interim Order excludes the Leases from the Collateral, limiting such collateral to only the proceeds of the disposition of the Leases ("Lease Proceeds"). See Interim Order, ¶ 5(a). Additionally, the Interim Order limits the lenders' access to the Premises in the event of a default under the Intercreditor Agreements by requiring the Prepetition Lenders to seek relief from the automatic stay before enforcing such rights ("Access Limitation"). Finally, the Interim Order preserves the respective rights of Debtors, lenders', and Landlords with respect to any insurance proceeds arising from loss or damage to Landlords' property ("Insurance Limitation"). See Interim Order, ¶ 5(a) (the Lease Proceeds, Access Limitation, and Insurance Limitation provisions, together with any other modifications to the Interim Order made at the request of Landlords, the "Landlord Protections"). The Interim Order includes a consolidated, summary 13-week budget, extending only through the week ending March 22, 2025 (the "Budget").

12.     However, despite the Debtors' ongoing use and occupancy of the Premises to conduct their business, including outside of the ordinary course of business through conduct of the Closing Sales at all locations, the Debtors have failed to pay post-petition rent for the period December 21, 2024 to December 31, 2024 (the "Stub Rent") to any of the Landlords for the use and occupancy of the Premises. The Budget consolidates all of the Debtors' expenses into a single "Total Operating Disbursements" line item. As a result, it is also unclear whether the Budget provides sufficient funds for the payment of all other additional post-petition rental obligations that may become due under the Leases pursuant to Section 365(d)(3) of the Bankruptcy Code through the rejection of such Leases (together with the Stub Rent, the "Post-Petition Rent"), including, but not limited to, January and February rent at all remaining locations, and for any bi-annual real estate taxes or annual reconciliations to be paid by the tenant, and other like charges

that may arise outside of the monthly recurring rental obligations that may not have been budgeted.[4]

13.    Landlords inquired as to whether Stub Rent was provided for anywhere in the Budget and were informed by Debtors' counsel that their current proposal is to pay Stub Rent in mid-April, two months after the Prepetition Lenders are paid despite contemplating that the liquidation sales will be concluded largely by the end of February.  Mid-April is six weeks after the conclusion of many store closing sales at the end of February, and three weeks after the conclusion of the last of the liquidation sales on Landlords' Premises, placing all risks of underperforming Closing Sales (or a post-liquidation sale conversion to Chapter 7) squarely on Landlords.

14.    A proposed final order approving the Cash Collateral Motion (the "Proposed Final Cash Collateral Order") has not been filed, but an early draft was provided to counsel for the Landlords, which did not contain the Landlord Protections explicitly negotiated in connection with the Interim Order.  To the extent the Proposed Final Cash Collateral Order presented to the Court excludes or materially alters to the Landlord Protections previously negotiated, Landlords reserve all rights to raise objections to any such provisions at the final hearing.

15.    Landlords further object to the approval of any 506(c) Waiver for the benefit of the Debtors' Prepetition Lenders prior to the payment, budgeting, or otherwise providing for adequate protection of the Debtors' ability to pay the Post-Petition Rent, including the

---

[4] While the Fifth Circuit has not yet addressed the issue, bankruptcy courts in both the Northern and Southern District of Texas have endorsed the so-called "billing date" theory with respect to accruing post-petition rent.  See, e.g., In re Imperial Beverage Group, LLC, 457 B.R. 490, 501 (Bankr. N.D. Tex. 2011); In re Appletree Markets, Inc., 139 B.R. 417, 420 (Bankr. S.D. Tex. 1992); see also In re Simbaki, Ltd., Case No. 13-36878, 2015 WL 1593888, *6 (Bankr. S.D. Tex. Apr. 6, 2015) (adopting the billing date theory).  This billing date approach applies not only to the issue of Stub Rent, but also to the payment of all obligations arising under a lease that are billed after the Petition Date, such as year-end adjustments, reconciliations, annual billings, and taxes, which are required to be timely paid pursuant to Section 365(d)(3).

administrative Stub Rent, incurred in these cases.  Debtors and their Prepetition Lenders must pay the freight of a bankruptcy in order to enjoy its benefits, sometimes known as "pay to play," and this case is no different.  In fact, in a straightforward full-chain liquidation case such as this, it is all the more clear that the Debtors' Prepetition Lenders should not obtain the benefit of a 506(c) Waiver unless and until Post-Petition Rent is paid or Landlords are provided with adequate protection of the Debtors' ability to pay the Post-Petition Rent.  The Debtors and their Prepetition Lenders are using the bankruptcy process to conduct Closing Sales outside of the ordinary course of business in all locations that are otherwise impermissible at the Premises for the sole benefit of the Debtors (and the Prepetition Lenders whose collateral is being sold at Landlords' Premises), and to the detriment of the Centers and other shopping center tenants, with no prospect of a going-concern sale of any kind.  This Court should not allow them to do so absent payment of all Post-Petition Rent and charges for such use and occupancy of the Premises.

16.     While Landlords are continuing to engage in discussions with the Debtors, the Committee, and the Prepetition Lenders regarding potential further interim or final resolutions of the numerous issues described herein, Landlord files this Objection to outline for the Court the open issues and legal support for the Landlords' positions in the event a consensual resolution is not reached.

## III.     ARGUMENT

### A.     Any Final Cash Collateral Order Must Maintain the Landlord Protections.

17.     Landlords were initially provided with a Proposed Final Cash Collateral order several weeks ago, which did not maintain all of the Landlord Protections specifically negotiated in connection with the Interim Order.

18.     Landlords do not object to the Prepetition Lenders having liens that attach to the proceeds of any disposition of the Leases consistent with the Interim Order.  However, the Bankruptcy Code does not create an independent right to grant a lien against the Leases themselves, and it does not authorize rendering lease provisions unenforceable in connection with

the Debtors' request for post-petition financing.  Any Proposed Final Cash Collateral Order should clearly provide that the Prepetition Lenders are not seeking any direct lien in the Leases.

19.     In addition to the strict prohibition in the Leases themselves against the granting of liens on, or hypothecation of, the leasehold interests, the Premises may be encumbered by their own mortgages which, upon information and belief, specifically prohibit the applicable Landlord from allowing any encumbrances to be granted upon the Leases.  Those Leases, as the mortgagee's collateral, are themselves subject to the prior mortgage liens of the Landlords' lenders.

20.     Neither the Debtors nor the Prepetition Lenders have provided any authority which would allow this Court to override the express prohibitions in the Leases against granting liens.  The simple reason is that no such authority exists.  Neither the Bankruptcy Code generally, nor 11 U.S.C. § 364 specifically, authorize Debtors to violate the Leases in connection with their post-petition financing (let alone mere use of cash collateral).  The United States Supreme Court is clear in its rulings that bankruptcy courts are to uphold nonbankruptcy rights unless a specific bankruptcy provision or policy requires differently.  Butner v. United States, 440 U.S. 48, 55 (1979).  "'Property rights are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.'" Stern v. Marshall, 131 S. Ct. 2594, 2616 (2011), quoting Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 451 (2007), quoting Butner, 440 U.S. at 55.  The burden to demonstrate that bankruptcy law overrides applicable state law falls on the party making that assertion.  See Raleigh v. Ill. Dept. of Revenue, 530 U.S. 15, 25 (2000); Butner, 440 U.S. at 55.  A lease provision that is enforceable under applicable state law is enforceable in a bankruptcy proceeding, absent a specific

bankruptcy provision or policy that requires differently.  There is no applicable bankruptcy law that overrides state law or the terms of the Leases with respect to the Debtors' request for postpetition financing, and the Prepetition Lenders do not need a direct lien on the Leases in any event.

21.     Section 364 authorizes Debtors to obtain financing.  It does not authorize Debtors to unilaterally alter lease provisions, and it does not preempt Section 365 or the rights granted to Landlords therein.  More specifically, Section 364 does not authorize Debtors, for the benefit of a non-debtor party, to render any provision of a lease unenforceable.  If Congress intended to provide such authority in connection with a request for financing, Congress would have included a provision in Section 364 that is similar to those set forth below.  Congress did not provide such language in connection with obtaining financing pursuant to Section 364.

22.     There are two statutory instances where the Bankruptcy Code potentially renders a lease provision unenforceable for bankruptcy purposes.  The first is where a provision is what is termed an "ipso facto" clause.  This is a provision that would cause a default or termination of a lease based upon the: (i) insolvency or financing condition of the debtor; (ii) commencement of a bankruptcy case; or (iii) appointment of a trustee or custodian in a bankruptcy case.  See 11 U.S.C. § 365(e)(1).  This section is not applicable to a request for post-petition financing.

23.     The second instance is where a lease provision prohibits assignment of a lease.  Section 365(f)(1) authorizes a debtor to assign an executory contact or unexpired lease (subject to compliance with Sections 365(b) and (c)), notwithstanding that such contact or lease prohibits assignment. Section 365(f)(1) applies only in the context of a motion to assume and assign a lease, and only upon compliance with the requirements of Sections 365(b) and (c).  See 11 U.S.C. § 365(f)(1).  Section 364 contains no such authorization with respect to lease provisions.

24.     Provisions that restrict the ability to encumber leases are critical to Landlords' ability to (a) control their properties, (b) preserve clear title to their Leases, (c) comply with their own financing and investment requirements, and (d) effectively market their properties. Even where a Lease may permit liens, such rights may be subordinate to Landlords' own financing. There is no authority for the Prepetition Lenders to use the Bankruptcy Code to gain rights that are not otherwise available to them under state law or the Leases.  Landlords object to any pledge, encumbrance, lien, or hypothecation of the Leases, and the Court should not approve any form of order that seeks to attach liens to the Leases or otherwise render provisions of the Leases unenforceable.

25.     Further, Section 365 mandates that Debtors "timely perform all of the obligations" under the Leases until such time that the Debtors assume or reject the Leases, and provides:

> The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

See 11 U.S.C. § 365(d)(3).  Accordingly, the Debtors must perform their obligations under the Leases and comply with the terms of the Leases, including provisions concerning encumbrances, hypothecations, mortgages, or other liens against Leases.  Moreover, the Leases may have provisions that subordinate any liens by a tenant to liens the Landlords have granted or may grant to their own lenders.

26.     Given the potential sweeping remedies granted under the Cash Collateral Motion and documents in the event Debtors' default, a grant of a security interest in the Leases, and any attendant exercise of remedies following a default, creates a de facto assignment of the Leases.  There is no authority to permit such an assignment (under the guise of pledging the Leases

as collateral), independent of the safeguards of Sections 365(b)(3) and (f)(2).[5]  Therefore, the Debtors cannot grant any lien that would give the Prepetition Lenders the ability to potentially circumvent Section 365.

27.     Any final order should limit any liens on the Leases to the proceeds of a disposition of the Leases and should not authorize any violation of the terms of the Leases consistent with the Interim Order.  Finally, nothing in the grant of any lien should compromise Landlords' rights under Section 365, and Landlords request that any final order specifically include language to that effect.

28.     Importantly, the Debtors and Prepetition Lenders have failed to even articulate a reason as to why such a lien on the Leases is even necessary or additive at all.  Granting a direct lien on the Leases is not necessary to protect the Lenders, as any disposition of the collateral is already controlled by the Bankruptcy Court.  Where leases are assumed and assigned, the Prepetition Lenders will retain a lien on the proceeds generated by such assignment, and as to the liquidation sales, the Lenders' liens again attach to the proceeds of those sales.  During either process, the Bankruptcy Court and state law remedies preserve the lenders' rights to realize upon the Debtors' assets.

29.     Landlords, not Debtors, own the Premises and Centers.  There is no need to force Landlords to accept a cloud on their title to the Leases.  The value in the Leases to Debtors and the Prepetition Lenders is the value that will be realized in a sales process.  Granting a security

---

[5] Because the Leases are shopping center leases, Debtors must comply with the heightened protections granted to shopping center landlords in connection with any such transfer of an interest in the Leases.  Therefore, section 365(b)(3) (applicable to an assignment of a lease through Section 365(f)) applies, and any assignment of the Leases require compliance with the special adequate assurance of future performance protections set forth in Sections 365(b)(3)(A) - (D).  See 11 U.S.C. § 365(b)(3).

interest in the Leases serves no economic purpose, is unnecessary, and unduly burdensome on the Landlords—especially in a short-term, full chain liquidation scenario.

30.     Further, the Landlord Protections limiting the Lenders' rights to access Landlords' owned real property in violation of the Leases must also be preserved in any Proposed Final Cash Collateral Order.  Otherwise, the relief sought in the Cash Collateral Motion, upon the occurrence of an event of default, provides the Prepetition Lenders with unfettered access and occupancy rights with respect to the Premises.  Such provisions are contrary to the Leases, and any attempt by the Prepetition Lenders to enforce their rights under the loan agreements must comply with all of the provisions of Section 365 of the Bankruptcy Code and the Leases themselves.

31.     Accordingly, any final order should limit any Lenders' access to the Premises to that provided by applicable non-bankruptcy law, by the terms of the Lease or separate agreement of Landlord and Lenders, or as otherwise ordered by this Court after the filing of a motion and appropriate opportunity for Landlord to object and be heard.

32.     Without these limitations, the granting of such rights through a cash collateral order is excessive and inappropriate, as the Debtors are otherwise bound by the terms of the Leases.  See 11 U.S.C. §§ 365(b)(3) and (d)(3).  There is no basis to exempt Prepetition Lenders from the restrictions in the Leases, or the explicit requirements of the Bankruptcy Code.

33.     Any request for authority to enter onto the Premises without proper protections in place, is also unduly prejudicial and exposes the Landlord and the Premises to unnecessary risk of loss.  The Prepetition Lenders are not parties to the Lease and have no contractual or possessory right to occupy and use Landlord's property.  Landlords provide Debtors with a right to occupy the Premises, as set forth by the terms of each of the Leases.  Debtors possess

no right to use the Premises beyond those rights granted within the Leases, and the Bankruptcy Code does not expand those rights.

34.     Finally, if the Prepetition Lenders seek to enter onto the Premises, the Prepetition Lenders must bear full financial responsibility, not only for all charges arising under the Leases going forward, but also for prior unpaid rent or other charges that arise.  To the extent the Prepetition Lenders seek authority to essentially step into the shoes of the Debtors following a default, there is no reason to allow them to exercise rights, which the Leases otherwise prohibit and "assume" the Leases for an indeterminate period of time, without being required to cure outstanding post-petition defaults.

**B.     Landlords are entitled to adequate protection for the Post-Petition Rent for the post-petition use and occupancy of the Premises as part of any Proposed Final Cash Collateral Order.**

35.     Landlords understand the Debtors' need for the use of Cash Collateral and the relief requested in the Cash Collateral Motion, provided the Landlord Protections are maintained in any further Cash Collateral order and Landlords receive adequate protection that they will receive payment of the Post-Petition Rent accrued under all Leases.  Since the bankruptcy filing, Landlords have provided and continue to provide critical benefits to the Debtors and the Prepetition Lenders by way of their continued use of the Premises in order to operate the Debtors' business to maximize the value of the lenders' collateral through non-ordinary course liquidation sales at all locations, secured storage of the Lenders' collateral, and payment of out of pocket expenses such as taxes, common area maintenance, utilities, and insurance.

36.     The Debtors recognize that their business is dependent on the ongoing use of their leased locations, and that Landlords are correspondingly critical to their potential success. That fact notwithstanding, the current Budget unfairly fails to budget for certain Post-Petition Rent, placing Landlords in a position unlike any other administrative creditor by relegating Landlords to

the position of an involuntary, unsecured, post-petition, interest-free lender to the Debtors in the amount of the unbudgeted Post-Petition Rent.  This is the very result that Section 365(d)(3) was intended to counteract.  See In re Warehouse Club, Inc., 184 B.R. 316, 318 (Bankr. N.D. Ill. 1994). The Budget provides for the payment of, upon information and belief, all other post-petition administrative expenses of these estates, including professional fees.  Landlords understanding is that the Budget fails to provide for the payment of the Stub Rent at any time through and including the final budgeted week, and it is unclear whether the Budget is sufficient to pay certain other post-petition Lease obligations, such as for bi-annual real estate taxes or annual reconciliations.  The Proposed Final Cash Collateral Order likely provides that the Debtors can only use the proceeds of the Cash Collateral as provided by the Budget, and the use of Cash Collateral in any manner that is not consistent with the Budget is an event of default under the Cash Collateral Documents. (See Interim Order, ¶ 3).  As a result, if an expense is not included in the Budget, the Debtors cannot and will not pay it.

37.     This structure places the ultimate payment of the Post-Petition Rent at a risk that is not shared by other administrative creditors.  While Landlords may not ever recover on account of the pre-petition rent that the Debtors have failed to pay, this Court should not further permit the Debtors to avoid paying for their post-petition use and occupancy of the Premises, while availing themselves of the benefits of the Bankruptcy Code (and simultaneously avoiding its obligations).  There is ample support for Landlords' entitlement to adequate protection under the Bankruptcy Code.

38.     Adequate protection for the Post-Petition Rent is warranted as a condition of a sale or plan that involves the use of the Premises under Section 363(e), which provides:

> Notwithstanding any other provision of this section, at any time, on
> request of an entity that has an interest in property used, sold, or

leased, or proposed to be used, sold, or leased, by the trustee, *the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest . . . .*

11 U.S.C. § 363(e) (emphasis added).

39.     Section 363(e) provides a basis to grant adequate protection to real property lessors in the form of budgeting for the payment of or reserving for the Post-Petition Rent.  See, e.g., Matter of Cont'l Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (finding that adequate protection is available under § 363(e) for a decrease in value due to the use, sale, *or lease* of an entity's interest in property) (emphasis added); In re P.J. Clarke's Rest. Corp., 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) (providing that a "landlord's right to adequate protection seems to follow clearly from the language of Section 363(e)"); In re Ernst Home Ctr., Inc., 209 B.R. 955, 966-67 (Bankr. W.D. Wash. 1997) (finding that adequate protection is available to real property lessors under Section 363(e)); In re RB Furniture, Inc., 141 B.R. 706, 713-14 (Bankr. C.D. Cal. 1992) (adequate protection under Section 363(e) may even be broader than the rights encompassed under Section 365(d)(3), given it "is a fluid concept that reflects all the circumstances surrounding a debtor's use of property").

40.     While all parties hope these cases will be administratively solvent, it is too early to tell if this will be true in these proceedings, and projected revenues from full chain liquidation sales are often unpredictable and unreliable.  The Debtors are liquidating all of their assets with no prospect of a plan of reorganization or a going-concern sale.  The Landlords' prospects for payment of the Post-Petition Rent seem entirely reliant upon the proceeds of the Debtors' ongoing liquidation sales and discrete asset sales, and Debtors inexplicably propose to defer payment of all Stub Rent until three to six weeks after the conclusion of that liquidation process—nearly four months after that occupancy was provided to them—subjecting Landlords to the maximum risk of loss in these cases.  Simply allowing an administrative expense claim for the Post-Petition Rent will not adequately protect Landlords.  See 11 U.S.C. § 361(3).  In fact, Section 361(3) makes clear that adequate protection may not take the form of a deferred administrative

claim. <u>In re Attorneys Office Management, Inc.</u>, 29 B.R. 96, 99 (Bankr. C.D. Cal. 1983) ("In §361(3) it is made clear that an administrative claim under § 503(b)(1) in itself will not constitute adequate protection.").

41.    The Debtors are still open and operating in Landlords' Premises.  Unlike other creditors, Landlords have no choice but to allow the Debtors to continue to use and occupy their Premises.  This Court has seen many cases where the Debtors and their professionals have stated (and believed) that there would be money to pay administrative claims at the end of a case, only later to concede that the estates are administratively insolvent.  Indeed, even where debtors have been compelled to budget for Post-Petition Rent to address these precise concerns, Landlords have recently seen cases where those budgeted rent payments during the course of a bankruptcy case were not paid, despite  the DIP lenders or prepetition lenders receiving the benefit of a 506(c) Waiver in exchange for such protection. <u>See, e.g.</u>, <u>In re Big Lots</u>, Case No. 24-11967 (JKS) (Bankr. D. Del.); <u>In re Christmas Tree Shops</u>, Case No 23-10576 (TMH) (Bankr. D. Del.); <u>In re WeWork</u>, Case No. 23-19865 (JKS) (Bankr. D.N.J.).  Landlords do not want to see this case added to this string cite.

42.    In this case, the Debtors are selling off their assets with no restructuring prospects.  Everyone, including Landlords, are hopeful that the Debtors can generate sufficient proceeds to pay all post-petition claims incurred during this liquidation process in full, but the outcome remains uncertain at this time and Landlords should not be put at the end of the line to shoulder this risk.  The Court should require the Debtors to provide adequate protection for the continued use of the Premises through the date of the payment of the Post-Petition Rent.

43.    Thus, any order approving the Cash Collateral Motion on a final basis must provide adequate protection to the Landlords.

**C.    Adequate protection can be provided to the Landlords in various ways.**

44.    Because the Landlords are entitled to adequate protection of the Post-Petition Rent, the Court may consider the various forms of adequate protection that can be provided.

####### *i.* *Payment is a form of adequate protection.*

45.     The best form of adequate protection the Debtors could provide is the payment of all of the Post-Petition Rent obligations that will accrue through the assumption, assumption and assignment, or rejection of the Leases.  See, e.g., In re ZB Company, Inc., 302 B.R. 316, 320 (Bankr. D. Del. 2003) (holding that rent should be paid to landlords on a per diem basis during the pre-rejection period in order to avoid the potential that the landlord could be left with an allowed administrative claim against an administratively insolvent estate).

46.     No provision of the Bankruptcy Code permits the Debtors to receive the benefits and protections of chapter 11 while simultaneously shirking their attendant obligations. In circumstances where there is a risk of administrative insolvency, it is appropriate for adequate protection to take the form of budgeting and immediate cash payments for post-petition use of the Premises.  See 11 U.S.C. § 361; In re Kellstrom Indus., Inc., 282 B.R. 787, 794 (Bankr. D. Del. 2002).

47.     Moreover, the Court may also allow the unpaid Post-Petition Rent, including Stub Rent, as an administrative expense of the Debtors under Section 503(b)(1), and order its payment.  Section 503(b)(1) provides for an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate.  See 11 U.S.C. § 503(b)(1).  Section 365(d)(3) does not preclude the Court from ruling that Stub Rent is an administrative expense under Section 503(b)(1).  See In re Goody's Family Clothing Inc., 610 F.3d 812, 816-19 (3d Cir. 2010); In re Garden Ridge Corp., 323 B.R. 136, 142-43 (Bankr. D. Del. 2005) (citing ZB Co. Inc., 302 B.R. at 319 (landlords entitled to prorated rent from the Petition Date—despite the fact that the billing date occurred the day before the petition date).  A landlord's administrative claim under Section 503(b)(1) is equal to the lease contract rate.  See ZB Co. Inc., 302 B.R. at 319 (contract rate is presumed to be the fair rental value).

48.     Courts have discretion to determine the timing of the administrative payments.  See, e.g., Garden Ridge Corp., 323 B.R. at 143 (citing In re HQ Global Holdings, Inc., 282 B.R. 169, 173 (Bankr. D. Del. 2002) (entering interim orders directing the full contract rent

for February 2004 to each landlord); <u>ZB Co., Inc.</u>, 302 B.R. at 320. "In determining the time of payment, courts consider prejudice to the debtor, hardship to the claimant, and potential detriment to other creditors." <u>See</u> <u>Garden Ridge Corp.</u>, 323 B.R. at 143; <u>see also</u> <u>HQ Global</u>, 282 B.R. at 173. The hardship to Landlords outweighs any prejudice to the Debtors or other creditors. Without immediate payment of Post-Petition Rent, including the Stub Rent, or at least providing adequate protection that Landlords will receive such payment in one of the manners set forth herein, Landlords bear the risk of administrative insolvency, while the Debtors and Prepetition Lenders continue to benefit from the use of their Premises. Other creditors do not provide post-petition services to the Debtors without payment. Forcing Landlords to act as involuntary post-petition lenders is contrary to the Bankruptcy Code, and directing payment (or adequate protection for payment) of the unpaid Post-Petition Rent, including Stub Rent, is appropriate under the circumstances. <u>See</u> <u>In re Travel 2000, Inc.</u>, 264 B.R. 444 (Bankr. W.D. Mich. 2001) (finding that Congress and courts have determined that a landlord should receive the benefit of its bargain to compensate a landlord for being compelled by the Bankruptcy Code to continue providing a debtor with a critical service). Therefore, this Court may allow and require the immediate payment of the Stub Rent under Section 503(b)(1).

### ii. *Post-Petition Rent can be escrowed as a form of adequate protection.*

49.    Short of immediate payment of the Post-Petition Rent owed to Landlords, the Debtors could escrow sufficient funds to provide adequate protection for the Post-Petition Rent, including Stub Rent. The Court was faced with a similar situation in *CEC Entertainment, Inc.*, where the debtors' financing budget failed to provide sufficient funds for the payment of stub rent and other outstanding post-petition lease obligations, and the debtors similarly sought a 506(c) waiver before those amounts would be paid to landlords. There, Judge Isgur fashioned a remedy of an escrow for the outstanding stub rent to provide adequate protection to landlords until the catchup payment could be made by the Debtors. [*CEC Entm't Inc.*, Case No. 20-33163, Tr. Hr'g 10/8/20 pp. 74:4-75:3, relevant portions attached hereto as <u>Exhibit 1</u>], <u>see also</u> <u>In re The Sports Authority, Inc., et al.</u>, Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (Final Order

18

Authorizing Debtors to Obtain Postpetition Financing) [Docket No. 1699, at § 40] (requiring reserve of stub rent for closing locations).[6]

        *iii.*      ***A carve out or condition to any surcharge waiver under Section 506(c) can provide Landlords adequate protection.***

        50.      As set forth in the Cash Collateral Motion, the Debtors are seeking a waiver of their surcharge rights under Section 506(c) in connection with a Proposed Final Cash Collateral Order.  Section 506(c) provides that a trustee or debtor in possession may recover from property securing an allowed secured claim the "reasonable, necessary costs and expenses of preserving or disposing of, such property to the extent of any benefit to the holder of such claim . . . ." 11 U.S.C. § 506(c); See Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Ind., Inc.), 57 F.3d 321, 325 (3d Cir. 1995).  The premise underlying Section 506(c) is that the unsecured creditors should not be required to bear the costs of preserving a secured creditor's collateral.  See In re Evanston Beauty Supply Inc., 136 B.R. 171, 175 (Bankr. N.D. Ill. 1992).  "Ample case authority exists which permits lessors to recover under Section 506(c) provided that the standards for recovery are met."  In re World Wines, Ltd., 77 B.R. 653, 658 (Bankr. N.D. Ill. 1987).  Standards for recovery are that the services were necessary and beneficial to the lender.  Visual Indus., Inc., 57 F.3d at 325.  Here, Debtors' basis for seeking a 506(c) Waiver is weak, as they are solely relying on Cash Collateral without securing additional financing from the lenders and proposing to push off the payment of certain Post-Petition Lease Obligations for nearly 4 months, beyond even the Budget period.  The Debtors and Prepetition Lenders continue to benefit from the post-petition use and occupancy of the Premises outside of the ordinary course of business through full chain liquidation sales, which are vital to the Debtors' bankruptcy goals, and there is no legitimate reason that they should not pay for that benefit.

        51.      Courts may surcharge Prepetition Lenders for post-petition rents and storage charges owed to them for storing lender's collateral, as necessary and directly beneficial to the lender.  In re Scopetta-Senra P'ship III, 129 B.R. 700 (Bankr. S.D. Fla. 1991) (determining

---

[6] A copy of the Sports Authority final DIP Order is attached to this Limited Objection as Exhibit 2.

that a landlord that provided post-petition lease space provided benefit to the secured creditor by storing its collateral, and ensuring the debtor's continued operations); In re Gain Electronics Corp., 138 B.R. 464, 465 (Bankr. D.N.J. 1992); In re World Wines, Ltd., 77 B.R. at 658 (finding that landlord was entitled to be paid by the bank for the use and occupancy of its premises for storage of wine pursuant to Section 506(c)); In re Proto-Specialties, Inc., 43 B.R. 81 (Bankr. D. Ariz. 1984).

52.     The Debtors and Prepetition Lenders are requesting a waiver of the Debtors' (and any other party's) ability to surcharge the Prepetition Lenders under Section 506(c).  This places the risk of future administrative insolvency on the Landlords in the amount of the unpaid Post-Petition Rent, as well as any other post-petition obligations that are not provided for in the Budget.  Shifting this risk to unsecured creditors—and involuntary unsecured creditors, at that— is contrary to the purpose of Section 506(c) and results in an unwarranted windfall to the lenders. As a result, courts have increasingly required that lenders pay for such benefits, which requirement is sometimes referred to as the "pay to play" concept.  See, e.g., In re The Sports Authority, Inc., et al., Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [Docket No. 1699] (preserving Section 506(c) rights for the Debtors or any party with standing absent providing for payment of Stub Rent and Section 503(b)(9) claims).  Given that Debtors' Prepetition Lenders have and will substantially benefit from the continued use and occupancy of Debtors' retail locations through the preservation and disposition of collateral located in the leased Premises through ongoing inventory liquidation sales, the Prepetition Lenders should be required to fund the expenses of that benefit rather than escape any responsibility for occupancy costs through attempted waivers of Sections 506(c) and 552, especially when they nobly propose to pay themselves off in full 8 weeks before paying the Landlords for that use and occupancy.

53.     Indeed, courts in a number of jurisdictions have adopted this "pay to play" concept.  In the Eighth Circuit, for instance, the case law provides that "if a secured creditor consents to the debtor's continued operation, it also impliedly consents to the debtor surcharging

the necessary operating expenses of continuing its business against the creditor's secured claim." See In re Machinery, Inc., 287 B.R. 755, 768 (Bankr. E.D. Mo. 2002); citing Underwriters Ins. v. Magna Bank (In re Hen House Interstate, Inc.), 150 F.3d 868, 871-72 (8th Cir. 1998) rev'd on other grounds 150 F.3d 868 (8th Cir.1998) (en banc) aff'd. 530 U.S. 1 (2000); United States v. Boatmen's First Nat'l. Bank, 5 F.3d 1157, 1159-60 (8th Cir.1993). "[B]oth Boatmen's and Hen House . . . require a finding that the secured creditor does in fact impliedly consent [to surcharging of its collateral] when it agrees to the debtor's continued operation of its business." Machinery, Inc., 287 B.R. at 768. This is just another way of stating the "pay to play" concept to make sure that Landlords and other unsecured creditors do not solely bear the risk of administrative insolvency.

54.     If the Debtors and their Prepetition Lenders are unable or unwilling to pay or escrow the Post-Petition Rent, than any waiver of the Debtors' surcharge rights under Section 506(c) should carve out Post-Petition Rent to make such waiver applicable to Post-Petition Rent only after such amounts are escrowed or paid to the Landlords. This conditional 506(c) waiver is another means of providing Landlords with the adequate protection to which they are entitled under the Bankruptcy Code. See In re The Sports Authority, Inc., et al., Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [Docket No. 1699, at ¶43(a)]. It is improper for the Debtors to seek to waive the statutory provisions specifically intended to protect Landlords' Post-Petition Rent claims while providing absolutely no means for such claims to be paid.[7]

### C.     The Bankruptcy Code Requires Equal Treatment of Administrative Expense Creditors.

55.     Moreover, the Bankruptcy Code does not allow the Debtors to treat similarly situated administrative claimants differently. In re Lazar, 83 F.3d 306, 308-09 (9th Cir.

---

[7] It has been observed that bankruptcy courts "should not ignore the basic injustice of an agreement in which a debtor, acting out of desperation, has compromised the rights of unsecured creditors." In re FCX, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985); accord, In re Defender Drug Stores, Inc., 145 B.R. 312, 317 (9th Cir. BAP 1992) (recognizing that debtors-in-possession "generally enjoy little negotiating power" with secured lenders, "particularly where the lender has a prepetition lien on cash collateral.").

1996) ("Under the Bankruptcy Code, administrative expense creditors must be treated equally and the court should not set up its own order of priorities.").  Through their Budget, the Debtors are establishing different classes of administrative claimants to receive payment, to the exclusion of others (namely, the Landlords), in violation of the Bankruptcy Code.  As these estates may be administratively insolvent, this alone should justify the payment of the Stub Rent or, at a minimum, the non-payment of other similarly situated administrative claims until such time as the Post-Petition Rent is paid.

## III.    RESERVATION OF RIGHTS

56.    Objecting Landlords reserve the right to make such other and further objections as may be appropriate, and do not waive and hereby preserve all of their rights, remedies, and arguments with respect to the Leases.

## IV.    JOINDER IN OBJECTIONS

57.    To the extent consistent with the objections expressed herein, Landlords also join in the objections of any other shopping center lessors or the official committee of unsecured creditors to the Debtors' proposed relief.

## V.    CONCLUSION

Landlords respectfully request that the Court require any Final Cash Collateral Order to be modified consistent with this Objection, and grant such further relief as the Court deems just and proper.

Dated: January 29, 2025
Wilmington, Delaware

*/s/ Laurel D. Roglen*
Leslie C. Heilman (DE No. 4716)
Laurel D. Roglen (DE No. 5759)
Margaret A. Vesper (DE No. 6995)
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail: heilmanl@ballardspahr.com
           roglenl@ballardspahr.com
              vesperm@ballardspahr.com

and

Dustin P. Branch, Esquire
Nahal Zarnighian, Esquire
Sara Shahbazi, Esquire
BALLARD SPAHR LLP
2029 Century Park East, Suite 1400
Los Angeles, California 90067-2915
Telephone: (424) 204-4400
Facsimile: (424) 204-4350
E-mail: branchd@ballardspahr.com
           zarnighiann@ballardspahr.com
              shahbazis@ballardspahr.com

*Counsel to 209-261 Junction Road Madison Investors LLC, 14700 Baltimore Avenue Investors LLC, ABJ Group Advancement TX, LLC, ARC ASANDSC001, LLC, ARC BBLVSNV001, LLC, ARC CLORLFL001, LLC, ARC MLLOLIN001, LLC, ARC NCCHRN001, LLC, ARC SMWMBFL001, LLC, ARC SRTUKOK001, LLC, ARC TTRALNC001, LLC, Acadia Realty Trust, BMA Joliet Commons LLC, Brixmor Operating Partnership LP, Brixton Everett, LLC, CR West Ashley, LLC, Capital Mall LP, Courtyard E Associates, LLC, DFG-Chattanooga, LLC, Danada Square West Shopping Center, LLC, Deutsche Asset & Wealth Management, EDENS, FBG Harriman Upper Retail LLC, FR Westgate Mall, LLC, FRIT Florida, LLC, GG REIF I Cool Springs LLC, HVTC, LLC, K-GAM Broadway Craycroft LLC, La Entrada Associates, SPG Doral Retail Partners, LLC, SVAP III Riverdale Commons, LLC, Savannah Square Associates, Ltd., Shapell Properties, Sunset Hills JV LLC/Sunset Hills Owner LLC, The Irvine Company LLC, Urban Edge Properties L.P., and Weitzman*

23

### SCHEDULE A

| | | |
|---|---|---|
| **209-261 JUNCTION ROAD MADISON INVESTORS, LLC** | | |
| Store No. 518 | Prairie Towne Center | Madison, WI |
| **14700 BALTIMORE AVENUE INVESTORS LLC** | | |
| Store No. 581 | Town Centre at Laurel | Laurel, MD |
| **ABJ GROUP ADVANCEMENT TX, LLC** | | |
| Store No. 488 | Shops at Vineyard Village | Euless, TX |
| **ARC ASANDSC001, LLC** | | |
| Store No. 1052 | Anderson Station | Anderson, SC |
| **ARC BBLVSNV001, LLC** | | |
| Store No. 538 | Best on the Boulevard | Las Vegas, NV |
| **ARC CLORLFL001, LLC** | | |
| Store No. 500 | Colonial Landing | Orlando, FL |
| Store No. 500 | Colonial Landing (Storage Space) | Orlando, FL |
| **ARC MLLOLIN001, LLC** | | |
| Store No. 813 | Market at Clifty Crossing | Columbus, IN |
| **ARC NCCHRNC001, LLC** | | |
| Store No. 1070 | Northlake Commons | Charlotte, NC |
| **ARC SMWMBFL001, LLC** | | |
| Store No. 357 | The Shoppes of West Melbourne | West Melbourne, FL |
| **ARC SRTUKOK001, LLC** | | |
| Store No. 1162 | Southroads Shopping Center | Tulsa, OK |
| **ARG TTRALNC001, LLC** | | |
| Store No. 1027 | Triangle Town Place | Raleigh, NC |
| **ACADIA REALTY TRUST** | | |
| Store No. 836 | Crossroads Shopping Center | Greenburg, NY |
| Store No. 1062 | Hickory Ridge Shopping Center | Hickory, NC |
| Store No. 6 | New Loudon Center | Latham, NY |
| Store No. 687 | Shops at Grand Avenue | Queens, NY |
| **BMA JOLIET COMMONS LLC** | | |
| Store No. 5113 | Joliet Commons | Joliet, IL |
| **BRIXMOR PROPERTY GROUP, INC.** | | |
| Store No. 196 | Annex of Arlington | Arlington Heights, IL |
| Store No. 1124 | Central Station | College Station, TX |
| Store No. 914 | Cobblestone Village | St. Augustine, FL |
| Store No. 5268 | Dickson City Crossings | Dickson City, PA |
| Store No. 839 | Ellisville Square | Ellisville, MD |
| Store No. 4000 | Lakes Crossing | Muskegon, MI |
| Store No. 644 | Metro 580 | Pleasanton, CA |
| Store No. 1057 | New Centre Market | Wilmington, NC |
| Store No. 1057 | New Centre Market (Parking lot) | Wilmington, NC |
| Store No. 923 | Park Shore Plaza | Naples, FL |

| | | |
|---|---|---|
| Store No. 1233 | Regency Park Shopping Center | Jacksonville, FL |
| Store No. 1233 | Regency Park Shopping Center (Parking lot) | Jacksonville, FL |
| Store No. 820 | Rivercrest Shopping Center | Crestwood, IL |
| Store No. 6028 | Sarasota Village | Sarasota, FL |
| Store No. 924 | Southfield Plaza | Southfield, MI |
| Store No. 5217 | Southland Shopping Center | Middleburg Heights, OH |
| Store No. 4140 | South Towne Centre | Dayton, OH |
| Store No. 1071 | The Centre at Preston Ridge | Frisco, TX |
| Store No. 6071 | The Plaza at Buckland Hills | Manchester, CT |
| Store No. 1180 | Warminster Towne Center | Warminster, PA |
| Store No. 6049 | Waterford Commons | Waterford, CT |
| Store No. 6052 | Watertower Plaza | Leominster, MA |
| Store No. 1060 | Wendover Place | Greensboro, NC |
| Store No. 1060 | Wendover Place (Parking lot) | Greensboro, NC |
| Store No. 3201 | Westminster City Center | Westminster, CO |
| Store No. 430 | West Ridge Plaza | Westland, MI |
| Store No. 490 | Wilkes-Barre Township Marketplace | Wilkes-Barre, PA |
| **BRIXTON EVERETT, LLC** | | |
| Store No. 853 | Everett Mall | Everett, WA |
| **CR WEST ASHLEY, LLC** | | |
| Store No. 1244 | West Ashley Shoppes | Charleston, SC |
| **CAPITAL MALL LP** | | |
| Store No. 450 | Capital Mall | Olympia, WA |
| **COURTYARD E ASSOCIATES, LLC** | | |
| Store No. 498 | Gateway Courtyard | Fairfield, CA |
| **DFG-CHATTANOOGA, LLC** | | |
| Store No. 5208 | Oak Park Town Center | Hixson, TN |
| **DANADA SQUARE WEST SHOPPING CENTER** | | |
| Store No. 197 | Danada Square West | Wheaton, IL |
| **DEUTSCHE ASSET & WEALTH MANAGEMENT** | | |
| Store No. 560 | Eastland Center | West Covina, CA |
| Store No. 374 | London Square | Miami, FL |
| **EDENS** | | |
| Store No. 6013 | Burlington Crossroads | Burlington, MA |
| Store No. 1056 | Columbiana Station | Columbia, SC |
| Store No. 6069 | South Bay Center | Dorchester, MA |
| **FBG HARRIMAN UPPER RETAIL LLC** | | |
| Store No. 686 | Harriman Commons | Monroe, NY |
| **FR WESTGATE MALL, LLC** | | |
| Store No. 546 | Westgate Center | San Jose, CA |
| **FRIT FLORIDA, LLC** | | |
| Store No. 302 | Tower Shops | Davie, FL |

| | | |
|---|---|---|
| **GG REIF COOL SPRINGS LLC** | | |
| Store No. 1195 | Cool Springs Pointe | Brentwood, TN |
| **HVTC, LLC** | | |
| Store No. 957 | Happy Valley Towne Center | Phoenix, AZ |
| **K-GAM BROADWAY CRAYCROFT LLC** | | |
| Store No. 944 | Broadway Commons | Tucson, AZ |
| **LA ENTRADA ASSOCIATES** | | |
| Store No. 445 | Promenade Shopping Center | Escondido, CA |
| **PGIM REAL ESTATE** | | |
| Store No. 197 | Danada Square West | Wheaton, IL |
| **SPG DORAL PARTNERS** | | |
| Store No. 333 | Bed Bath & Beyond Plaza | Miami, FL |
| Store No. 333 | Bed Bath & Beyond Plaza (Storage lease) | Miami, FL |
| **SAVANNAH SQUARE ASSOCIATES, LTD.** | | |
| Store No. 326 | Sawgrass Square | Sunrise, FL |
| **SHAPELL PROPERTIES** | | |
| Store No. 751 | Marketplace at Laguna Niguel | Laguna Niguel, CA |
| **SVAP III RIVERDALE COMMONS, LLC** | | |
| Store No. 326 | Riverdale Commons | Coon Rapids, MN |
| **SUNSET HILLS JV LLC/SUNSET HILLS OWNER LLC** | | |
| Store No. 564 | The Plaza & Shoppes at Sunset Hills | St. Louis, MO |
| **THE IRVINE COMPANY** | | |
| Store No. 548 | The Market Place I | Tustin, CA |
| **URBAN EDGE PROPERTIES, L.P.** | | |
| Store No. 406 | Hudson Commons | Jersey City, NJ |
| Store No. 406 | Hudson Commons (Parking lot) | Jersey City, NJ |
| Store No. 738 | Woodmore Towne Centre | Lanham, MD |
| **WEITZMAN** | | |
| Store No. 1192 | Capitol Plaza | Austin, TX |
| Store No. 807 | The Crossing at 288 | Pearland, TX |
| Store No. 63 | Trinity Plaza | Carrollton, TX |