**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARTY CITY HOLDCO INC., *et al.*,[1] | ) | Case No. 24-90621 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

**OBJECTION OF MULTIPLE LANDLORDS TO DEBTORS' EMERGENCY
MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) USE CASH COLLATERAL AND (B) GRANT LIENS AND
PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, ETC. AND
REQUEST FOR ADEQUATE PROTECTION.**

The landlords identified in Exhibit A hereto (collectively, the "Objecting Landlords") hereby file this objection ("Objection") to the *Debtors' Emergency Motion For Entry Of Interim and Final Orders (I) Authorizing the Debtors To (A) Use Cash Collateral and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection To Certain Prepetition Secured Parties, (III) Modifying The Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* [Docket No. 44] (the "Cash Collateral Motion"), and entry of a final order thereon, and respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      Objecting Landlords do not generally object to Debtors' efforts to gain approval for access to cash collateral but, as discussed below, this Court should not enter a final order with respect to Debtors' Cash Collateral Motion that fails to provide adequate protection to Debtors'

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Inc. (1359); Am-Source, LLC (8427); Party City Corporation (3692); Party City Holdings Inc. (3029); PC Intermediate Holdings, Inc. (1229); and Trisar, Inc. (0659). The location of the Debtors' service address for purposes of these chapter 11 cases is:  100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

lessors, including Objecting Landlords, as to accruing post-petition occupancy costs that do not appear to be adequately provided for by the Cash Collateral Motion and accompanying Initial Budget.[2] As Debtors' "first day" pleadings make clear, these Chapter 11 cases are not contemplated to result in a reorganization of Debtors' business but, rather, are intended to "effectuate an efficient and value maximizing sale of the Company's assets and orderly wind-down of its business." *Declaration of Deborah Rieger-Paganis, Chief Restructuring Officer of Party City Holdco, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 45] (the "Rieger-Paganis Declaration") at ¶ 7.)  The Prepetition Secured Parties are not contributing any "new money" to the liquidation process through any post-petition financing. There are genuine questions regarding the adequacy and completeness of the proposed Initial Budget and December "stub rent" is not proposed to be paid for several months, after the ABL/FILO Lenders have been paid in full. Indeed, given Debtors' non-payment of December rent, including post-petition "stub rent," Debtors' landlords can be fairly described as having provided more post-petition financing to these cases than the Prepetition Secured Parties.

2. Under these circumstances, Debtors should not be permitted to waive their rights under Bankruptcy Code sections 506(c) and 552 unless and until potential administrative expense claims for December "stub rent" are provided for, whether by payment or the segregation of funds to provide some assurance of the payment of post-petition occupancy expenses, particularly given the risk of administrative insolvency in these liquidating Chapter 11 cases. Further, Debtors' Prepetition Secured Parties improperly seek to expand the scope of their Prepetition Collateral by imposing liens on Debtors' leasehold interests as part of the Adequate Protection Liens, in

---

[2]    Capitalized terms not otherwise defined shall have the same meaning as set forth in the Cash Collateral Motion.

contravention of the terms of Debtors' shopping center leases and Bankruptcy Code section 365(d)(3).

3. Here, any relief under the Cash Collateral Motion needs to better balance the competing interests of Debtors, the Prepetition Secured Parties, landlords and other stakeholders. This Court should not permit the Prepetition Secured Parties and Debtors to compel Debtors' landlords, including Objecting Landlords, to effectively finance Debtors' post-petition operations without paying for the use and occupancy of the leased premises or providing adequate protection that these post-petition occupancy costs will be paid.

## FACTUAL AND PROCEDURAL BACKGROUND

4. On December 21, 2024 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On December 21, 2024, the Court entered an order authorizing joint administration and procedural consolidation of these Chapter 11 cases [Docket No. 4]. No trustee or examiner has been appointed and Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Objecting Landlords are each lessors of nonresidential real property leases, located in California, Illinois, Oklahoma and Texas, operated by Debtors as "Party City" retail stores. It cannot be seriously disputed that each of Debtors' leases with Objecting Landlords is for premises in a "shopping center," as that term is defined in Section 365(b)(3) of the Bankruptcy Code. *See, e.g.*, *In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1087 (3d Cir. 1990); *In re Three A's Holdings, LLC*, 364 B.R. 550, 560 (Bankr. D. Del. 2007).

6. On December 22, 2024, as part of its "first day" motions, Debtors filed their Cash Collateral Motion, seeking use of cash collateral from the Prepetition Secured Parties (i.e., the ABL Secured Lenders and Prepetition 2L Notes Secured Parties) during these Chapter 11 cases.

According to the Debtors, as of the Petition Date, Debtors had $16.4 million total cash on hand, all of which constitutes Cash Collateral.

7.     As previously described, Debtors are winding down their businesses and liquidating their assets, not reorganizing as a going concern, and the Prepetition Secured Parties are not contributing any "new money" to the administration of these Chapter 11 cases. Indeed, as described in the "first day" Rieger-Paganis Declaration, Debtors have been "compelled to pivot to a liquidation strategy" and intend to "effectuate an efficient and value-maximizing sale of the Company's assets and orderly wind-down of its business." Rieger-Paganis Declaration at ¶ 7. Indeed, the Cash Collateral Motion asserts that the "immediate use of cash collateral is necessary for the orderly liquidation of the Prepetition Collateral …." Cash Collateral Motion at ¶ 19.

8.     On December 23, 2024, this Court entered its *Interim Order (I) Authorizing the Debtors To (A) Use Cash Collateral and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection To Certain Prepetition Secured Parties, (III) Modifying The Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* [Docket No. 65] (the "Interim Order").

9.     On the same day, the Court granted, on an interim basis [Docket No. 66], *Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures For Store Closing Sales, and (III) Granting Related Relief* [Docket No. 43] (the "Store Closing Motion"), approving Debtors' assumption of a Consulting Agreement with Gordon Brothers Retail Partners, LLC and Gordon Brothers Commercial & Industrial, LLC (collectively, "Gordon Brothers") and the immediate commencement of Store Closing Sales. As is made clear in the Rieger-Paganis Declaration (at ¶ 42), "certain of the Debtors' secured lenders considered it essential to commence store closing

sales before the Christmas and New Year's selling season to maximize the proceeds of such sales for the benefit of all stakeholders."

10.     The Store Closing Motion was approved, on a final basis, by order entered January 21, 2025 [Docket No. 291].

11.     As provided in the Cash Collateral Motion and Interim Order, the Prepetition Lenders seek, at the final hearing on the Cash Collateral Motion, entry of an order granting, as part of the Adequate Protection Liens, a direct lien on "the Debtors' interest in real property leaseholds" Interim Order at ¶ 5(a) and fn. 5. The Prepetition Lenders further seek entry of a final order waiving (a) the Debtors' right to surcharge the Prepetition Collateral and the Adequate Protection Collateral pursuant to Bankruptcy Code section 506(c) and (b) any "equities of the case" exception under Bankruptcy Code section 552(b). *See* Interim Order at ¶¶ 13-15.

12.     Accompanying the Cash Collateral Motion is Debtors' proposed Initial Budget, Schedule 1 to the Interim Order. This initial 13-week Budget, however, uses "high level" expense categories, such as "Total Operating Disbursements" and "Other Restructuring Items," that thwart meaningful analysis as to its adequacy and completeness. Parties already know, based on Debtors' presentation at the first day hearing on December 23, 2024, that payment of December "stub rent" is not contemplated until mid-April 2025, several weeks after the period reflected in the Initial Budget (ending the week of March 22, 2025) and a month after the full ABL/FILO Repayment during the week of February 15, 2025.

## ARGUMENT

### I.     There are Legitimate Questions Regarding the Proposed Budget and Who Should Bear the Risk of Administrative Insolvency

13.     The Initial Budget does not appear to provide for significant upcoming obligations under Debtors' real property leases. Notwithstanding Debtors' assertions as to the adequacy of the Budget, several "red flags" have been raised in the last several weeks. First, at least several

landlords have been advised by Debtors' accounting staff that "all 2024 YE Recs cannot be paid." Under most modern "triple net" leases, including Debtors' leases with Objecting Landlords, common area maintenance, real estate tax and/or insurance obligations are billed monthly on an estimated basis, subject to annual reconciliations and adjustments. These reconciliations usually occur, in the ordinary course, in the first few months of the following calendar year (i.e., 2024 reconciliations would be billed in February or March of 2025).

14.     Bankruptcy Code section 365(d)(3) unambiguously provides, in pertinent part, that "[t]he trustee [or debtor-in-possession] shall timely perform all obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title."

15.     While there is no definitive Fifth Circuit authority, bankruptcy courts in both the Northern and Southern District of Texas have endorsed the so-called "billing date" theory with respect to accruing post-petition rent. *See*, *e.g*., *In re Imperial Beverage Group, LLC*, 457 B.R. 490, 501 (Bankr. N.D. Tex. 2011); *In re Appletree Markets, Inc*., 139 B.R. 417, 420 (Bankr. S.D. Tex. 1992); *see also In re Simbaki, Ltd*., Case No. 13-36878, 2015 WL 1593888, *6 (Bankr. S.D. Tex. Apr. 6, 2015) (Isgur, J.) (adopting the billing date theory).

16.     In *In re Appletree Markets, Inc*., *supra*, the bankruptcy court for the Southern District found that the legislative history of Bankruptcy Code section 365(d)(3) made clear that the debtor's "obligations must be performed *at the time required in the lease*." 139 B.R. at 420; *In re Simbaki, Ltd*., *supra*, 2015 WL 1593888 at *6 ("Plainly, a debtor incurs a lease payment when he becomes liable to pay it.").  Under the billing date theory, periodic reconciliations of 2024 real property taxes, common area maintenance expenses and other items, when billed under in 2025 under the terms of a lease, are post-petition lease obligations payable under Bankruptcy Code

section 365(d)(3). Nevertheless, based on communications to landlord from Debtors' representatives, Debtors do not intend timely perform.

17.     Are Debtors stating that accruing post-petition obligations such as periodic expense reconciliations "cannot be paid," notwithstanding Bankruptcy Code section 365(d)(3), because they lack the liquidity to do so or because they have been directed by their Prepetition Secured Parties not to make such payments as part of the "agreed-upon budget"? Are these payments even provided for in the Interim Budget?[3]

18.     Further, earlier this month, A&G Realty, Debtors' real estate consultant, contacted landlords and requested an agreement that February and March 2025 rent be paid on a "pro rata, per diem basis." As part of this proposed per diem rental structure, Debtors would agree not close the store location before February 15, 2025, nor after March 31, 2025. According to A&G Realty, "[t]he alternative for Party City is to accelerate the Going Out of Business sales, reject your lease, and exit your location(s) by the end of January or February." Considering that "[t]he Debtors project that the Store Closing Sales will take approximately 10 to 12 weeks to complete" (*Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures For Store Closing Sales, and (III) Granting Related Relief* [Docket No. 43] at ¶ 9), the request of the "per diem letter" appears to be nothing more than an effort by the Debtors to manage liquidity in the month of March 2025 by avoiding the ordinary consequences of the billing date approach at as many closing store locations as

---

[3]     If Debtors believe that the omission of certain accruing post-petition lease obligations from the Interim Budget can be "cured" through the pending lease marketing process and contemplated assumption and assignment of real property leases, it is completely unrealistic that the entirety of these obligations will be provided for in that fashion. Objecting Landlords challenge the professionals for Debtors and the Prepetition Secured Parties to identify any liquidating Chapter 11 case, such as this, where there is no going concern buyer and leases are being marketed for assignment to third parties, where over fifty percent (50%) of the debtor's leases were ultimately assigned. Even an overly optimistic result of such efforts here would still result in substantial post-petition lease obligations that are unaccounted for.

possible. While seeking consensual application as to the pro-ration of February and March rent, Debtors do not propose to pay December stub rent (calculated on a pro-rated basis) until long after the completion of the store closing and lease marketing processes and the ABL/FILO Lenders are paid in full.

19.     Debtors' apparent repudiation of responsibility for accruing post-petition lease obligations and efforts to reduce rent exposure for the month of March strongly suggest that the Initial Budget is inadequate and incomplete. While the Initial Budget plainly provides for payment of certain post-petition administrative expenses, particularly professional fees and "Liquidator Fees/Expenses," it is unclear whether the Initial Budget adequately provides for all accruing post-petition lease obligations. Given these facts, landlords, including Objecting Landlords, are entitled to adequate protection of their right to receive payment of post-petition occupancy expenses.

II.     **Any Final Order Approving the Cash Collateral Motion Should Adequately Protect Landlords and not Waive Debtors' Rights Under Bankruptcy Code sections 506(c) and 552(b)**

20.     Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself.  11 U.S.C. § 506(c). This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries.  *See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[S]ection 506(c) is designed to prevent a windfall to the secured creditor"); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (stating that "the reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs"); *In re Codesco Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors

should not be required to bear the cost of protecting what is not theirs.").[4]  Similarly, the "equities of the case" exception in Bankruptcy Code section 552(b) allows a debtor, creditors' committee or other party-in-interest to exclude post-petition proceeds from pre-petition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure or other disposition of assets.  11 U.S.C. § 552(b).

21.     Under the billing date theory, since December rent and charges under Debtors' real property leases became due on December 1, prior to the Petition Date, Objecting Landlords would not have a claim for unpaid December rent and charges under Bankruptcy Code section 365(d)(3) but Objecting Landlords nevertheless have administrative expense claims under Bankruptcy Code section 503(b)(1)(A) for the use and occupancy of the leased premises during the stub rent period (December 21-31) as an actual, necessary cost of preserving Debtors' estates.  *See In re Imperial Beverage Group, LLC*, *supra*, 457 B.R. at 501-502; *In re Goody's Family Clothing Inc.,* 610 F.3d 812, 817-820 (3d Cir. 2010).

22.     There should be little doubt that this case is being run for primary benefit of Debtors' Prepetition Secured Parties. As is made clear in the Rieger-Paganis Declaration, "certain of the Debtors' secured lenders considered it essential to commence store closing sales before the Christmas and New Year's selling season to maximize the proceeds of such sales for the benefit of all stakeholders." Rieger-Paganis Declaration at ¶ 42. This "Christmas and New Year's selling season" is exactly the same December 21-31, 2024 period that gives rise to landlords' stub rent claims. Yet payment of stub rent is not provided for in the Budget and apparently Debtors do not intend to pay stub rent until mid-April, literally two months after the "ABL/FILO Repayment"

---

[4]     It is well-settled, however, that administrative claimants do not have an independent right to seek payment of otherwise unsatisfied claims under Bankruptcy Code section 506(c) from property encumbered by a secured creditor's lien since the statute reserves that right to a trustee (or debtor-in-possession in a Chapter 11 case). *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947 (2000).

contemplated by the Budget, assuming sufficient funds are available at that time. Thus, Debtors' landlords, including Objecting Landlords, are involuntary creditors in these Chapter 11 cases and bear the risk of potential administrative insolvency while the Prepetition Secured Parties benefit from the continued operation of Debtors' business through the payment of significant fees and expenses (see ¶ 5(f) and (g) of *Interim Order*) and the opportunity to realize on their Prepetition Collateral through a liquidating Chapter 11 process.[5] As a result, Debtors' Prepetition Secured Parties must accept the costs and risks associated with those benefits, including payment of necessary administrative expenses incurred by Debtors in these Chapter 11 cases. *See, e.g., In re Scopetta-Senra Partnership III,* 129 B.R. 700, 701 (Bankr. S.D. Fla. 1991) (landlord that leased auto dealership premises to debtor, without payment of administrative rent, provided benefit to secured creditors through the continued use of the premises to sell the vehicles to enable repayment to the secured creditors); *In re So Good South Potato Chip Co.*, 116 B.R. 144, 146 (Bankr. E.D. Mo. 1990) (where the trustee declined to pursue a Section 506(c) surcharge claim, the failure of secured creditor to pay for storage of collateral at premises leased by debtor would otherwise "result in a windfall benefit to the secured creditor to the detriment of a third party."); *In re Issac Cohen Clothing Corp.*, 39 B.R. 199, 201 (Bankr. S.D.N.Y. 1984) (granting surcharge because lender "clearly benefited from the property being stores on the [landlord's] premises"). The Prepetition Secured Parties' role and objective in these cases should not be without burden or expense.  It has been observed that bankruptcy courts "should not ignore the basic injustice of an agreement in which a debtor, acting out of desperation, has compromised the rights of unsecured creditors."  *In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D. N.C. 1985); *accord, In re Defender*

---

[5]    *See, e.g.*, Interim Order at ¶ H(ii) ("The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral is necessary and vital to the preservation and maintenance of the value of the Prepetition Collateral and the ultimate recovery to the Prepetition Secured Parties and other creditors of the Debtors' estates.").

*Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992) (recognizing that debtors-in-possession "generally enjoy little negotiating power" with secured lenders, "particularly where the lender has a prepetition lien on cash collateral.").

23.     Under these circumstances, landlords, including Objecting Landlords, are entitled, at a minimum, to adequate protection under Bankruptcy Code section 363(e) with respect to the payment of post-petition occupancy costs.  The purpose of adequate protection "is to [e]nsure that the creditor receives the value for which [he] bargained prebankruptcy."  *MBank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396 (10th Cir. 1987).  It is well-settled that real property lessors are entitled to seek adequate protection.  *See, e.g., Memphis-Shelby County Airport Authority v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 783 F.2d 1283, 1286-1287 (5th Cir. 1986) (recognizing landlord's right to adequate protection); *In re P.J. Clarke's Restaurant Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) (noting that a "landlord's right to adequate protection seems to follow clearly from the language of §363(e)…"); *In re Ernst Home Center, Inc.*, 209 B.R. 955, 965-966 (Bankr. W.D. Wash. 1997); *In re MS Freight Distribution, Inc.*, 172 B.R. 976, 980 fn. 4 (Bankr. W.D. Wash. 1994) ("Section 363(e) by its express terms authorizes an entity whose property is to be leased by the debtor to seek adequate protection."); *In re RB Furniture, Inc.*, 141 B.R. 706, 713 (Bankr. C.D. Cal. 1992) (adequate protection under § 363(e) may even be broader that the rights provided lessors under § 365(d)(3) given that it "is a fluid concept that reflects all the circumstances surrounding a debtor's use of property.").

24.     While provisions for the payment of "stub rent" and other accruing post-petition rent obligations are preferred,[6] in the absence of a clear commitment to make sufficient funds

---

[6]     The mere allowance of an administrative priority claim for accruing post-petition rents is not adequate protection. *In re Attorneys Office Management, Inc.*, 29 B.R. 96, 99 (Bankr. C.D. Cal. 1983) ("In §361(3) it is made clear that an administrative claim under §503(b)(1) in itself will not constitute adequate protection.").

available to ensure administrative solvency, including payment of stub rent and on-going rent obligations, the preservation of the Debtors' ability to surcharge the Prepetition Secured Parties for the cost of preservation and disposition of the Collateral through store closing sales, including the on-going occupancy costs for Debtors' leased locations, would be a form of adequate protection. Accordingly, the Prepetition Secured Parties should not be permitted to escape any responsibility for occupancy costs through attempted waivers of the bankruptcy estates' rights under Bankruptcy Code sections 506(c) and 552, as sought by the Cash Collateral Motion.  *See* Interim Order at ¶¶ 13-15.

25.     In denying a Section 506(c) waiver in *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del.), Judge Walrath observed that where a Chapter 11 case is being run for the "benefit of the lenders," then "the lenders are going to have to pay the cost of that.  And that includes all administrative.  It includes the rent."  April 26, 2016 hearing transcript [Docket No. 1463] at 194:10 to 195:16. The *Sports Authority* holding is consistent with the Fifth Circuit's conclusion that "a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost." *Southwest Securities, FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 696 (5th Cir. 2015).[7]

26.     Debtors should not be allowed to waive their statutory ability to compel their secured lenders to "pay to play" in these Chapter 11 cases.  Any final order approving the Cash

---

[7]     Another approach was taken by Judge Isgur in *In re CEC Entertainment, Inc.*, Case No. 20-33163 (MI) (Bankr. S.D. Tex. 2020), where the debtors' proposed financing budget failed to provide sufficient funds for the payment of stub rent and other post-petition lease obligations. In that case, Judge Isgur conditioned approval of post-petition financing on the establishment of a $13 million "Rent Reserve Account" to support ultimate payment, subject to adjustment or consensual reduction based upon agreement between the debtors and their landlord. *In re CEC Entertainment, Inc.*, Case No. 20-33163 (MI) (Bankr. S.D. Tex. October 13, 2020) [Docket No. 1118] (*Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, etc.* at ¶ 39).

Collateral Motion should not waive Debtors' rights under Bankruptcy Code sections 506(c) and 552(b).

### III. Debtors and the Prepetition Lenders Cannot Render Lease Provisions Restricting Liens on Debtors' Leasehold Interests Unenforceable in Connection with the Authorization to Cash Collateral

27.     The Bankruptcy Code does not create a right to grant a lien against a debtor's nonresidential real property leases where none existed pre-petition and does not authorize the Debtors (or any other party) to void a landlord's state law and/or contractual rights in granting adequate protection liens to their pre-petition lenders. Express lease provisions that restrict the Debtors' ability to mortgage or pledge real property leases as collateral are not general anti-assignment provisions governed by Bankruptcy Code section 365(e) and are not contrary to any bankruptcy policy.   Debtors' leases with the Objecting Landlords contain reasonable and legitimate restrictions that allow the landlord to preserve clear title to the lease and the leased premises, and this Court should not allow any lien on the leases in connection with a final order on the Financing Motion. For example, Debtors' lease with TUVF-Hilltop LLC for premises at Hilltop Plaza, Richmond, California, clearly provides (at ¶ 33(k)) that "Tenant shall not encumber, pledge, mortgage, hypothecate or transfer as security (whether by conditional assignment or sublease, or otherwise), this Lease or any interest therein, or any of Tenant's rights, duties or obligations hereunder." Bankruptcy Code section 365(d)(3) requires that Debtors honor such real property lease obligations pending assumption or rejection of the Lease.

28.     Bankruptcy Code section 365(d)(3) requires that the Debtor "timely perform *all of the obligations of the debtor*, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." (Emphasis added.) *See In re*

*Cukierman*, 265 F.3d 846, 850 (9th Cir. 2001)("Congress made the provision for trustee [or debtor-in-possession] compliance broad, extending it to cover all the obligations under a lease.").

29.     The inclusion of Debtor's real property leasehold interests in the broad "all tangible and intangible prepetition and postpetition property of the Debtors" in the definition of the "Adequate Protection Liens" sought by the Cash Collateral Motion (*see* Interim Order ¶ 5(a) and (c)) effectively strikes the anti-encumbrance language of Debtors' shopping center leases with the Objecting Landlords, or at the least, requires that this Court determine the language inconsistent with the provisions of the Bankruptcy Code. But Debtors' Cash Collateral Motion offers no authority to support such relief. Granting this aspect of the Cash Collateral Motion requires that this Court ignore specific lease prohibitions, negotiated at arms-length, and which are otherwise enforceable under applicable state law and protected by the Bankruptcy Code. Provisions that restrict the ability to encumber leases are critical to a landlords' ability to control its real property, to comply with their own financing and investment covenants, and any compromise of these provisions detracts from the marketability of their property as a whole.

30.     The problem with granting a security interest in Debtors' real property leases, and the fundamental alteration of Debtors' leases with Objecting Landlords, is highlighted by the events which would follow a Cash Collateral Termination Event. In the exercise of their remedies, the Prepetition Secured Parties could then seek to foreclose on the Collateral (*see* Interim Order at ¶ 12), including the proposed security interest in the Debtors' real property leases.  In that event, Objecting Landlords would be denied both the benefit of their respective bargains with Debtors when entering into the leases, as well as adequate assurance of future performance required by the Bankruptcy Code in the event of a subsequent assignment.  *See* 11 U.S.C. § 365(b)(1)(C). Following a foreclosure, the Prepetition Secured Parties could potentially seek to sell and assign one or more leases to another tenant, thereby creating, among other things, uncertainty and the

prospect of litigation over compliance with assignment restrictions and other covenants of the leases as well as responsibility for outstanding arrearages in Debtors' monetary obligations under the leases that would otherwise be payable upon assignment under Bankruptcy Code section 365(b)(1)(A). These uncertainties "cloud" Objecting Landlords' interests in the leased premises and objections to such uncertainty are more than justified. Indeed, this scenario is precisely what the Bankruptcy Code sought to avoid with the requirements of Bankruptcy Code section 365(b). There is not even any assurance that the rejection of Debtors' leases would extinguish the security interests being granted to the Prepetition Secured Parties (*see, e.g., Matter of Austin Development Company*, 19 F.3d 1077, 1083-1084 (5th Cir. 1994)(security interest granted in lease not extinguished by rejection, noting conflict in case law), potentially leaving leases encumbered for the duration of their terms (and far beyond the life of these Chapter 11 cases) in favor of secured lenders that contributed no "new money" to these Chapter 11 cases.

A.   **The Bankruptcy Code Does Not Provide Any General Right To Render Lease Provisions Unenforceable in Connection With The Use of Cash Collateral.**

31.   The Objecting Landlord objects to any provision in a final order that seeks blanket relief rendering lease provisions unenforceable. Bankruptcy Code section 363(c), while authorizing Debtors to obtain approval for the use of cash collateral, does not provide the Debtor or the Prepetition Secured Parties with authority to override or alter the terms of Debtors' real property leases. Nothing in Bankruptcy Code section 363's language grants rights to alter real property lease provisions or to pre-empt or override the rights and protections otherwise granted to landlords under Bankruptcy Code section 365. More specifically, nowhere does Section 363 authorize the Debtors, for the benefit of a non-debtor, to render any provision of a lease unenforceable. Congress knows how to grant such authority when it so chooses. *See, e.g*., 11 U.S.C. § 365(e) and (f). If Congress intended to allow the Debtor to render lease provisions unenforceable in connection with post-petition financing, Congress would have included a

provision similar to Bankruptcy Code section 365(f)(1) in Section 363 but did not.  Thus, while the Debtor may obtain approval for the post-petition use of cash collateral pursuant to Section 363, the Debtors cannot violate the terms of their nonresidential real property leases to do so.

32.     There are two primary instances where the Bankruptcy Code can potentially render a lease provision unenforceable.  The first instance is where a provision is a so-called "*ipso facto*" clause, i.e., lease provisions that would purport to cause a default or termination based upon the: (i) insolvency or financing condition of the debtor; (ii) the commencement of a bankruptcy case; or (iii) the appointment of a trustee or custodian in a bankruptcy case.  The Bankruptcy Code provides such a provision is unenforceable. *See* 11 U.S.C. § 365(e)(1).  Bankruptcy Code section 365(e)(1) is inapplicable here to the relief sought by the Cash Collateral Motion.

33.     A bankruptcy court may also render certain nonresidential lease provisions unenforceable pursuant to Section 365(f)(1). Bankruptcy Code section 365(f)(1) authorizes a debtor to assign an executory contact or unexpired lease (subject to compliance with Section 365(b) and (c)) to a third party, notwithstanding that such contact or lease otherwise prohibits or restricts assignment.  Bankruptcy Code section 365(f)(1) provides a limited ability for the Bankruptcy Court to permit the assumption and assignment of a non-residential real property lease in connection with a motion to assume and assign a lease brought under Section 365, but only after the debtor and proposed assignee comply with the adequate assurance of future performance requirements set forth in Section 365(b) and (c).  As the 2005 amendments to the Bankruptcy Code make clear, Section 365(f)(1) is specifically subject to the other subparagraphs of Section 365. There is no reference in the Congressional record or caselaw that Section 365(f)(1) applies outside of a motion to assume and assign a lease.[8]

---

[8]     Through the Bankruptcy Abuse Prevention And Consumer Protection Act of 2005 ("BAPCPA"), "Section 365(f)(1) [was] amended to make sure that all of the provisions of Section 365(b) are adhered to and that

34.     The changes embodied in the BAPCPA specifically preserve a nonresidential landlords' right to enforce use and other lease provisions. Therefore, absent clear instruction from Congress to the contrary, there is no legitimate argument that Bankruptcy Code section 365(f)(1) can eviscerate Objecting Landlords' contractual agreements concerning financing, especially where the Debtors' authority to obtain the use of cash collateral and the grant of Adequate Protection Liens do not even arise under Section 365.

35.     BAPCPA clarified Bankruptcy Code section 365 to reflect the Congressional intent that Section 365(f)(1) not be used by debtors to avoid lease provisions. Therefore, to the extent Debtors seek to assign to its Prepetition Secured Parties an interest in their leases with Objecting Landlords, any assignment must remain subject to all provisions of the underlying leases. There is no authority for the proposition that such an assignment (under the guise of pledging the Debtors' leasehold interests as collateral), and independent of the safeguards of Sections 365(b)(3) and (f)(2), would be permissible, and no basis exists to render any provision of Debtors' real property leases unenforceable at this time, as contemplated by the imposition of liens on Debtors' leasehold interests through the broad grant of liens on all property of the Debtors as part of the Adequate Protection Liens sought by the Cash Collateral Motion.

**B.      The Prepetition Secured Parties do not Need a Security interest in Debtors' Real Property Leases to Protect Their Interests.**

36.     Prior to filing for bankruptcy protection, the Debtors did not encumber their interest in their leases with Objecting Landlords.  There is no legitimate reason to now grant the Prepetition Secured Parties (as non-debtor parties) liens that violate the terms of the leases where no such

---

365(f) of the code does not override Section 365(b)."  Floor Statement of Senator Orrin Hatch, 151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10,2005).

rights existed under state law, and no such liens existed pre-petition.  Nothing in the Bankruptcy Code gives the lenders such rights where they did not exist pre-petition.

37.     Moreover, the Prepetition Secured Parties do not need a security interest in Debtors' leases in order to liquidate their Collateral should the Debtors default.  Both the Bankruptcy Code and applicable state law remedies preserve all rights to realize upon the Collateral, neither of which require the granting a lien or other possessory right in Objecting Landlords' real property to do so.

38.     The Prepetition Secured Parties have no right or need to force Objecting Landlords to relinquish control over their real property or accept a cloud to the landlords' title to the leased premises.  The value in the Debtors' leasehold interests to its lenders is that which may be realized from the proceeds in a sale or other disposition of a leasehold interest, a process that is underway. *See, e.g.*, *Revised Notice of Bid Deadline and Potential Sale Hearing Related to Leases* [Docket No. 331].

39.     Accordingly, Objecting Landlords submit that there is a less intrusive means to provide Debtors' lenders with a security interest in the value of Debtors' real property leases, if any, without violating express provisions of the leases and without abrogating the protections afforded to landlords of nonresidential real property under the Bankruptcy Code.  A lien on the potential proceeds of the disposition of Debtors' real property leases more than adequately protects the interests of the Prepetition Secured Parties, while remaining consistent with the terms of the underlying leases.[9]  The "bonus value" of a debtor's leases has been recognized as property of the bankruptcy estate (*see, e.g., In re Ernst Home Center, Inc.*, 209 B.R. 974, 985-986 (Bankr. W.D.

---

[9]     Limiting a lender's interests to the proceeds of the prospective disposition of real property leases, rather than a direct lien on the leasehold interest, is routine in major Chapter 11 cases where the underlying leases restrict or prohibit the mortgage, pledge or collateral assignment. *See, e.g. In re WeWork, Inc.*, Case No. 23-19865-JKS (Bankr. D.N.J.), *Final Order (I) Authorizing the Debtors To Obtain New Postpetition Financing, etc.* [Docket No. 2054] at ¶ 5, fn. 9; In re Cineworld Group plc, Case No. 23-90168 (MI) (Bankr. S.D. Tex.), *Final Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, etc*. [Docket No. 676] at ¶ 7(a).

Wash. 1997)) and a security interest in that bonus value, in the form of a lien on the proceeds of the disposition of leases, strikes an appropriate balance between the Prepetition Secured Parties' interests, Debtors' need to access cash collateral and Objecting Landlords' rights under their respective leases and under the Bankruptcy Code.

**IV.** **Any Final Order Must Contain Language Limiting the Remedies of the Prepetition Secured Parties in the Event of Default, Consistent With the Interim Order**

40.      Any final order on the Cash Collateral Motion should also make it clear that the Prepetition Secured Parties do not have unrestricted rights of access to use and occupy Debtors' leased premises following a Cash Collateral Termination Event.  Notwithstanding any remedies purported to be granted by the Prepetition Credit Documents, there is no basis for a bankruptcy court to grant a non-debtor party rights to use and occupy real property leased by a debtor outside the parameters of Section 365.  *See, e.g., In re Antwerp Diamond, Inc.*, 138 B.R. 865, 866-869 (Bankr. N.D. Ohio 1992). Any final order approving the Cash Collateral Motion should maintain the limitations on lender access in the exercise of remedies contained in the Interim Order (*see* Interim Order at ¶ 12), consistent with similar limitations in other major Chapter 11 cases and applicable state law.

**V.** **JOINDER**

41.      To the extent not inconsistent with the foregoing, Objecting Landlords join in the objections to the Cash Collateral Motion and entry of a final order thereon filed by Debtors' other landlords.

**VI.** **RESERVATION OF RIGHTS**

42.      Objecting Landlords each reserve their respective rights to further object to the relief sought by the Cash Collateral Motion based upon any new information provided by Debtors or the Prepetition Secured Parties or upon any different relief requested by Debtors.

## VII.    <u>CONCLUSION</u>

43.    While Objecting Landlords are continuing to engage in discussions with representatives of the Debtors, the Official Committee of Unsecured Creditors, the Prepetition Secured Parties and other landlords regarding the potential interim or final resolution of the various issues raised in this Objection, to date, no consensual resolution has been reached. For the foregoing reasons, Debtors should not be permitted to waive their statutory rights and remedies to compel the Prepetition Lenders to "pay to play" in these Chapter 11 cases. The payment of accruing post-petition lease obligations and December stub rent must be adequately provided for in any Approved Budget. Any final order approving the Cash Collateral Motion should not waive Debtors' rights under Bankruptcy Code sections 506(c) and 552(b).

Respectfully Submitted,
January 29, 2025

_/s/ Ronald E. Gold_

**FROST BROWN TODD LLP**
Ronald E. Gold (Ohio Bar No. 0061351)
3300 Great American Tower
301 East Fourth Street
Cincinnati, OH 45202
Tel: (513) 651-6800
Fax: (513) 651-6981
Email: rgold@fbtlaw.com

-and-

Mark A. Platt (Texas Bar No. 00791453)
2101 Cedar Springs Road, Suite 900
Dallas, TX 75201
Tel: (214) 545-3474
Fax: (214) 545-3473
Email: mplatt@fbtlaw.com

_Counsel for Objecting Landlords_

_/s/ Ivan M. Gold_

**ALLEN MATKINS LECK GAMBLE**
 **MALLORY & NATSIS LLP**
Ivan M. Gold (SBN 121486)
3 Embarcadero Center, 12th Floor
San Francisco, CA 94111-4074
Telephone:     (415) 837-1515
Facsimile:     (415) 837-1516
Email:         igold@allenmatkins.com

_Counsel for Objecting Landlords_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2025 a true and correct copy of the foregoing *Objection of Multiple Landlords to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Use of Cash Collateral and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* was sent via CM/ECF electronic mail to all parties receiving CM/ECF noticing.

*/s/ Ronald E. Gold*

0028924.0732310  4919-2110-2100v1