United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 05, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARTY CITY HOLDCO INC., *et al.,*[1] | ) Case No. 24-90621 (ARP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) **Re: Docket No. 44** |

### SECOND INTERIM ORDER (I) AUTHORIZING
### THE DEBTORS TO (A) USE CASH COLLATERAL, AND
### (B) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE
### EXPENSE CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
### PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
### (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "**Cash Collateral Motion**")[2] of Party City Holdco Inc. and each of its affiliates that are debtors and debtors-in-possession (each, a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (together, the "**Local Rules**"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**" and, together with the Local Rules,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Inc. (1359); Am-Source, LLC (8427); Party City Corporation (3692); Party City Holdings Inc. (3029); PC Intermediate Holdings, Inc. (1229); and Trisar, Inc. (0659). The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

[2] Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the Cash Collateral Motion or the Prepetition Credit Documents, as applicable (each as defined herein).

the "**Bankruptcy Local Rules**"), seeking entry of this second interim order (this "**Interim Order**") and the Final Order (as defined herein) as applicable, among other things:

    (i)    authorizing the Debtors to use Cash Collateral (as defined herein) solely in accordance with this Interim Order and the Approved Budget;

    (ii)    granting the Debtors authority to provide adequate protection to the Prepetition Secured Parties for their interests in the Prepetition Collateral, including Cash Collateral;

    (iii)    waiving (a) the Debtors' right to surcharge the Prepetition Collateral (as defined herein) and the Adequate Protection Collateral (together, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code; *provided* that the foregoing waivers (i) shall be without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order and (ii) be otherwise on the terms set forth herein;

    (iv)    except as provided in this interim order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to the Collateral for the benefit of any party other than the Prepetition Secured Parties; *provided* that the foregoing waiver shall be without prejudice to any provisions of the Final Order;

    (v)    vacating and modifying the automatic stay under the Bankruptcy Code (the "**Automatic Stay**") to the extent set forth herein and as necessary to permit the Debtors and their affiliates, the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, and, upon entry, the Final Order, and to deliver any notices of termination described below and as further set forth herein;

    (vi)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

    (vii)    scheduling a final hearing (the "**Final Hearing**") to consider final approval of the use of Cash Collateral pursuant to a proposed final order[3] (the "**Final Order**"), as set forth in the Cash Collateral Motion filed with this Court.

The Court having considered the interim relief requested in the Cash Collateral Motion, the *Declaration of Deborah Rieger-Paganis in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Use Cash Collateral, and (B) Grant*

---

[3]    A proposed Final Order will be posted to the docket prior to the Final Hearing.

*Liens And Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**Rieger-Paganis Declaration**"), and the *Declaration of Deborah Rieger-Paganis, Chief Restructuring Officer of Party City Holdco Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**") and the evidence submitted and arguments made at the interim hearings held on December 23, 2024 and on February 5, 2025 (the "**Interim Hearings**"); and due and sufficient notice of the Interim Hearings having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearings having been held and concluded; and the first interim order on the Cash Collateral Motion having been granted on December 23, 2024 (the "**First Interim Order**"); and all objections, if any, to the interim relief requested in the Cash Collateral Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Cash Collateral Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing and is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the orderly wind down of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARINGS, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they

A.     *Petition Date*. On December 21, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**"). On December 21, 2024, this Court has entered an order approving the joint administration of the Chapter 11 Cases.

B.     *Debtors in Possession*. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     *Jurisdiction and Venue*. This Court has core jurisdiction over the Chapter 11 Cases, the Cash Collateral Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. Consideration of the Cash Collateral Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article III of the United States Constitution. Venue for the Chapter 11 Cases and proceedings on the Cash Collateral Motion is proper before this Court pursuant to 28 U.S.C. § 1408. The predicates for the relief sought herein are sections 105, 361, 362, 363(b), 363(c), 363(e), 363(m), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D.     *Committee Formation*: On January 6, 2025, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code and the

---

are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

*United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 167] (a "**Creditors' Committee**").

E.      *Notice*. The Interim Hearings were held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Proper, timely, adequate and sufficient notice of the Cash Collateral Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice was required under the circumstances to enter this Interim Order. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F.      *Cash Collateral*. As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

G.      *Debtors' Stipulations*. Subject to the provisions and limitations contained in paragraph 19 hereof (including the Challenge Period, as defined therein), and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate and agree that:

(i)      *Prepetition ABL Facility*. Pursuant to that certain ABL Credit Agreement dated as of October 12, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "**Prepetition ABL Credit Agreement**," and collectively with the other Loan Documents (as defined in the Prepetition ABL Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Prepetition ABL Credit Documents**" and the credit facilities evidenced thereby, collectively, the "**Prepetition ABL Facility**"), among (a) Party City Holdco Inc. (the "**Company**"),

(b) Party City Holdings, Inc. ("**Parent Borrower**"), (c) Party City Corporation, (and, together with Parent Borrower, "**Prepetition ABL Borrowers**"), (d) PC Intermediate Holdings, Inc. ("**Holdings**"), (e) the other guarantors party thereto (and, together with the Company and Holdings, the "**Prepetition ABL Guarantors**"), (f) JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (solely in such capacity, the "**Prepetition ABL Agent**"), and (g) the lenders from time to time party thereto with respect to the ABL Revolving Loans (as defined in the Prepetition ABL Credit Agreement), the FILO Loans (as defined in the Prepetition ABL Credit Agreement) and any other Obligations (as defined in the Prepetition ABL Credit Agreement) (collectively, the "**Prepetition ABL Lenders**," and collectively with the Prepetition ABL Agent, and all other holders of Prepetition ABL Debt (as defined below), the "**Prepetition ABL Secured Parties**" and, together with the Prepetition 2L Notes Secured Parties (as defined below), the "**Prepetition Secured Parties**"), the Prepetition ABL Lenders provided revolving credit and other financial accommodations to the Prepetition ABL Borrowers pursuant to the Prepetition ABL Credit Documents, and the Prepetition ABL Guarantors guaranteed on a joint and several basis the "Obligations" (as defined in the Prepetition ABL Credit Agreement, the "**Prepetition ABL Obligations**") under the Prepetition ABL Credit Agreement and the other Prepetition ABL Credit Documents;

(ii)      *Prepetition 2L Notes*. Pursuant to that certain indenture for the 12.00% senior secured second lien PIK Toggle Notes due 2029 (collectively, the "**Prepetition 2L Notes**") dated as of October 12, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "**Prepetition 2L Notes Indenture**," and collectively with the other Notes Documents (as defined in the Prepetition 2L Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may have been amended,

restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Prepetition 2L Notes Documents**") by and among (a) the Company, as issuer (the "**Prepetition 2L Notes Issuer**"), (b) the guarantors party thereto (collectively, the "**Prepetition 2L Notes Guarantors**") and (c) Wilmington Savings Fund Society, FSB, as trustee and collateral trustee (solely in such capacity, the "**Prepetition 2L Notes Trustee**") for the benefit of the holders of the Prepetition 2L Notes (the "**Prepetition 2L Noteholders**" and, together with the Prepetition 2L Notes Trustee and all other holders of Prepetition 2L Notes Debt (as defined below), the "**Prepetition 2L Notes Secured Parties**"), the Prepetition 2L Notes Issuer issued the Prepetition 2L Notes to the Prepetition 2L Noteholders and the Prepetition 2L Notes Guarantors guaranteed on a joint and several basis the "Obligations" (as defined in the Prepetition 2L Notes Indenture, the "**Prepetition 2L Notes Obligations**" and, together with the Prepetition ABL Obligations, the "**Prepetition Secured Obligations**") of the Prepetition 2L Notes Issuer under the Prepetition 2L Notes Indenture and the other Prepetition 2L Notes Documents;

(iii)     *Prepetition Intercreditor Agreement*. Pursuant to and to the extent set forth in that certain Intercreditor Agreement, dated as of October 12, 2023 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time) (the "**Prepetition Intercreditor Agreement**" and, together with the Prepetition 2L Notes Documents and the Prepetition ABL Credit Documents, the "**Prepetition Credit Documents**") by and among the Prepetition ABL Agent, Prepetition 2L Notes Trustees, as trustee for the Notes Secured Parties referred to therein, Holdings, the Company, Parent Borrower, and the subsidiaries of the Company from time to time party thereto, the parties thereto agreed, among other things: (a) that the Prepetition ABL Liens (as defined herein) are senior to the Prepetition 2L Notes Liens (as defined

herein) on the Collateral and (b) to be bound by the other waterfall and turnover provisions contained therein.

(iv)    *Prepetition ABL Debt*. As of the Petition Date, the Prepetition ABL Borrowers, Holdings and the other Prepetition ABL Guarantors were justly and lawfully indebted and liable to the Prepetition ABL Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than (a) $118,165,942 in outstanding principal amount of ABL Revolving Loans (as defined in the Prepetition ABL Credit Agreement) plus interest and fees thereon (the "**Prepetition ABL Revolving Debt**"), plus $30,942,000 of the aggregate stated principal amount available for drawing under all outstanding letters of credit and all unpaid reimbursement obligations with respect to drawn letters of credit (the "**Prepetition Letters of Credit**") and (b) $13,312,000 in outstanding principal amount of FILO Loans (as defined in the Prepetition ABL Credit Agreement) plus interest (the "**Prepetition FILO Debt**"), which loans and outstanding letters of credit were made or issued by the Prepetition ABL Lenders pursuant to, and in accordance with the terms of, the Prepetition ABL Credit Documents, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition ABL Credit Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition ABL Credit Documents (collectively, the "**Prepetition ABL Debt**"), which Prepetition ABL Debt has been guaranteed on a joint and several basis by each of the Prepetition ABL Guarantors;

(v)    *Prepetition 2L Notes Debt*. As of the Petition Date, the Prepetition 2L Notes Issuer and the Prepetition 2L Notes Guarantors were justly and lawfully indebted and liable to the

Prepetition 2L Notes Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $232,394,231 of the outstanding Prepetition 2L Notes, which notes were issued by the Prepetition 2L Notes Issuer pursuant to, and in accordance with the terms of, the Prepetition 2L Notes Documents, plus accrued and unpaid interest thereon and any fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition 2L Notes Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) to the extent provided in the Prepetition 2L Notes Documents (collectively, the "**Prepetition 2L Notes Debt**," and, together with the Prepetition ABL Debt, the "**Prepetition Secured Debt**"), which Prepetition 2L Notes Debt has been guaranteed on a joint and several basis by each of the Prepetition 2L Notes Guarantors;

(vi)     *Validity of Prepetition Secured Debt*. The Prepetition Secured Debt constitutes legal, valid, binding, and non-avoidable obligations of the Prepetition ABL Borrowers, the Prepetition 2L Notes Issuer, the Prepetition ABL Guarantors, and the 2L Notes Guarantors, as applicable, enforceable in accordance with their respective terms, pursuant to the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement and Disclosure Statement Supplement on a Final Basis and (II) Confirming the Fourth Amended Joint Chapter 11 Plan of Reorganization of Party City Holdco INC. and its Debtor Affiliates*, at ¶ 105-106 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023) [ECF No. 1711] (the "**2023 Confirmation Order**") and the Prepetition Credit Documents, and no portion of the Prepetition Secured Debt or any payment made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Credit Documents prior to the Petition Date is subject to any contest, attack,

rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is used in the Bankruptcy Code), cause of action (including any claims or avoidance actions under Chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law.

(vii)    *Validity, Perfection and Priority of Prepetition ABL Liens*. As of the Petition Date, pursuant to and in connection with the Prepetition ABL Credit Documents, the Prepetition ABL Borrowers, Holdings and the other Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, a security interest in and continuing lien on (the "**Prepetition ABL Liens**" and, together with the Prepetition 2L Notes Liens, the "**Prepetition Liens**") substantially all of their assets and property, pursuant to the 2023 Confirmation Order at ¶ 105, including, (i) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien (the "**Prepetition ABL Liens**") on the First Priority Collateral (as defined in the Prepetition Intercreditor Agreement) (which, for the avoidance of doubt, includes the Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition ABL Collateral**"), which Prepetition ABL Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only, to the extent applicable, certain other liens permitted by the Prepetition ABL Credit Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition ABL Liens as of the Petition Date (the "**Prepetition ABL Permitted Senior Liens**").

10

(viii)   *Validity, Perfection and Priority of Prepetition 2L Notes Liens*. As of the Petition Date, pursuant to and in connection with the Prepetition 2L Notes Documents, the Prepetition 2L Notes Issuer and the Prepetition 2L Notes Guarantors granted to the Prepetition 2L Notes Trustee, for the benefit of itself and the other applicable Prepetition 2L Notes Secured Parties, a security interest in and continuing lien on (the "**Prepetition 2L Notes Liens**") substantially all of their assets and property, including, pursuant to the 2023 Confirmation Order at ¶ 107, (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Second Priority Collateral (as defined in the Prepetition Intercreditor Agreement) (which, for the avoidance of doubt, includes the Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition 2L Collateral**" and, together with the Prepetition ABL Collateral, the "**Prepetition Collateral**"), which Prepetition 2L Notes Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim (as defined in the Bankruptcy Code) or applicable non-bankruptcy law, subject and subordinate only to the liens of Prepetition ABL Agent and, to the extent applicable, certain other liens permitted by the Prepetition 2L Notes Documents, solely to the extent any such other permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition 2L Notes Liens as of the Petition Date (the "**Prepetition 2L Notes Permitted Senior Liens**" and, together with the Prepetition ABL Permitted Senior Liens, the "**Prepetition Permitted Senior Liens**") and the Debtors waive, discharge and release any right to challenge any of the Prepetition Secured Debt, the Prepetition ABL Liens and the Prepetition 2L Liens, including any right to challenge or contest in any way

the perfection, priority or enforceability of Prepetition Secured Debt, the Prepetition Credit Documents, the Prepetition ABL Liens and the Prepetition 2L Notes Liens.

(ix)   *No Control*. None of the Prepetition Secured Parties control (or have in the past controlled) the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors in each case by virtue of any actions taken with respect to, in connection with, related to or arising from the Prepetition Credit Documents.

(x)   The Debtors are in default under each of the Prepetition Credit Documents, including as a result of the Chapter 11 Cases, and an event of default has occurred and is continuing under each of the Prepetition Credit Documents.

(xi)   *No Claims or Causes of Action*. No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined herein) (in each case, in their capacity as such) under or relating to any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date.

(xii)   *Release*. Effective as of the date of entry of the First Interim Order and ratified and reaffirmed by this Interim Order, each of the Debtors and (subject to the Challenge Period in paragraph 19) the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably on the date of the First Interim Order released and forever discharged and acquitted the Prepetition Secured Parties and each of their respective Representatives in such capacity (as defined herein) (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from

any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise (collectively, the "**Released Claims**"), in each case arising out of or related to (as applicable) the Prepetition Credit Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.

H.    *Findings Regarding the Use of Cash Collateral.*

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to use Cash Collateral and grant the Prepetition Secured Parties adequate protection.

(ii)    The Debtors have an immediate and critical need to use Prepetition Collateral (including Cash Collateral) in order to permit, among other things, the orderly liquidation of the Collateral, to make payroll, to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral is necessary and vital to the preservation and maintenance of the value of the Prepetition Collateral and the ultimate recovery to the Prepetition Secured Parties and other creditors of the Debtors' estates.

(iii)   The Debtors find it prudent, in the exercise of their business judgment to obtain consensual use of Cash Collateral and, in connection therewith incur the Adequate Protection Obligations (as defined herein), in each case as provided for herein under the terms and conditions set forth in this Interim Order.

(iv)   The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral, all of which constitute Prepetition Collateral under the Prepetition Credit Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Credit Documents, as applicable.

(v)   The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code. Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date or hereafter created or arising, including balances of funds in the Debtors' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.

(vi)   Based on the Cash Collateral Motion, the Rieger-Paganis Declaration, the First Day Declaration and the record presented to the Court at the Interim Hearings, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraph 5 of this Interim Order (the "**Adequate Protection**"), and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(vii)   The Prepetition Secured Parties have acted in good faith regarding the Debtors' continued use of the Prepetition Collateral (including Cash Collateral) to fund the

14

administration of the Debtors' estates and orderly wind down of their businesses (including the incurrence and payment of and performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)   The Prepetition Secured Parties are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. Based on the Cash Collateral Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral, and, to the extent their consent is required, the requisite Prepetition Secured Parties have consented or are deemed hereby to have consented to the use of the Prepetition Collateral, including the Cash Collateral, on the terms set forth in this Interim Order; *provided* that nothing in this Interim Order shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and the Approved Budget, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by this Interim Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection or

assert any rights of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

(ix)     In connection with the First Interim Order, the Debtors prepared and delivered to the advisors to the Prepetition Secured Parties an initial budget (which was attached to the First Interim Order as Schedule 1), and have, in accordance with the First Interim Order, prepared and delivered an updated budget (the "**Updated Budget**"), which is attached hereto as Schedule 1. The Updated Budget reflects, among other things, the Debtors' anticipated operating receipts, anticipated operating disbursements, anticipated non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby. The Updated Budget may be modified, amended, extended, and updated from time to time in accordance with paragraph 6(a), and once approved in accordance therewith, shall modify, replace, supplement, or supersede, as applicable, the Updated Budget for the periods covered thereby (the Updated Budget and each subsequent approved budget shall constitute, without duplication, an "**Approved Budget**"). Any subsequent Approved Budget shall be promptly provided to the Creditors' Committee. No changes may be made to the professional fees of the Creditors' Committee in any approved Budget without the written consent of the Creditors' Committee. Updates, modifications, and supplements to the Approved Budget shall not require any further approval of this Court. The Debtors believe that the Updated Budget is reasonable under the circumstances. The Prepetition Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to permitted variances), and this Interim Order in determining to allow the use of Cash Collateral as provided for in this Interim Order.

(x)     Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception

under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral; *provided* that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order.

      I.      *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Bankruptcy Local Rule 4001-1(b). Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. The permitted use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and Approved Budget, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. The Cash Collateral Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-1(b).

      J.      *Prepetition Permitted Senior Liens; Continuation of Prepetition Liens*. Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Senior Lien and/or security interests. The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Senior Lien, as used herein, and is expressly subject to the Adequate Protection Liens (as defined herein) and the Prepetition Liens. The Prepetition Liens and the Adequate Protection Liens are continuing liens, and the Collateral is and will continue to be encumbered by such liens.

K.    *Intercreditor Agreements.* Pursuant to Section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Credit Documents (the "**Intercreditor Agreements**") (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims granted or amounts payable in respect thereof by the Debtors under this Interim Order or otherwise) and (iii) shall not be deemed to be amended, altered or modified by the terms of this Interim Order, unless expressly set forth herein.

Based upon the foregoing findings and conclusions, the Cash Collateral Motion and the record before the Court with respect to the Cash Collateral Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    *Motion Granted.* The interim relief sought in the Cash Collateral Motion is granted and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in this Interim Order. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.    *Use of Cash Collateral.* The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use all Cash Collateral in accordance with this Interim Order and the Approved Budget (subject to permitted variances); *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth and (b) except on the

terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

3.      *Reserves*.  Upon entry of the First Interim Order, the Debtors established, subject to the liens of the Prepetition ABL Agent and the Prepetition 2L Notes Trustee to the extent set forth in this paragraph 3: *first*, a reserve in a segregated account (the "**Wind Down Reserve**"), which reserve was funded in accordance with the Approved Budget from Collections and the proceeds of the Prepetition Collateral (including Cash Collateral) in the amount of $28 million, and is subject to adjustment in accordance with the budget approval process set forth in paragraph 6(a) (such amount as may be adjusted, the "**Wind Down Reserve Amount**"), without duplication of any amounts funded to the WARN/Severance Reserve (as defined below) or the Carve-Out Account; and *second*, a reserve in a segregated account, which may be the same account as the Wind Down Reserve (the "**WARN/Severance Reserve**" and together with the Wind Down Reserve and the Stub Rent Reserve (as defined in paragraph 21), the "**Reserves**") in an amount up to $3.5 million, which reserve shall be funded in accordance with the Approved Budget from Collections and the proceeds of the Prepetition Collateral (including Cash Collateral), to fund costs associated with the federal Worker Adjustment and Retraining Notification Act and state law equivalents. Any segregated account formed to hold the proceeds of any Reserve is referred to herein as a "**Reserve Account**."  All funds in the Reserve Accounts shall be used, subject to the Approved Budget, first to pay all allowed or undisputed claims benefitting from the Reserves until such claims are paid in full. If, after paying all such amounts, the Reserves have not been reduced to zero, all remaining funds in the Reserves shall be applied as set forth in paragraph 4 hereof. The Reserves and the Reserve Accounts shall constitute Collateral hereunder; *provided* that, notwithstanding any other provision of this Interim Order or the Prepetition Secured Parties' rights

and remedies under this Interim Order or applicable law, following a Cash Collateral Termination Event, the proceeds of the Reserves shall be applied, and the Debtors are expressly authorized, to pay without further order of this Court (a) with respect to the Wind Down Reserve, all accrued and unpaid allowed or undisputed liabilities set forth in the Approved Budget (without duplication of the WARN/Severance Reserve) related to the line items "Payroll, Benefits & Taxes" and "Taxes – Sales and Other" whether accrued on or after the occurrence of a Cash Collateral Termination Event, (b) with respect to the WARN/Severance Reserve, any accrued and unpaid allowed or undisputed liabilities benefitting from such reserve, and (c) with respect to the Stub Rent Reserve (as defined in paragraph 21), any accrued and unpaid allowed or undisputed liabilities benefitting from such reserve (collectively, the "**Required Reserve Payments**"), in each case, prior to the Prepetition Secured Parties' exercise of any remedies authorized hereunder with respect to the Reserves or the Reserve Accounts.  Following a Cash Collateral Termination Event, the Debtors shall provide written notice to the Directing Cash Collateral Agent as soon as reasonably practicable that, with respect to any applicable Reserve, the disbursements authorized pursuant to the preceding sentence have been made (any such notice, a "**Reserve Satisfaction Notice**"). Immediately upon the Directing Cash Collateral Agent's receipt of a Reserve Satisfaction Notice with respect to any Reserve, the Directing Cash Collateral Agent and any other Prepetition Secured Party (as applicable) shall be entitled to exercise any rights and remedies provided under this Interim Order or applicable law with respect to the Reserve subject to such notice in accordance with the terms of this Interim Order.

4.       *Liquidation*. On the second business day of each week after the date hereof, any cash received by the Debtors from any source, including, without limitation, accounts, sale of property, leaseholds, loan advances, refunds, cash proceeds, or extraordinary receipts (together

"**Collections**") as of the previous Saturday (each, a "**Repayment Determination Date**"), the amount of Collections in excess of the amounts necessary to fully fund the Reserves, to pay the Stub Rent (as defined below) on the schedule set forth herein and the Carve-Out shall be transferred to the Prepetition ABL Agent until repayment in full of all the Prepetition ABL Obligations (a "**Repayment Transfer**"). The Prepetition ABL Agent shall, and is hereby authorized to, apply such amounts to repay any then outstanding Prepetition ABL Obligations held by the Prepetition ABL Secured Parties and to cash collateralize any Prepetition Letters of Credit, in each case as set forth and in accordance with the priorities and terms of the Prepetition ABL Credit Agreement.

5.     *Adequate Protection of Prepetition Secured Parties*. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) for the diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the use of Cash Collateral, the payment of any amounts under the Carve-Out or Reserves or pursuant to this Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "**Adequate Protection Claims**"). In consideration of the foregoing, the Prepetition ABL Agent and the Prepetition 2L Trustee, as applicable, and for the benefit of the applicable Prepetition Secured Parties, are hereby granted the following as Adequate Protection on account of their Adequate Protection Claims, and as an inducement to the Prepetition Secured Parties to consent to the use of the Prepetition Collateral (including Cash Collateral) (collectively, the "**Adequate Protection Obligations**"):

(a)     *ABL Adequate Protection Liens*. The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders is hereby granted (effective and perfected upon the date of the First Interim Order and ratified and reaffirmed on the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, automatically perfected first priority security interest in and lien upon (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the Debtors (including the Prepetition Collateral), whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, including, without limitation, any and all cash of the Debtors (wherever held) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, chattel paper (including electronic chattel paper and tangible chattel paper), proceeds of leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise in each case other than (a) commercial tort claims, (b) claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") and, without prejudice to the Final Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")) and (c) the

Carve-Out Account and any amounts held therein (the "**Adequate Protection Collateral**," and the liens thereon, the "**ABL Adequate Protection Liens**"),[5] senior to all other liens subject and subordinate to only (i) the Prepetition Permitted Senior Liens (if any) and (ii) the Carve-Out; *provided* that notwithstanding the foregoing, upon payment of all amounts required to be paid from the Carve-Out Account hereunder, the Carve-Out Account and any remaining funds therein shall constitute Collateral hereunder and the ABL Adequate Protection Liens shall attach thereto. In all events the Prepetition ABL Agent and the Prepetition ABL Lenders agree to exercise commercially reasonable efforts to marshal away from assets included in the Adequate Protection Collateral that were not part of the Prepetition Collateral before turning to such non-Prepetition Collateral to collect any Adequate Protection Claims.

(b)        *Prepetition ABL Secured Parties' Section 507(b) Claim.* The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, was granted under the First Interim Order and is hereby granted an allowed superpriority administrative expense claim (senior to all other administrative expense claims of any kind but subject to the Carve-Out )on account of such Prepetition ABL Secured Parties' Adequate Protection Claims as provided for in

---

[5]    Notwithstanding anything contained herein to the contrary, the Adequate Protection Liens shall not encumber, and the Adequate Protection Collateral shall not be deemed to include:  (a) American Greetings Corporation's ("**AG**") interest in products (the "**AG Products**") located at the Debtors' stores that were or are hereafter supplied by AG pursuant to that certain SBT Supply Agreement dated December 8, 2017, as thereafter amended (the "**AG SBT Agreement**"); (b) the portion of the proceeds from the sale of the AG Products to which AG is entitled under the AG SBT Agreement (the "**AG Sale Proceeds**"); (c) Papyrus-Recycled Greetings, Inc.'s ("**Papyrus**") interest in products (the "**Papyrus Products**") located at the Debtors' stores that were or are hereafter supplied by Papyrus pursuant to that certain SBT Supply Agreement dated May 27, 2019 (the "**Papyrus SBT Agreement**"); nor (d) the portion of the proceeds from the sale of the Papyrus Products to which Papyrus is entitled under the Papyrus SBT Agreement (the "**Papyrus Sale Proceeds**"). The Debtors are hereby authorized and directed to continue to remit the AG Sale Proceeds to AG pursuant to the terms of the AG SBT Agreement, and to continue to remit the Papyrus Sale Proceeds to Papyrus pursuant to the terms of the Papyrus SBT Agreement; *provided* that nothing herein shall be deemed to constitute an assumption by the Debtors of the AG SBT Agreement or the Papyrus SBT Agreement, with the Debtors reserving all of their rights with respect thereto under 11 U.S.C. § 365.

section 507(b) of the Bankruptcy Code (the "**Prepetition ABL 507(b) Claim**") which Prepetition ABL 507(b) Claim shall be senior to all other claims and be payable from and have recourse to all Adequate Protection Collateral and all proceeds thereof (excluding Avoidance Actions and, without prejudice to the Final Order, the Avoidance Proceeds); *provided* that such recourse shall be subject to the Required Reserve Payments.

(c)      *Prepetition 2L Notes Adequate Protection Liens*. The Prepetition 2L Notes Trustee, for itself and for the benefit of the other applicable Prepetition 2L Notes Secured Parties, is hereby granted (effective and perfected upon the date of the First Interim Order and ratified and reaffirmed pursuant to this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Adequate Protection Collateral (the "**2L Notes Adequate Protection Liens**" and, together with the ABL Adequate Protection Liens, the "**Adequate Protection Liens**"), subject and subordinate to (i) the ABL Adequate Protection Liens, (ii) the Prepetition ABL Liens, (iii) Prepetition Permitted Senior Liens (if any), and (iv) the Carve-Out; *provided* that notwithstanding the foregoing, upon payment of all amounts required to be paid from the Carve-Out Account hereunder, the Carve-Out Account and any remaining funds therein shall constitute Collateral hereunder and the 2L Notes Adequate Protection Liens shall attach thereto. In all events the Prepetition 2L Notes Trustee and the Prepetition 2L Notes Secured Parties agree to exercise commercially reasonable efforts to marshal away from assets included in the Adequate Protection Collateral that were not part of the Prepetition Collateral before turning to such non-Prepetition Collateral to collect any Adequate Protection Claims.

(d)     *Prepetition 2L Notes Secured Parties' Section 507(b) Claim*.     The Prepetition 2L Notes Trustee, for itself and for the benefit of the other applicable Prepetition 2L Notes Secured Parties, was granted as of the First Interim Order and is hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim on account of such Prepetition 2L Notes Secured Parties' Adequate Protection Claims as provided for in section 507(b) of the Bankruptcy Code (the "**Prepetition 2L Notes 507(b) Claim**" and, together with the Prepetition ABL 507(b) Claim, the "**Adequate Protection 507(b) Claims**"), which Prepetition 2L Notes 507(b) Claim shall be payable from and have recourse to all Adequate Protection Collateral and all proceeds thereof (excluding Avoidance Actions and, without prejudice to the Final Order, the Avoidance Proceeds); *provided* that such recourse shall be subject to the Required Reserve Payments. The Prepetition 2L Notes 507(b) Claims shall be subject and subordinate only to (1) the Carve-Out, (2) claims in respect of the Prepetition ABL Debt, and (3) the Prepetition ABL 507(b) Claim.

(e)     *Prepetition ABL Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, the Debtors shall provide the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the Prepetition ABL Agent under the Prepetition ABL Credit Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of primary, special, conflicts and local counsel (in each applicable jurisdiction) and financial advisors, including the reasonable and documented fees and out-of-pocket expenses of Simpson Thacher & Bartlett LLP and Berkeley Research Group, LLC as financial advisor (the "**ABL Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 17 of this Interim Order.

(f) *Prepetition 2L Notes Secured Parties Adequate Protection Fees and Expenses*. As further adequate protection, the Debtors shall provide the Prepetition 2L Notes Trustee, for the benefit of the applicable Prepetition 2L Notes Secured Parties current cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of primary, special, conflicts and local counsel (in each applicable jurisdiction) and financial advisors to the Prepetition 2L Notes Trustee and the Prepetition 2L Noteholders, including, without limitation, Davis Polk & Wardwell LLP, Haynes Boone LLP and K&L Gates LLP (such fees and expenses, the "**2L Notes Adequate Protection Fees and Expenses**" and, together with the ABL Adequate Protection Fees and Expenses, the "**Adequate Protection Fees and Expenses**"), and, subject to the review procedures set forth in paragraph 17 of this Interim Order.

(g) *ABL Postpetition Interest*. From and after entry of this Interim Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payment during the Chapter 11 Cases of all accrued interest on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest becomes due and payable as set forth in the following sentence, during the Chapter 11 Cases at the applicable contractual default rate thereunder and in the amounts specified in the Prepetition ABL Credit Agreement. The first such interest payment date shall be January 1, 2025, and thereafter, the first business day of every calendar month.

(h) *ABL ABR Rollover*. Notwithstanding anything to the contrary herein or in the Prepetition ABL Credit Agreement, upon the termination of any applicable Interest Period (as defined in the Prepetition ABL Credit Agreement), each Term SOFR Borrowing (as defined in the Prepetition ABL Credit Agreement) shall automatically convert to and be deemed to be an ABR

Borrowing (as defined in the Prepetition ABL Credit Agreement) for all purposes under the Prepetition ABL Credit Agreement; *provided* that no break funding payments shall be payable in connection therewith.

(i)     *ABL Adequate Protection Information Rights*. The Debtors shall provide to the Prepetition ABL Agent with all reporting required under the Prepetition ABL Credit Agreement when due in accordance with its terms and with any other reporting reasonably requested by the Prepetition ABL Agent or its advisors as soon as practicable after request; *provided, however,* that the Debtors shall not be required to provide the reporting specified in sections 5.01(a), 5.01(b), 5.01(c), 5.01(d), and 5.01(h) of the Prepetition ABL Credit Agreement nor, for the avoidance of doubt, any similar reporting under the Prepetition 2L Notes Indenture. Concurrently with such delivery to the Prepetition ABL Agent, the Debtors shall provide such reporting in substantially similar form to the Prepetition 2L Notes Trustee, the advisors of the Prepetition Secured Parties and the advisors to the Creditors' Committee.

(j)     *Borrowing Base Reporting*.[6] The Debtors shall deliver to the Prepetition ABL Agent, the Prepetition 2L Notes Trustee, the advisors of the Prepetition Secured Parties and the advisors to the Creditors' Committee a Borrowing Base Certificate, with all the information required to be provided in connection therewith pursuant to the Prepetition ABL Credit Agreement, in each case in the format customarily delivered with each Borrowing Base Certificate delivered prior to the Petition Date, setting forth the Borrowing Base (i) calculated as of the last day of the immediately preceding calendar week (with weeks, for purpose of the Borrowing Base Certificate, beginning on Sunday and ending on Saturday) on Thursday of each week commencing on January

---

[6]     Terms used in this paragraph that are not otherwise defined herein shall have the meanings given to them in the Prepetition ABL Credit Agreement.

2, 2025, for the week ending December 28, 2024, and each Thursday thereafter; and (ii) calculated as of the last business day of the immediately preceding fiscal month, promptly, but in no event later than January 20, 2025, with respect to the fiscal month ended December 31, 2024, and twenty calendar days (or, if such day is not a business day, the next business day) following the end of each subsequent fiscal month which monthly Borrowing Base Certificates shall reconcile all weekly inventory roll forwards.

        (k)    *Sale Process Reporting.* The Debtors and their advisors shall provide, in connection with any sale process conducted by the Debtors and/or its advisors (including by any liquidators hired by the Debtors) to the advisors of the Prepetition Secured Parties and the advisors to the Creditors' Committee: (i) all material developments in connection with the efforts of the Debtors, their advisors and any liquidators to sell some, all or substantially all of the Debtors' assets as promptly as possible, (ii) on a weekly basis, reasonably detailed updates on the progress of any such sale, which may be in the form of a weekly status update call, (iii) access to any data room, (iv) copies of all reports, analyses, non-legally privileged materials (including, without limitation, any and all confidential memoranda or other work product provided by the investment banker or any liquidator in connection with the sales process), and (v) within two (2) business days after receipt of any bona fide bid or indication of interest ("**IOI**"), a summary of such bid or IOI and, if applicable, any documentation, letter or agreement accompanying such bid or IOI; *provided* that the aforementioned reporting obligations shall not apply as to any applicable Prepetition Secured Party with respect to any assets for which such Prepetition Secured Party is a potential bidder.

(l)   *Maintenance of Collateral.* The Debtors shall continue to maintain and insure the Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Credit Documents.

(m)   *Adequate Protection Milestones.* The Prepetition Secured Parties are hereby entitled to performance of those certain case milestones set forth in <u>Schedule 2</u> hereto (the "**Adequate Protection Milestones**").

6.   *Budget.*

(a)   *Budget Reporting.* At any time, but no later than the fifth (5th) business day after each of the following:  (i) January 31, 2025, (ii) February 28, 2025, and (iii) after the occurrence of (i) and (ii), either (1) the date a request is made by the Prepetition ABL Agent or, following the indefeasible payment in full in cash and cash collateralization (as applicable) of all of the Prepetition ABL Obligations, the Prepetition 2L Notes Trustee (the "**Directing Cash Collateral Agent**"); *provided* that no party may request an updated Approved Budget more often than once in a given four-week period pursuant to this clause (iii) (1) or (2); or (2) at the Debtors' election, the Debtors shall deliver to the Directing Cash Collateral Agent (and, for information purposes only, to each other secured debt agent or trustee and the advisors to the Creditors' Committee) a rolling 13-week cash flow forecast of the Debtors in the form of the budget (a "**Proposed Budget**") that includes, among other things, an updated Wind Down Reserve Amount. The Proposed Budget (including any subsequent revisions to any such Proposed Budget) will become the Approved Budget with respect to the thirteen-week (13-week) period (such period as set forth in the Approved Budget in effect at such time, the "**Budget Period**") covered thereof effective five business days after such submission (such date, the "**Budget Transition Date**") unless the Debtors receive a written objection from the Directing Cash Collateral Agent (prior to

repayment in full of the Prepetition ABL Obligations, acting at the direction of the requisite lenders under the Prepetition ABL Credit Agreement (the "**Prepetition ABL Required Lenders**")) prior to the Budget Transition Date. In the event the Directing Cash Collateral Agent (prior to repayment in full of the Prepetition ABL Obligations, acting at the direction of the Prepetition ABL Required Lenders) timely objects to a Proposed Budget, the prior Approved Budget shall remain in full force and effect until the Directing Cash Collateral Agent approves any Proposed Budget (with email from the Directing Cash Collateral Agent's counsel to the Debtors' counsel being sufficient).[7]

(b) *Variance Testing; Permitted Variances*. The Debtors shall at all times use Cash Collateral solely for the purposes included in the Approved Budget. By not later Saturday, January 4, 2025, and no later than the last day of each week thereafter, the Debtors shall deliver to the Prepetition ABL Agent, the Prepetition 2L Notes Trustee, the advisors of the Prepetition Secured Parties, the advisors to the Creditors' Committee and the U.S. Trustee, a variance report for the applicable Testing Period (as defined below) in form and detail reasonably acceptable to the Directing Cash Collateral Agent (a "**Variance Test**") showing comparisons of (a) aggregate cash receipts for the Testing Period, compared to the aggregate projected cash receipts of the Debtors for such Testing Period as set forth in the Approved Budget and (b) aggregate actual cash disbursements of the Debtors for such Testing Period compared to the projected cumulative cash disbursements for such Testing Period as set forth in the Approved Budget (any such difference on an aggregate basis, a "**Disbursements Variance**"). Each "**Variance Test**" shall indicate whether there are any adverse Variances that exceed the Permitted Deviation (as defined below)

---

[7] With respect to the Prepetition ABL Agent, the approval of any Proposed Budget or any modifications to any Approved Budget, as well as waiving any Cash Collateral Termination Event resulting from, among other things, any Variance Test showing an adverse variance exceeding a Permitted Deviation shall, in each case, be subject to the prior approval of such budget by the Prepetition ABL Required Lenders.

and shall provide a written explanation for such variances. "**Permitted Deviation**" shall mean, excluding professional fees and payments made pursuant to this Interim Order, (a) with respect to the aggregate Variance Test for any applicable Testing Period, based on receipts solely with respect to the line items reflecting receipts of the Store Closing Sales,[8] an aggregate unfavorable Variance equal to or less than (i) 20% for the first week of the Chapter 11 Cases and (ii) 15% thereafter (the "**Receipts Permitted Deviation**") and (b) with respect to the aggregate Variance Test for any applicable Testing Period based on disbursements, an aggregate unfavorable Variance equal to or less than (i) 17.5% for the first week of the Chapter 11 Cases, and (ii) 12.5% thereafter (the "**Disbursements Permitted Deviation**"). It shall be a condition precedent to the use of Cash Collateral that the Debtors shall have delivered an Approved Budget in accordance with paragraph 6(a). A Variance Test showing noncompliance with the Permitted Deviations, shall constitute an automatic Cash Collateral Termination Event (as defined below) hereunder unless waived by the Directing Cash Collateral Agent (which waiver shall not require this Court's authorization or notice). A "**Testing Period**" means each rolling cumulative four-week period beginning with the first full week after the approval of the Updated Budget; provided that for the initial week after approval of the Updated Budget, the Testing Period shall be the prior one-week period, for the initial two weeks after the approval of the Updated Budget, the Testing Period shall be the prior rolling cumulative two-week period and for the initial three weeks after the approval of the Updated Budget, the Testing Period shall be the prior rolling cumulative three-week period.

---

[8]   "Store Closing Sales" shall mean the sales of Merchandise and FF&E, each as defined in that certain Asset Disposition Consulting Agreement, dated December 16, 2024, by and between Party City Holdings Inc., Party City Corporation, and Amscan Inc. and Gordon Brothers Retail Partners, LLC and Gordon Brothers Commercial and Industrial, LLC.

7.      *Reservation of Rights of Prepetition Secured Parties*. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that any of the Prepetition Secured Parties (subject to any applicable contractual limitations on such rights) may request further or different adequate protection and the Debtors or any other party in interest may contest any such request.

8.      *Perfection of Adequate Protection Liens.*

(a)      Without in any way limiting the automatically valid effective perfection of the Adequate Protection Liens granted pursuant to paragraph 4 hereof, the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Prepetition Secured parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of securities, or to amend or modify security documents, or enter into intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("**Perfection Actions**"). Whether or not the Prepetition Secured Parties shall take such Perfection Actions, the liens and security interests granted hereunder shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.

(b)     A certified copy of this Interim Order may, in the discretion of the Prepetition ABL Agent or the Prepetition 2L Notes Trustee be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a certified copy of this Interim Order for filing and/or recording, as applicable. The Automatic Stay shall be modified to the extent necessary to permit the Prepetition 2L Notes Trustee, and the Prepetition ABL Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

9.     *Carve-Out.*

(a)     As used in this Interim Order, the term "**Carve-Out**" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) subject, in each case, to application of any retainers that may be held and to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors or the Creditors' Committee pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code (collectively, the "**Estate Professionals**") (in each case, other than any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors) at any time before or on the first business day following delivery by the Directing Cash Collateral Agent of a Carve-Out Trigger Notice (as defined below) and without regard to whether such fees and expenses are

provided for in any Approved Budget, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the amounts set forth in this clause (iii) being the "**Pre-Carve-Out Trigger Notice Cap**"); and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $1,750,000 incurred after the first business day following delivery by the Directing Cash Collateral Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise, (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the Pre-Carve-Out Trigger Notice Cap and the amounts set forth in clauses (i) through (ii), the "**Carve-Out Cap**"); *provided* that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in this paragraph 9(a) on any grounds. The Carve-Out shall be subject to the applicable restrictions on the use of the Cash Collateral set forth in this Interim Order.

(b)      Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any Adequate Protection Obligations or Prepetition Obligations, the Debtors shall be required to deposit into a separate account not subject to the control of the Prepetition Secured Parties (the "**Carve-Out Account**") (which disbursement shall be deemed approved under this Interim Order) in an amount equal to the difference between the Carve-Out Cap and the balance held in the Carve-Out Account as of the Carve-Out Trigger Notice Date (as defined below). Notwithstanding anything to the contrary herein, following delivery of a Carve-Out Trigger Notice, the Directing Cash Collateral Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Account has been fully funded as permitted above in an amount equal to all obligations benefitting from the Carve-Out. The amounts in the Carve-Out Account shall be

available only to satisfy Allowed Professional Fees and other amounts included in the Carve-Out until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for Allowed Professional Fees that are paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. For the avoidance of doubt, the incurrence or payment of any Carve-Out shall not be restricted by the Approved Budget. In no way shall the Carve-Out, the Carve-Out Account, or any Approved Budget be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).

(c)     For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email by the Directing Cash Collateral Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, advisors to the Prepetition Secured Parties and counsel to the Creditors' Committee, which notice may only be delivered following the occurrence and during the continuation of a Cash Collateral Termination Event (as defined below) hereunder and that is continuing, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(d)     On the day on which a Carve-Out Trigger Notice is received by the Debtors (the "**Carve-Out Trigger Notice Date**"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to transfer cash to the Carve-Out Account in an amount equal to the Carve-Out Cap less any amount then held in the Carve-Out Account pursuant to paragraph 10 hereof.

(e)     For the avoidance of doubt, to the extent that professional fees and expenses of the Estate Professionals have been incurred by the Debtors or the Creditors' Committee at any time before or on the first business day after delivery by the Directing Cash Collateral Agent of a

Carve-Out Trigger Notice but have not yet been allowed by the Court, such professional fees and expenses of the Estate Professionals shall constitute Allowed Professional Fees benefiting from the Carve-Out upon their allowance by the Court, whether by interim or final compensation order and whether before or after delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall include such professional fees and expenses.

(f)     The Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or expenses of any Estate Professionals incurred in connection with the Chapter 11 Cases or any Successor Case under any chapter of the Bankruptcy Code, regardless of whether payment of such fees or disbursement has been allowed by the Court. Nothing in this Interim Order or otherwise shall be construed to obligate any of the Prepetition Secured Parties in any way to pay compensation to or reimburse expenses of any Estate Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or expense reimbursement.

(g)     All funds in the Carve-Out Account shall be used first to pay all obligations benefitting from the Pre-Carve-Out Trigger Notice Cap, until paid in full, and then the obligations benefitting from the Post-Carve-Out Trigger Notice Cap. If, after paying all amounts set forth in the definition of Carve-Out, the Carve-Out Account has not been reduced to zero, all remaining funds in the Carve-Out Account shall be applied as set forth in paragraph 4 hereof.

10.     *Professional Fees Escrow*. Within five (5) business days of the Petition Date, the Debtors shall fund into the Carve-Out Account an amount equal to the total budgeted Estate Professional fees for the first two (2) weeks set forth in the Approved Budget and, thereafter on a weekly basis, the Debtors shall transfer into the Carve-Out Account available cash in an amount equal to the estimated Estate Professional fees (excluding, for the avoidance of doubt, any

restructuring, sale, success or other transaction fee of any investment bankers or financial advisors) for the next unfunded week set forth in the Approved Budget into the Carve-Out Account. Thereafter, the Debtors shall use such funds held in the Carve-Out Account to pay Estate professional fees as they become allowed and payable pursuant to interim or final orders from the Court.

11.   *Protection of Prepetition Secured Parties' Rights*.

(a)   Notwithstanding anything to the contrary herein, so long as there are any Prepetition ABL Obligations (including the Prepetition ABL 507(b) Claim) outstanding and prior to the payment in full, in cash of the Prepetition ABL Obligations (including the Prepetition ABL 507(b) Claims and cash collateralization of all Prepetition Letters of Credit), the enforcement rights and any other rights of the other Prepetition Secured Parties with respect to the Collateral shall be subject to the terms of the Prepetition Intercreditor Agreement.

(b)   Upon the occurrence of any of the below events (a "**Cash Collateral Termination Event**"), the Directing Cash Collateral Agent on not less than five (5) business days' notice (a "**Default Notice**") to lead restructuring counsel to the Debtors, lead restructuring counsel to the Prepetition ABL Agent, lead restructuring counsel to the Prepetition 2L Note Trustee, lead restructuring counsel to the Ad Hoc Noteholder Group, counsel to the Creditors' Committee, and the U.S. Trustee (the "**Remedies Notice Parties**") (such five (5) business day period, the "**Cash Collateral Remedies Notice Period**"), and unless the Court orders otherwise (*provided* that during the Cash Collateral Remedies Notice Period, the Debtors, the Creditors' Committee and/or any party in interest shall be entitled to seek an emergency hearing (with the Directing Cash Collateral Agent being deemed to consent to such emergency hearing) with the Court for the purpose of contesting whether, in fact, a Cash Collateral Termination Event

has occurred and is continuing or to obtain non-consensual use of Cash Collateral, and *provided further that* if a request for such hearing is made prior to the end of the Cash Collateral Remedies Notice Period, the Cash Collateral Remedies Notice Period shall be continued until the Court hears and rules with respect thereto), the Directing Cash Collateral Agent may terminate its consent to the Debtors' use of Cash Collateral:

- The failure to make any payment pursuant to paragraph 4 or 5 hereof;

- The filing of any motion or pleading by the Debtors to stay, vacate, reverse, amend, or modify the Interim Order or Final Order in a manner adverse to the Prepetition Secured Parties;

- The Court shall have entered an order, or the Debtors shall have filed a motion or application seeking an order, or the Debtors fail to timely contest a motion or application filed by another party seeking an order, (i) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a responsible officer, in one or more of the Chapter 11 Cases of a Debtor, or (iii) dismissing the Chapter 11 Cases;

- The entry of an order appointing a trustee, receiver or examiner with expanded powers with respect to any of the Debtors;

- The Debtors shall attempt to invalidate, reduce or otherwise impair the Prepetition Secured Obligations;

- Debtors lose the exclusive right to file and solicit acceptances of a chapter 11 plan;

- The creation of any liens on Collateral that are pari passu or senior to the liens in favor of the applicable Prepetition Secured Parties (except the Carve-Out);

- The Debtors' failure to comply with any Adequate Protection Milestone set forth on Schedule 2 hereto, to the extent such Adequate Protection Milestone is not waived in accordance with Schedule 2 hereto;

- The effective date of any plan of reorganization

- The conversion of any of the Chapter 11 Cases to a case under chapter 7;

- The failure to deliver any Borrowing Base Certificate (as defined herein) when required, the failure to make any other adequate protection payments required to be made under the Interim Order or Final Order to the Prepetition Secured Parties, in each case after two (2) business days' notice and an opportunity to cure;

- The failure to fund the Carve-Out Account pursuant to the paragraph 9 of the Interim Order or Final Order, which failure has not been remedied within three (3) business days;

- The lifting of the Automatic Stay with respect to or the exercise of any remedies against any portion of the Collateral with a fair value in excess of $1,000,000;

- A failure by the Debtors of any Variance Test;

- A material breach by the Debtors of the Interim Order or Final Order (*provided* that the terms and provisions with respect to adequate protection shall be deemed material);

- The stay, reversal, vacatur, rescission or other modification of the Interim Order or Final Order in a manner materially adverse to the Prepetition Secured Parties;

- Any of the Debtors file any motions, pleadings, briefs, or support any other parties in furtherance of any event that would constitute a Cash Collateral Termination Event; and

- The earlier of (i) the liquidation and sale of all Collateral or (ii) March 31, 2025, which may be extended by the Directing Cash Collateral Agent in its sole discretion;

it being understood that each Cash Collateral Termination Event may be waived, extended or consented to, as applicable, by the Directing Cash Collateral Agent in its sole discretion and no approval of, or notice to, this Court shall be required for any waivers or extensions provided by the Directing Cash Collateral Agent under this Paragraph 11.[9]

12.     Notwithstanding anything to the contrary herein, upon the occurrence of a Cash Collateral Termination Event, the Prepetition ABL  Agent, the Prepetition 2L Notes Trustee and the Prepetition Secured Parties may, subject to the terms of the Prepetition Intercreditor Agreement and paragraph 3 of this Interim Order (including with respect to the Required Reserves Payments), exercise the rights and remedies available under the Prepetition Credit Documents, this Interim Order or applicable law (subject only to the Carve Out), including without limitation, foreclosing upon and selling all or a portion of the Collateral in order to collect the Adequate Protection Obligations or the Prepetition Secured Obligations. The automatic stay under section 362 of the

---

[9]     With respect to the Prepetition ABL Agent, any waiver of a Cash Collateral Termination Event shall be subject to the prior approval of the Prepetition ABL Required Lenders.

Bankruptcy Code is hereby deemed modified and vacated to the extent necessary to permit (i) upon the occurrence and during the continuance of a Cash Collateral Termination Event, the Directing Cash Collateral Agent (prior to repayment in full of the Prepetition ABL Obligations, acting at the direction of the Prepetition ABL Required Lenders) to (x) deliver a Default Notice and (y) subject to the Debtors' permitted uses of Cash Collateral during the Cash Collateral Remedies Notice Period, terminate any use of Cash Collateral and (ii) such other actions as described in the foregoing, provided that during the Cash Collateral Remedies Notice Period, unless the Court orders otherwise, the automatic stay under section 362 of the Bankruptcy Code (to the extent applicable) shall remain in effect.  Notwithstanding the foregoing, the rights of the Prepetition ABL Agent, the Prepetition 2L Notes Trustee, and the Prepetition Secured Parties to use or occupy any premises subject to a lease of non-residential real property shall be limited to (a) any such rights agreed in writing by the applicable landlord, (b) any such rights under applicable non-bankruptcy law, if any, or (c) further order of the Court following a notice and hearing appropriate under the circumstances.

13.     *Limitation on Charging Expenses Against Collateral.* Except to the extent of the Carve-Out, any unpaid Stub Rent and paragraph 3 of this Interim Order (including with respect to the Required Reserve Payments), no costs or expenses of administration of the Chapter 11 Cases or any successor cases to these Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Prepetition ABL Agent and/or the Prepetition 2L Notes Trustee as applicable, and no consent shall be implied from any other action, inaction or

acquiescence by the Prepetition ABL Agent, Prepetition 2L Notes Trustee, or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the Prepetition ABL Agent, the Prepetition 2L Notes Trustee or the Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise; *provided* that this waiver shall be without prejudice to the Final Order with respect to the period after entry of the Final Order. The Debtors shall seek, subject to the Court's availability, to schedule the Final Hearing on or before March 30, 2025.

14.     *No Marshaling*. Except as otherwise set forth herein, in no event shall the Prepetition ABL Agent, the Prepetition 2L Notes Trustee or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, the Prepetition Secured Debt, or the Prepetition Collateral. Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to each of the Prepetition ABL Agent, the Prepetition 2L Notes Trustee or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral; *provided* that this waiver shall be without prejudice to the Final Order with respect to the period after entry of the Final Order. The Debtors shall seek, subject to the Court's availability, to schedule the Final Hearing on or before March 30, 2025.

15.     *Payments Free and Clear*. Subject to the paragraph 19, any and all payments or proceeds remitted to the Prepetition Secured Parties pursuant to the provisions of this Interim Order or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors.

16.     *Preservation of Rights Granted Under this Interim Order.*

(a)     Other than (i) the Carve-Out and (ii) other claims and liens expressly granted or permitted by the First Interim Order or this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by the First Interim Order or this Interim Order to the Prepetition Secured Parties shall be permitted while any of the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Interim Order, the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(b)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting these Chapter 11 Cases to cases under chapter 7: (A) the Adequate Protection 507(b) Claims and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Adequate Protection Obligations shall have been paid in full (and Adequate Protection Claims and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Interim Order, including with respect to the Carve-Out, shall not be affected; and

(C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Prepetition ABL Agent or the Prepetition 2L Notes Trustee, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the Adequate Protection Liens, or the Carve-Out. Notwithstanding any such reversal, modification, vacatur or stay of any use of Cash Collateral, any Adequate Protection Obligations or Adequate Protection Liens incurred by the Debtors and granted to the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the Prepetition ABL Agent or the Prepetition 2L Notes Trustee, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition 2L Notes Trustee, the Prepetition ABL Agent, and the other Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under section 363(m) of the Bankruptcy Code and this Interim Order with respect to all uses of Cash Collateral and Adequate Protection Obligations.

(d)     Except as expressly provided in this Interim Order, the Adequate Protection Liens, the Adequate Protection Obligations, the Adequate Protection Claims and all other rights and remedies of the Prepetition ABL Agent, the Prepetition 2L Notes Trustee, and the other Prepetition Secured Parties granted by the provisions of this Interim Order and the Carve-Out shall

survive, and shall not be modified, impaired or discharged by:  the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission;  the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code;  the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Prepetition Secured Parties have waived any discharge as to any remaining Adequate Protection Obligations. The terms and provisions of this Interim Order shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the Prepetition ABL Agent, the Prepetition 2L Notes agent and the other Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the Adequate Protection Claims are indefeasibly paid in full in cash, as set forth herein (and in the case of rights and remedies of the Prepetition ABL Agent, the Prepetition 2L Notes Trustee and the other Prepetition Secured Parties, shall remain in full force and effect thereafter, subject to the terms of this Interim Order), and the Carve-Out shall continue in full force and effect.

17.    *Payment of Fees and Expenses*.  The Debtors are authorized to and shall pay the Adequate Protection Fees and Expenses.  Subject to the review procedures set forth in this paragraph 17, payment of all Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court. Professionals for the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, however, any time that such professionals seek payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan,

each professional shall provide summary copies of its invoices including aggregate amounts of fees and expenses and total amount of time on a per-professional basis (which shall not be required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) to the Debtors, lead restructuring counsel to the Prepetition ABL Agent, lead restructuring counsel to the Prepetition 2L Notes Trustee, lead restructuring counsel to the Ad Hoc Noteholder Group, counsel to the Creditors' Committee and the U.S. Trustee (together, the "**Review Parties**"). Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after the receipt by the Review Parties (the "**Review Period**"). If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the Debtors shall pay such invoices within five (5) business days. If an objection to a professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the date of entry of this Interim Order any Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the Prepetition Secured Parties to first deliver a copy of its invoice or other supporting

documentation to the Review Parties (other than the Debtors). No attorney or advisor to Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to Prepetition Secured Parties in connection with or with respect to these Chapter 11 Cases, are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

18.     *Letters of Credit*. The Debtors shall be authorized to maintain Prepetition Letters of Credit prior to the Petition Date on an uninterrupted basis, in accordance with the same practices and procedures as were in effect prior to the Petition Date in each case subject to the terms of the Prepetition ABL Credit Agreement (except as set forth in the prior parenthetical), and to take all actions reasonably appropriate with respect thereto. The Debtors shall, in accordance with the Approved Budget cash collateralize each such Prepetition Letter of Credit in accordance with the procedures set forth in the Prepetition ABL Credit Agreement and on terms and conditions otherwise satisfactory to the Prepetition ABL Agent in its reasonable discretion.

19.     *Effect of Stipulations on Third Parties*. The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or any other party in interest with

46

requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by no later than (x) as to the Creditors' Committee only, 60 calendar days after the appointment of the Creditors' Committee and (y) as for all other parties in interest, 75 calendar days after entry of the First Interim Order; *provided* that*, if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 trustee or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period, then the Challenge Period for any such chapter 7 trustee or chapter 11 trustee shall be extended (solely as to such chapter 7 trustee and chapter 11 trustee) to the date that is the later of (1) seventy-five (75) calendar days after entry of the First Interim Order or (2) the date that is thirty (30) calendar days after its appointment; and (ii) any such later date as (x) has been agreed to by the Prepetition ABL Agent with respect to the Prepetition ABL Obligations or the Prepetition ABL Liens, (y) has been agreed to by the Prepetition 2L Notes Trustee with respect to the Prepetition 2L Notes Obligations or the Prepetition 2L Notes Liens, or (z) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(ii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns

thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred; *provided, further*, that the filing of a motion seeking standing to file a Challenge before the Challenge Period terminates (a "**Standing Motion**"), which attaches a proposed Challenge shall extend the Challenge Period with respect to such party and such attached Challenges until two (2) business days after the Court rules on the Standing Motion, or such other time period ordered by the Court in approving the Standing Motion. If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (1) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the Debtors under the Prepetition Credit Documents, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except under the Intercreditor Agreements), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (3) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and

48

liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than pursuant to the Intercreditor Agreements), or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral shall be deemed forever waived, released and barred. If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each other statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in

such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Debt or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization; *provided* that nothing herein shall limit the Creditors' Committee's ability to file a timely Standing Motion in respect of any timely Challenge for which it cannot obtain standing as a matter of law because the applicable Debtor is a limited liability company and applicable non-bankruptcy law prohibits a party other than the Debtors from bringing such claim (an "<u>LLC Challenge Issue</u>").   In the event the Creditors' Committee files a timely Standing Motion that includes an LLC Challenge Issue, the expiration of the Challenge Period solely for the specific Challenge attached to the Standing Motion, and solely as to the defendant(s) specifically named therein, shall be tolled until five (5) Business Days after the Court enters an order addressing the relief requested in such Standing Motion, and the Creditors' Committee, the Debtors, and the applicable Prepetition Secured Parties shall meet and confer with respect to an appropriate process (if any) for the prosecution of any such Challenge to address the LLC Challenge Issue and all of their respective rights with respect to the LLC Challenge Issue are reserved.

20.     *Limitation on Use of Collateral*. Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the

investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, Representatives, attorneys, or advisors, in each case in their respective capacities as such, or any action purporting to do the foregoing in respect of the, Prepetition Secured Debt, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the Prepetition Secured Debt or Adequate Protection Claims granted under this Interim Order, the Final Order, or the Prepetition Credit Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $75,000), (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition ABL Agent's, the Prepetition 2L Notes Trustee's or the Prepetition Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Debt, Prepetition Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the Prepetition Credit Documents and this Interim Order; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition ABL Agent, the Prepetition 2L Notes Trustee or the

Prepetition Secured Parties, under this Interim Order or the Prepetition Credit Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens or security interests in the Collateral or any portion thereof that are senior to, or on parity with, the Adequate Protection Liens and Adequate Protection 507(b) Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the Directing Cash Collateral Agent or expressly permitted under this Interim Order (including the Approved Budget, subject to permitted variances), in each case unless all Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the each Prepetition Secured Party under this Interim Order, have been paid in full in cash (including the cash collateralization of any letters of credit). For the avoidance of doubt, this paragraph 20 shall not limit the Debtors' right to use Collateral to contest that a Cash Collateral Termination Event has occurred hereunder pursuant to and consistent with paragraph 11 of this Interim Order.

21.    *Stub Rent.* Notwithstanding anything to the contrary herein, the Debtors shall pay their postpetition contractual rent obligations to applicable landlords for the period of the Petition Date to December 31, 2024 ("**Stub Rent**") as follows: (a) thirty-four percent (34%) of Stub Rent shall be paid by no later than February 15, 2025, (b) thirty-three percent (33%) of Stub Rent shall be paid by no later than March 15, 2025, and (c) thirty-three percent (33%) of Stub Rent shall be paid by no later than the earlier of (x) the effective date of a plan of reorganization and (y) May 15, 2025 (the Stub Rent payable pursuant to this clause (c), the "**Final Installment**"); *provided*, *however*, that, with respect to Stub Rent due under leases that are subject to an active bid (pursuant to the Debtors' lease sale process referenced in the notice filed at Docket No. 331) as of

February 4, 2025, any Stub Rent with respect to any such lease shall be deferred (the "**Deferred Amounts**") and paid on the earlier of (i) the date set forth in the applicable sale order approving the assumption and assignment of such lease; (ii) on the next scheduled Stub Rent payment date after which such lease is no longer subject to an active bid; and (iii) May 15, 2025. The Debtors shall establish a segregated account to hold any Deferred Amounts and to hold the Final Installment (the "**Stub Rent Reserve**") until the applicable payment date, as set forth in this paragraph; *provided* that the Stub Rent Reserve shall be subject to reduction on a weekly basis to account for satisfaction of Stub Rent pursuant to a sale order in connection with any assumption(s) and assignment(s) of leases or other lease disposition benefitting from the Stub Rent Reserve. The Stub Rent Reserve shall otherwise be subject to the terms and conditions set forth in paragraph 3 of this Interim Order.

22. *Indemnification*. The Prepetition Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens, any challenges or objections to the use of Cash Collateral and all other documents related to and all transactions contemplated by the foregoing, Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Credit Documents. The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this paragraph 21, or in the Prepetition Credit Documents to indemnify and/or hold harmless the Prepetition Secured Parties, as the case may be, and any such defenses are hereby waived.

23.     *Interim Order Governs*. In the event of any inconsistency between the provisions of this Interim Order (including, but not limited to, with respect to the Adequate Protection Obligations) or the Prepetition Credit Documents, the provisions of this Interim Order shall govern. Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the Approved Budget (subject to permitted variances).

24.     *Binding Effect; Successors and Assigns*. The provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the Prepetition ABL Agent, the Prepetition 2L Notes Trustee the other Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Prepetition ABL Agent, the Prepetition 2L Notes Trustee, the other Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the Prepetition ABL Agent, the Prepetition 2L Notes Trustee and the other Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

25.     *Exculpation*. Nothing in this Interim Order, the Prepetition Credit Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. The Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Adequate Protection Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the Adequate Protection Collateral or Prepetition Collateral shall be borne by the Debtors.

26.     *Limitation of Liability*. In determining to permit the use of the Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the Prepetition Credit Documents, none of the Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the Prepetition ABL Agent, the Prepetition 2L Notes Trustee or other Prepetition Secured Parties of

any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

27.     *Master Proofs of Claim*. The Prepetition ABL Agent, the Prepetition 2L Notes Trustee and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any successor case in order to assert claims on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Secured Debt arising under the Prepetition Credit Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Credit Documents. The statements of claim in respect of such indebtedness set forth in this Interim Order are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status. However, in order to facilitate the processing of claims, each of the Prepetition ABL Agent and the Prepetition 2L Notes Trustee is authorized, but not directed or required, to file in the Debtors' lead chapter 11 case *In re Party City Holdco Inc.*, Case No. 24-90621 (ARP), a master proof of claim on behalf of its respective Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Credit Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors. Upon the filing of a Master Proof of Claim by either the Prepetition ABL Agent or the Prepetition 2L Notes Trustee, as applicable, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Credit Documents, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases. The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim

from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims. The provisions of this paragraph 26 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to each of the Prepetition ABL Agent or the Prepetition 2L Notes Trustee, as applicable.

28.    *Credit Bidding*. Subject to the lien priorities set forth herein and any successful Challenge, the Prepetition ABL Agent and the Prepetition 2L Notes Trustee shall have the right, consistent with the provisions of the Prepetition Credit Documents, as applicable, to credit bid up to the full amount of the applicable Prepetition Obligations and the Adequate Protection Obligations in any sale of the Collateral, as applicable, in each case outside the ordinary course of business, without the need for further Court order authorizing the same and whether any such sale is effectuated through sections 363(k), 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case unless the Court for cause orders otherwise; *provided* that the amount of any Adequate Protection Obligations shall have been determined by an order of the Court prior to the submission of any credit bid including such obligations.

29.    Notwithstanding any other provisions in this Interim Order or any final orders pertaining to the use of cash collateral in these Chapter 11 Cases, any statutory liens on account of

taxes for the Debtors' tangible property held by the Broward County, Florida, Tax Collector (the "**BC Tax Liens**") shall neither be primed by nor made subordinate to any liens granted to any party hereby to the extent the BC Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by Broward County are fully preserved.  Furthermore, from the proceeds of the sale of any of the Debtors' tangible property subject to the BC Tax Liens located in Broward County, the amount of $14,241.35 shall be set aside by the Debtors in a segregated account (the "**BC Tax Reserve**") as adequate protection for the asserted secured tax claims of the Broward County Tax Collector, to such BC Tax Liens (the "**BC Tax Claims**"). The BC Tax Liens of the Broward County Tax Collector shall attach to the BC Tax Reserve to the same extent and with the same priority as the liens attached to the Debtors' assets securing the BC Tax Liens.  The funds in the BC Tax Reserve shall be on the order of adequate protection and shall constitute neither the allowance of the BC Tax Claims nor a cap on the amounts Broward County may be entitled to receive.  The funds from the BC Tax Reserve may be distributed only upon agreement between the Broward County Tax Collector and the Debtors, with the consent of the Directing Cash Collateral Agent, or by subsequent order of the Court, duly noticed to the Broward County Tax Collector.  Notwithstanding any order that may be entered converting these Chapter 11 Cases to cases under chapter 7, the funds in the BC Tax Reserve will continue to be held for the benefit of Broward County and the BC Tax Liens shall remain attached to the funds in the BC Tax Reserve in their relative priority until the BC Tax Claims are paid in full. Any payment made to Broward County for the taxes giving rise to the BC Tax Liens from sources other than the BC Tax Reserve shall reduce the BC Tax Reserve dollar for dollar.

30.     Notwithstanding any other provisions in this Interim Order or any final orders pertaining to the use of cash collateral in these Chapter 11 Cases, any statutory liens on account of ad valorem taxes held by the Texas Taxing Authorities [10] (the "**Texas Tax Liens**") shall neither be primed by nor made subordinate to any liens granted to any party hereby to the extent the Texas Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved.  Furthermore, from the proceeds of the sale of any of the Debtors' assets or closing of any store located in the state of Texas and in the jurisdictions of the Texas Taxing Authorities, the amount of $1,573,548.39 shall be set aside by the Debtors in a segregated

---

[10]   The "Texas Taxing Authorities" are the following:  Tyler Independent School District, Brownsville Independent School District, Potter County Tax Office, Richardson Independent School District, City of Burleson, Burleson Independent School District, City of Lake Worth, Grapevine-Colleyville Independent School District, Carrollton-Farmers Branch Independent School District, Frisco Independent School District, Plano Independent School District, Fort Bend Independent School District, Fort Bend County Levee Improvement District # 2, Fort Bend County Levee Improvement District #12, Fort Bend County Municipal Utility District # 50, Harris County Municipal Utility District # 346, Humble Independent School District, Harris County Municipal Utility District # 132, Harris County Municipal Utility District # 358, Harris County Water Control Improvement District #155, Tomball Independent School District, City of Tomball, Clear Creek Independent School District, Pasadena Independent School District, Fallbrook Municipal Utility District, Klein Independent School District, Galena Park Independent School District, Channelview Independent School District, Harris County Municipal Utility District # 285, Alief Independent School District, West Harris County Municipal Utility District # 6, City of Houston, Lubbock Central Appraisal District, Midland County, Wichita County Tax Office, Brazoria County, et al, and Brazoria County MUD #6, Cameron County, Cypress-Fairbanks Independent School District, Dallas County, Ector CAD, City of El Paso, Fort Bend County, City of Frisco, Galveston County, Gregg County, Harris County Emergency Service District #01, Harris County Emergency Service District #07, Harris County Emergency Service District #08, Harris County Emergency Service District #09, Harris County Emergency Service District #11, Harris County Emergency Service District #17, Harris County Emergency Service District #46, Harris County Emergency Service District #48, Harris County Emergency Service District #60, Harris County Improvement District #03, Hidalgo County, City of Houston, Houston Community College System, Houston Independent School District, Irving Independent School District, Jefferson County, Katy Independent School District, Lewisville Independent School District, Lone Star College System, City of McAllen, McLennan County, Montgomery County, Nueces County, City of Pasadena, Rockwall CAD, Smith County, Tarrant County and City of Webster, Bell County TAD, Bowie CAD, Brazos County, Denton County (including City of Denton, Denton ISD, and City of Lewisville), City of Waco and Waco ISD, Midland CAD, Taylor County CAD, and Williamson County.

account (the "**Texas Tax Reserve**") as adequate protection for the asserted secured tax claims of the Texas Taxing Authorities to such Texas Tax Liens (the "**Texas Tax Claims**"). The Texas Tax Liens of the Texas Taxing Authorities shall attach to the Texas Tax Reserve to the same extent and with the same priority as the liens attached to the Debtors' assets securing the Texas Tax Liens. The funds in the Texas Tax Reserve shall be on the order of adequate protection and shall constitute neither the allowance of the Texas Tax Claims nor a cap on the amounts the Texas Taxing Authorities may be entitled to receive.  The funds from the Texas Tax Reserve may be distributed only upon agreement between the Texas Taxing Authorities and the Debtors, with the consent of the Directing Cash Collateral Agent, or by subsequent order of the Court, duly noticed to the Texas Taxing Authorities.  Notwithstanding any order that may be entered converting these Chapter 11 Cases to cases under chapter 7, the funds in the Texas Tax Reserve will continue to be held for the benefit of the Texas Tax Authorities and the Texas Tax Liens shall remain attached to the funds in the Texas Tax Reserve in their relative priority until the Texas Tax Claims are paid in full.  Any payment made to the Texas Tax Authorities from sources other than the Texas Tax Reserve shall reduce the Texas Tax Reserve dollar for dollar.

31.  *Effectiveness*. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

32.  *Governing Order*. Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order, including compliance with the Approved Budget and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the

terms of such other order and this Interim Order, this Interim Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

33.     *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

34.     *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Cash Collateral Motion.

35.     *No Third-Party Rights*. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

36.     *Necessary Action*. The Debtors and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Interim Order. In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

37.     *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

38.     *Final Hearing*. A final hearing to consider the relief requested in the Cash Collateral Motion shall be held on March 26, 2025 at 1 PM (Prevailing Central Time) and any objections or responses to the Cash Collateral Motion shall be filed on or prior to March 19, 2027 by 5 PM (Prevailing Central Time).

39.    *Objections*. Any party in interest objecting to the relief sought at the Final Hearing shall file and serve (via mail and e-mail) written objections, which objections shall be served upon (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Creditors' Committee; (c) JPMorgan Chase Bank, N.A., as Prepetition ABL Agent, and counsel thereto, Simpson Thacher & Bartlett LLP, 425 Lexington Ave., New York, NY 10017; (d) counsel to the Prepetition 2L Notes Secured Parties, Davis Polk & Wardwell LLP, 450 Lexington Ave., New York, NY 10017; and (e) counsel to the Prepetition 2L Notes Trustee, K&L Gates LLP, 1717 Main Street, Suite 2800 Dallas, Texas 75201.

40.    The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearings and to any party that has filed a request for notices with this Court.

Signed: February 05, 2025

Alfredo R Pérez
United States Bankruptcy Judge

## Schedule 1

**Updated Budget**

**PCHI February Cash Collateral Budget**
*($ 000's)*

*DRAFT*
*Subject to Material Revision*

| Forecast Week # | Week 1 2/1/25 Forecast | Week 2 2/8/25 Forecast | Week 3 2/15/25 Forecast | Week 4 2/22/25 Forecast | Week 5 3/1/25 Forecast | Week 6 3/8/25 Forecast | Week 7 3/15/25 Forecast | Week 8 3/22/25 Forecast | Week 9 3/29/25 Forecast | Week 10 4/5/25 Forecast | Week 11 4/12/25 Forecast | Week 12 4/19/25 Forecast | Week 13 4/26/25 Forecast | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Collections | 22,748 | 29,452 | 33,763 | 30,392 | 27,227 | 24,985 | 23,324 | 22,287 | 13,673 | 7,015 | 2,363 | 4,030 | 5,267 | 246,527 |
| Total Merchandise Disbursements | (3,602) | (2,210) | (1,925) | (377) | (491) | (136) | (60) | - | - | - | - | - | - | (8,799) |
| Total Operating Disbursements | (25,686) | (24,119) | (14,515) | (12,271) | (15,848) | (14,236) | (10,719) | (7,563) | (10,404) | (1,827) | (3,820) | (4,002) | (1,915) | (146,924) |
| **Net Operating Cash Flow** | **(6,539)** | **3,124** | **17,323** | **17,744** | **10,889** | **10,613** | **12,546** | **14,724** | **3,269** | **5,189** | **(1,457)** | **28** | **3,352** | **90,804** |
| Debt Service and Related Fees | - | (1,190) | - | - | - | (620) | - | - | (130) | (151) | - | - | - | (2,091) |
| **Restructuring Items** | | | | | | | | | | | | | | |
| Professional Fees | (1,814) | (1,534) | (1,534) | (1,061) | (961) | (1,141) | (1,009) | (1,009) | (979) | (961) | (934) | (679) | (679) | (14,292) |
| Liquidator Fees/Expenses | (1,108) | (1,334) | (1,775) | (1,827) | (1,969) | (1,785) | (1,539) | (1,408) | (1,267) | (1,034) | (559) | (695) | 1,500 | (14,801) |
| Other Restructuring Items (inc. Stub Rent) | (1,000) | - | (1,276) | - | - | - | (1,276) | - | - | (6,780) | - | - | - | (10,332) |
| Total Restructuring Items | (3,922) | (2,868) | (4,585) | (2,888) | (2,930) | (2,925) | (3,824) | (2,417) | (2,245) | (8,775) | (1,493) | (1,374) | 821 | (39,425) |
| Net Sale of Lease, IP and Other Assets | - | - | - | - | - | - | - | - | - | 12,500 | 8,500 | - | - | 21,000 |
| **Total Net Cash Flow** | **(10,461)** | **(935)** | **12,738** | **14,856** | **7,959** | **7,068** | **8,722** | **12,307** | **894** | **8,763** | **5,550** | **(1,347)** | **4,173** | **70,288** |
| **Book Cash** | | | | | | | | | | | | | | |
| Beginning Cash Balance | 37,910 | 15,685 | 14,750 | 27,488 | 40,602 | 33,605 | 32,894 | 30,416 | 34,001 | 22,557 | 22,409 | 15,896 | 8,999 | 37,910 |
| Net Cash Flow (See Above) | (10,461) | (935) | 12,738 | 14,856 | 7,959 | 7,068 | 8,722 | 12,307 | 894 | 8,763 | 5,550 | (1,347) | 4,173 | 70,288 |
| LC Cash Collateralization (@1.05) | - | - | - | - | - | - | - | - | (4,160) | (8,911) | (12,063) | (3,470) | - | (28,604) |
| WARN Escrow Acct Draw/(Fund) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ABL/FILO Repayment | (11,764) | - | - | (1,742) | (14,956) | (7,779) | (11,200) | (8,722) | (8,177) | - | - | (2,080) | (11,232) | (77,653) |
| **Ending Book Cash Balance** | **15,685** | **14,750** | **27,488** | **40,602** | **33,605** | **32,894** | **30,416** | **34,001** | **22,557** | **22,409** | **15,896** | **8,999** | **1,940** | **1,940** |
| **ABL + FILO Balance** | | | | | | | | | | | | | | |
| Beginning ABL + FILO Balance | 77,653 | 65,889 | 65,889 | 65,889 | 64,147 | 49,191 | 41,411 | 30,211 | 21,489 | 13,312 | 13,312 | 13,312 | 11,232 | 77,653 |
| ABL/FILO Repayment | (11,764) | - | - | (1,742) | (14,956) | (7,779) | (11,200) | (8,722) | (8,177) | - | - | (2,080) | (11,232) | (77,653) |
| Ending ABL + FILO Balance | 65,889 | 65,889 | 65,889 | 64,147 | 49,191 | 41,411 | 30,211 | 21,489 | 13,312 | 13,312 | 13,312 | 11,232 | - | |
| LCs Outstanding / Exposure | 27,242 | 27,242 | 27,242 | 27,242 | 27,242 | 27,242 | 27,242 | 27,242 | 23,280 | 14,793 | 3,305 | | | |
| **Total Outstanding / Exposure** | **93,131** | **93,131** | **93,131** | **91,389** | **76,433** | **68,653** | **57,453** | **48,731** | **36,592** | **28,105** | **16,617** | **11,232** | **-** | |

## Schedule 2

**Adequate Protection Milestones**

**Schedule 2**

**Adequate Protection Milestones**

| Date | Milestone |
|---|---|
| January 31, 2025 | The Debtors shall have delivered a reasonably detailed report from Gordon Brothers commenting on sales performance, and with respect to the going-out-of-business sales of inventory, including a recommendation whether to continue such sales into March 2025. |
| February 15, 2025 | The Debtors shall have shipped all inventory to be sold through retail locations from the distribution center to the retail locations. |
| February 23, 2025 | All inventory to be sold through retail locations shall have arrived at the retail locations; provided that a failure to achieve this milestone solely as a result of factors beyond the control of the Debtors shall not be a breach hereunder. |
| February 28, 2025 | The Debtors shall have completed all inventory liquidations and shall have vacated all retail premises and returned possession to the landlords in accordance with the leases governing such locations, other than with respect a maximum of 525 retail locations (the "**March Locations**"). |
| March 15, 2025 | The Debtors shall have completed a marketing and sale process to effectuate a sale of their intellectual property assets with qualified buyer(s) pursuant to a sales process reasonably acceptable to the Directing Cash Collateral Agent. |
| March 31, 2025 | The Debtors will have used their best efforts to have vacated all distribution centers, turned over possession to the landlords and will have filed a motion to either (i) reject the leases with respect to such distribution centers in accordance with section 365 of the Bankruptcy Code or (ii) assume and assign the lease to a third-party pursuant to sections 363 and 365 of the Bankruptcy Code. |
| March 31, 2025 | The Debtors shall have completed all inventory liquidations and shall have vacated the March Locations and returned possession to the landlords in accordance with the leases governing such locations. |
| April 15, 2025 | The Debtors shall have completed a marketing and sale process to effectuate a sale or the assumption and assignment (as applicable), of their saleable real property assets (including leases) with qualified buyer(s) pursuant to a sales process reasonably acceptable to the Directing Cash Collateral Agent. |