**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PARTY CITY HOLDCO, INC., *et al.*,[1] | Case No. 24-90621 (ARP) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 1367** |

**PRELIMINARY OBJECTION OF**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**TO GORDON BROTHERS RETAIL PARTNERS, LLC'S MOTION**
**SEEKING CARVE-OUT DETERMINATION AND GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") of Party City Holdco Inc. and its affiliated debtors (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), by and through its undersigned counsel, hereby submits this preliminary objection (this "**Preliminary Objection**") to *Gordon Brothers Retail Partners, LLC's Motion Seeking Carve-Out Determination and Granting Related Relief*, dated May 9, 2025 [Docket No. 1367] (the "**Motion**"), filed by Gordon Brothers Retail Partners, LLC (the "**Movant**" or "**GBRP**").

**I.**
**PRELIMINARY STATEMENT[2]**

1.      The Movant—a counterparty to an assumed prepetition services contract—fails to establish that it is an Estate Professional, as defined in the Cash Collateral Orders, and therefore is

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Inc. (1359); Am-Source, LLC (8427); Party City Corporation (3692); Party City Holdings Inc. (3029); PC Intermediate Holdings, Inc. (1229); and Trisar, Inc. (0659). The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

[2]     Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Preliminary Objection.

not entitled to benefit from the Carve-Out.  This Court should reject the Movant's transparent attempt to improve its position as an administrative creditor relative to the other similarly situated administrative creditors (such as landlords that are owed unpaid postpetition rent) and deny the relief requested in the Motion for several reasons.

2.      **First**, as a threshold matter, the Consultant was never retained as a professional of the Debtors' estates.  The Debtors were free to seek the retention of the Consultant as a professional of their estates, but chose not to do so.  This relief was neither requested in the Store Closing Motion nor approved pursuant to the Final Store Closing Order.  In fact, the Court has never had an opportunity to consider the Consultant's retention as a professional of the Debtors' estates.

3.      **Second**, the Debtors' assumption of the Consulting Agreement did not effectuate the retention of the Consultant as a professional of the Debtors' estates.  Pursuant to the Final Store Closing Order, the Debtors assumed the Consulting Agreement to ensure that the Consultant would perform the services contemplated thereby on a postpetition basis.  The Movant was not implicitly (let alone explicitly) retained as a professional of the Debtors' estates by virtue of the assumption of the Consulting Agreement.

4.      **Third**, the Consultant has never been retained as a professional of the Debtors' estates pursuant to section 363(b) of the Bankruptcy Code.  The Final Store Closing Order authorized, among other things, the Debtors to perform under the Consulting Agreement because the store closing sales pursuant to certain specified procedures, full-chain liquidation, and payment of fees contemplated thereby each involve the sale or use of estate property outside the ordinary course of business, which necessitated the Debtors to seek relief under section 363(b).  The Final Store Closing Order, consistent with the Store Closing Motion, makes no mention of the retention of the Consultant as a professional of the Debtors' estates pursuant to section 363(b).

5.     ***Fourth***, the Carve-Out only applies to Estate Professionals—which the Consultant is not.  As such, the Consultant is not covered by the Carve-Out.

6.     While the Committee has waited for the Debtors and the Movant to upload a proposed scheduling order for the Court's consideration consistent with the Court's request at the May 14 Scheduling Conference, no such proposed order has been filed.  In addition, the procedurally deficient Motion fails to identify an objection deadline.  Accordingly, with a hearing on the Debtors' Cash Collateral Motion scheduled for tomorrow, the Committee has determined that it must file this Preliminary Objection now, but reserves the right to supplement this Preliminary Objection at a later date, if necessary.

7.     For the foregoing reasons, and the reasons that follow, the Motion should be denied.

## II.
## RELEVANT BACKGROUND

8.     On December 21, 2024 (the "**Petition Date**"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").  On January 6, 2025, the Office of the United States Trustee, Region 7, appointed the Committee.  *See* Docket No. 167.

**A.     The Consulting Agreement**

9.     Prior to the Petition Date, on December 16, 2024, the Debtors (collectively, the "**Merchant**"), GBRP, and Gordon Brothers Commercial & Industrial, LLC ("**GBC&I**" and, together with GBRP, the "**Consultant**"[3] and, together with the Merchant, the "**Parties**") entered into that certain *Asset Disposition Consulting Agreement*.  Docket No. 43-1 (the "**Consulting**

---

[3]     The term "Consultant" is defined in the Consulting Agreement (as defined herein) to include both GBRP and GBC&I.  However, the Motion defines the term "Consultant" as only encompassing the Movant, but states in a footnote that "[t]he Consultant is comprised of a contractual joint venture formed among [GBRP], [GBC&I], and Hilco Merchant Resources, LLC."  *See* Mot. at 1, 1 n. 2.

Agreement").[4]  Among other things, pursuant to the Consulting Agreement, the Merchant agreed to "retain[] Consultant as its exclusive, independent consultant" to perform certain "services," which the Consultant agreed to perform in exchange for certain compensation specified therein. Consult. Agmt. at § 1; *see id.* at §§ 4, 6.  The "services" the Merchant engaged the Consultant to perform are specified in Section 1 of the Consulting Agreement, but generally relate to assisting the Company in liquidating its inventory, merchandise, and furniture, fixtures, and equipment located in the Merchant's stores and distribution center.  *See id.* at § 1.  The Consulting Agreement provided the Consultant with the opportunity to earn fees (or commissions) based upon the gross sale proceeds of Merchandise and FF&E.  *See id.* at §§ 4, 6.

10.    Under the Consulting Agreement, the Consultant also had the right to "supplement the Merchandise with additional goods procured by Consultant" ("**Additional Consultant Goods**") in connection with the Sale on a "true consignment" basis.  *See id.* at §§ 7(A), 7(C).  In exchange for the right to sell Additional Consignment Goods as part of the Sale, the Consulting Agreement obligated the Consultant to "pay to Merchant an amount equal to 5% of the gross proceeds (excluding sales taxes) from the sale of the Additional Consultant Goods" (the "**Additional Consultant Goods Fee**").  *See id.* at § 7(B).

11.    The Merchant agreed to "promptly have this [Consulting] Agreement and the transactions contemplated [there]by . . . approved by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code (and *not pursuant to sections 327, 328, 330, or 331* thereof) and an order with terms acceptable to both Merchant and Consultant[.]" (any such order, an "**Approval Order**").  *Id.* at § 11(A) (emphasis added).  If any such Approval Order did "not

---

[4]    Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to such terms in the Consulting Agreement.

include the terms and conditions contained" in the Consulting Agreement, the Consultant was permitted to, "in its sole discretion, elect to terminate" the Consulting Agreement "immediately." *Id.* at § 11(B).

12.     Following the Petition Date, on January 10, 2025, the Consulting Agreement was supplemented pursuant to that certain *Agreement to Market and Sell Intangible Assets of Party City Holdings Inc., Party City Corporation, Amscan Inc., and Related Company Entities*, dated January 10, 2025 [Docket No. 235-1] (the "**Letter Agreement**"), by and among, the Debtors and a contractual joint venture between Gordon Brothers Brands, LLC and Hilco IP Services, LLC d/b/a Hilco Streambank.  The Letter Agreement generally expanded the scope of services set forth in the Consulting Agreement to include the disposition of the Debtors' brand, trademarks, and intellectual property, among other things, and provided for a distinct commission-based compensation structure in connection therewith.  *See* Letter Agmt. at 1, §§ 2–5.

**B.     The Store Closing Motion**

13.     On December 22, 2024, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 43] (the "**Store Closing Motion**").  The Consulting Agreement was annexed as Exhibit A to the Store Closing Motion.  Store Closing Mot. at Exh. A.  Pursuant to the Store Closing Motion, the Debtors requested authority to, among other things, assume the Consulting Agreement and continue performing thereunder.  *See, e.g.*, *id.* at ¶¶ 1, 10.  The Store Closing Motion did not request the authority to retain and employ the Consultant as a professional of the Debtors' estates. *See generally id.*

C.     **The Final Store Closing Order**

14.    On January 21, 2025, the Court entered the *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 291] (the "**Final Store Closing Order**").  Among other things, the Final Store Closing Order authorized the assumption of the Consulting Agreement,[5] pursuant section 365 of the Bankruptcy Code, and, pursuant to section 363(b) of the Bankruptcy Code, the Debtors' performance under the Consulting Agreement, including "making the payments required thereunder."   Final Store Closing Order at ¶ 1; *see also id.* at ¶ 26 ("Nothing herein is intended to be or should be construed as: . . . a request or authorization to assume, adopt, or reject any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement) . . . .").   The Final Store Closing Order does not contain any language authorizing the Debtors to retain and employ the Consultant as a professional of the Debtors' estates.  *See generally id.*

D.     **The Cash Collateral Orders**

15.    Following the Petition Date, on December 22, 2024, the Debtors filed the Cash Collateral Motion.[6]   The next day, the Court entered the First Interim Order.[7]   Since that time, the Court has entered four subsequent orders authorizing the Debtors' use of cash collateral on an

---

[5]    As set forth in the Final Store Closing Order, the term "Consulting Agreement" was defined as encompassing the Consulting Agreement, as supplemented by the Letter Agreement.  Final Store Closing Order at 1.

[6]    *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Use Cash Collateral and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, dated Dec. 22, 2024 [Docket No. 44] (the "**Cash Collateral Motion**").

[7]    *Interim Order (I) Authorizing the Debtors to (A) Use Cash Collateral, and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, entered Dec. 23, 2024 [Docket No. 65] (the "**First Interim Order**").

interim basis: (i) on February 5, 2025 [Docket No. 468] (the "**Second Interim Order**"); (ii) on

April 14, 2025 [Docket No. 1127] (the "**Third Interim Order**"); (iii) on April 18, 2025 [Docket

No. 1178] (the "**Fourth Interim Order**"); and on May 2, 2025 [Docket No. 1333] (the "**Fifth**

**Interim Order**" and, collectively with the First Interim Order, the Second Interim Order, the Third

Interim Order, and the Fifth Interim Order, the "**Cash Collateral Orders**").

16.    Each of the Cash Collateral Orders contains a customary "Carve-Out":

> As used in this Interim Order, the term "**Carve-Out**" means the sum
> of:  (i) all fees required to be paid to the Clerk of the Court and to
> the U.S. Trustee under section 1930(a) of title 28 of the United States
> Code plus interest at the statutory rate, if any, pursuant to
> 31 U.S.C. § 3717 (without regard to the notice set forth in (iii)
> below); (ii) all reasonable and documented fees and expenses up to
> $100,000 incurred by a trustee under section 726(b) of the
> Bankruptcy Code (without regard to the notice set forth in (iii)
> below); (iii) subject, in each case, to application of any retainers that
> may be held and **to the extent allowed at any time**, whether by
> interim order, procedural order, final order or otherwise, **all unpaid
> fees and expenses** (the "**Allowed Professional Fees**") **incurred by
> persons or firms retained by the Debtors or the Creditors'
> Committee pursuant to section 327, 328, 363, or 1103 of the
> Bankruptcy Code** (collectively, the "**Estate Professionals**") (in
> each case, other than any restructuring, sale, success or other
> transaction fee of any investment bankers or financial advisors) at
> any time before or on the first business day following delivery by
> the Directing Cash Collateral Agent of a Carve-Out Trigger Notice
> (as defined below) and **without regard to** whether such fees and
> expenses are provided for in any Approved Budget, **whether
> allowed by the Court prior to or after delivery of a Carve-Out
> Trigger Notice** (the amounts set forth in this clause (iii) being
> the "**Pre-Carve-Out Trigger Notice Cap**"); and (iv) **Allowed
> Professional Fees of Estate Professionals** in an aggregate amount
> not to exceed $1,750,000 incurred after the first business day
> following delivery by the Directing Cash Collateral Agent of the
> Carve-Out Trigger Notice, **to the extent allowed at any time**,
> whether by interim order, procedural order, final order or otherwise,
> (the amount set forth in this clause (iv) being the "**Post-Carve-Out
> Trigger Notice Cap**" and, together with the Pre-Carve-Out Trigger
> Notice Cap and the amounts set forth in clauses (i) through (ii),
> the "**Carve-Out Cap**"); *provided* that nothing herein shall be
> construed to impair the ability of any party to object to the fees,

**expenses, reimbursement or compensation described in this paragraph 9(a) on any grounds**.  The Carve-Out shall be subject to the applicable restrictions on the use of the Cash Collateral set forth in this Interim Order.[8]

First Interim Order at ¶ 9(a) (emphasis added); Second Interim Order at ¶ 9(a) (same); Fourth Interim Order at ¶ 9(a) (same); Fifth Interim Order at ¶ 9(a) (same); Third Interim at ¶ 8(a) (same, but with internal reference to paragraph 8(a) instead of paragraph 9(a)).   By its terms, the Carve-Out exclusively applies to the Allowed Professional Fees of Estate Professionals retained by the Debtors or the Committee.  *Id.*

17.    In connection with the Carve-Out, the Cash Collateral Orders establish a "Professional Fee Escrow," which requires the Debtors to fund amounts into a separate "**Carve Out Account**" for the benefit of Estate Professionals, including "to pay Estate professional fees as they become allowed and payable pursuant to interim or final orders of the Court."  *See* First Interim Order at ¶ 10 (emphasis added); Second Interim Order at ¶ 10; Third Interim at ¶ 9 (same); Fourth Interim Order at ¶ 10 (same); Fifth Interim Order at ¶ 10 (same).[9]

### III.
### ARGUMENT

**A.    The Consultant was Never Retained as a Professional of the Debtors' Estates**

18.    As a threshold matter, the Consultant was never retained as a professional of the Debtors' estates.

---

[8]    As used in this Preliminary Objection, the terms "**Allowed Professional Fees**," "**Estate Professional**," and "**Carve-Out**" shall have the meanings ascribed to such term in the Cash Collateral Orders.

[9]    Consistent with the terms of the Cash Collateral Orders, it appears that neither the Debtors nor the Movant (and certainly not the Committee) viewed the Consultant as an Estate Professional.  The parties' actions affirm this view because, among other things, no money for the Consultant was funded into the Professional Fee Escrow. The Movant was undoubtedly aware of the Professional Fee Escrow and appears to not have requested to be included for several months, likely because the Movant—like the Debtors and the Committee—knew that they are not an Estate Professional.

**1.      The Store Closing Motion did not Request Authority to Retain the Consultant as a Professional of the Debtors' Estates**

19.      The Store Closing Motion did not seek authorization from this Court to retain the Consultant as a professional of the Debtors' estates.  *See* Store Closing Mot. at ¶ 1 ("The Debtors seek entry of interim and final orders . . . (a) authorizing the Debtors to assume that certain Consulting Agreement . . . (b) authorizing and approving the store closings and related matters in accordance with the terms of the Consulting Agreement . . . .").  Rather, pursuant to the Store Closing Motion, the Debtors specifically sought, among other things, authorization to assume and perform under the Consulting Agreement.  *See, e.g.*, *id.* at ¶¶ 1, 10,[10] 12, 30–33.  As such, the retention of the Consultant as a professional of the Debtors' estates was not part of the package of relief requested in the Store Closing Motion.

**2.      The Final Store Closing Order did not Authorize the Retention of the Consultant as a Professional of the Debtors' Estates**

20.      It is axiomatic that a "Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re Baker*, 593, F. App'x 416, 417 (5th Cir. 2015);  *In re Chiron Equities, LLC*, 552 B.R. 674, 684 (Bankr. S.D. Tex. 2016).  A plain reading of the Final Store Closing Order confirms that this Court did not authorize the retention of the Consultant as a professional of the Debtors' estates pursuant to such Order.

21.      Consistent with the relief requested in the Store Closing Motion, the Final Store Closing Order did not authorize the retention of the Consultant.  *See generally* Final Store Closing Order.   Instead, the Final Store Closing Order, among other things, merely authorized the

---

[10]     "To help facilitate the Store Closing Sales process, the Debtors also seek to assume and continue to perform under the Consulting Agreement.  The Consulting Agreement allows the Consultant to perform the work contemplated thereunder and described in this motion in connection with the Closing Stores."  Store Closing Mot. at ¶ 10.

assumption of the Consulting Agreement, pursuant to section 365(a), and, pursuant to section 363(b), the Debtors to perform thereunder:

> ***The Consulting Agreement is hereby assumed*** as of the date of this Final Order. ***The Debtors are authorized, pursuant to section 363(b) of the Bankruptcy Code, to perform under the Consulting Agreement***, ***including***, without limitation, ***making payments required thereunder*** (including fees and reimbursement of expenses to the Consultant without the need for any application of the Consultant or a further order of this Court) ***in accordance with this Final Order***. All such payments of fees and reimbursement of expenses shall be free and clear of any and all encumbrances.

*Id.* at ¶ 1 (emphasis added). Indeed, the word "retention" does not even appear in the Final Store Closing Order. *See generally id.* Similarly, the word "retain" only appears twice in the Final Store Closing Order, in each case, in connection with this Court's retention of jurisdiction. *Id.* at ¶¶ 10(c), 32. The Final Store Closing Order simply does not contain any language authorizing the retention of the Consultant as a professional of the Debtors' estates.

22.     Tellingly, the Final Store Closing Order expressly distinguishes the retained professionals of the Debtors' estates from the Consultant:

> In addition to any other reporting requirements contained herein, the Debtors shall on a confidential basis provide to the Committee . . . copies of periodic reports and information regarding the conduct of the Store Closing Sales that are prepared by ***the Debtors***, ***their professionals***, ***and/or the Consultant***, including, without limitation, any periodic reports transmitted to the Directing Cash Collateral Agent.

*Id.* at ¶ 24 (emphasis added). If the Final Store Closing Order had authorized or was intended to authorize the retention of the Consultant as a professional of the Debtors' estates, there would have been no reason to treat the Consultant as categorically distinct from the Debtors' retained professionals in Paragraph 24 of such Order. But the Final Store Closing Order did not authorize the Debtors' retention of the Consultant as a professional of the Debtors' estates.

23.     Had the Final Store Closing Order not contained "terms acceptable to both Merchant and Consultant" or reflect "the terms and conditions" of the Consulting Agreement, then the Consultant could have exercised its discretion and elected to "immediately" terminate the Consultant Agreement.  Consult. Agmt. at ¶¶ 11(A) (first quote), 11(B) (second and third quotes). Yet, the Consulting Agreement remained in effect through its natural term,[11] and the Consultant did not elect or attempt to elect to terminate the Consulting Agreement.  This means that the Final Store Closing Order, including that such Order clearly did not authorize the retention of the Consultant as a professional of the Debtors' estates, was (i) acceptable to both the Debtors and the Consultant and (ii) consistent with the terms and conditions the Consulting Agreement.

24.     As such, this Court should determine that the Final Store Closing Order authorized the assumption of the Consulting Agreement and the Debtors to perform thereunder—not retain the Consultant as a professional of the Debtors' estates.

**3.      No Application or Motion Seeking Authority to Retain the Consultant as a Professional of the Debtors' Estates has Been Filed**

25.     The Debtors have never filed an application or motion seeking authority to retain the Consultant as a professional of the Debtors' estates.  As of the date hereof, the Debtors have filed applications and obtained this Court's approval to retain the following professionals of the Debtors' estates: (i) AP Services, LLC and Deborah Rieger-Paganis [Docket Nos. 298, 511]; (ii) Paul, Weiss, Rifkind, Wharton & Garrison LLP [Docket Nos. 299, 514]; (iii) A&G Realty Partners, LLC [Docket Nos. 300, 512]; and (iv) Porter Hedges LLP [Docket Nos. 301, 513]

---

[11]    As set forth in Section 2 of the Consulting Agreement, "the 'Sale Term' shall commence no later than December 20, 2024, or such other date mutually acceptable to Merchant and Consultant . . . and shall conclude no later than March 31, 2025, provided, that the Parties may mutually agree in writing to amend the Sale Term with respect to any one or more Stores or Distribution Facilities."  Consult. Agmt. at § 2(A).

(collectively, the "**Debtors' Retained Professionals**").[12]   The Debtors could have filed an application or motion seeking to retain the Consultant as a professional of the Debtors' estates, but chose not to do so.  Because the Debtors have not filed such an application or motion, this Court has not had the opportunity to consider approving the retention of the Consultant as a professional of the Debtors' estates.  Accordingly, the Consultant is not one of the Debtors' Retained Professionals and, therefore, does not constitute a professional of the Debtors' estates.

26.     The Store Closing Motion did not seek authority to retain the Consultant as a professional of the Debtors' estates.  The Final Store Closing Order approved the assumption of the Consulting Agreement and authorized the Debtors perform thereunder, but did not authorize the Debtors to retain the Consultant as a professional of the Debtors' estates.  No application or motion requesting authorization to retain the Consultant as a professional of the Debtors' estates has ever been filed.  As such, the Consultant has not been retained, is not one of the Debtors' Retained Professionals, and does not constitute an Estate Professional, as defined by the Cash Collateral Orders.

**B.    The Assumption of the Consulting Agreement did not Effectuate the Retention of the Consultant as a Professional of the Debtors**

27.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).[13]   Pursuant to "section 365, 'an assumed lease or contract will remain in effect through and then after the completion of the reorganization,'" and both the debtor and non-debtor parties "'must continue to perform[.]'"  *In re Liljeberg Enters.*, 304 F.3d 410, 438

---

[12]   The Debtors have also filed an application seeking to retain and employ TP-West LLC [Docket No. 1350], but such application remains pending as of the date hereof.

[13]   "A debtor in possession enjoys the powers of a trustee under 11 U.S.C. § 1107, except those withheld by 11 U.S.C. § 1106."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 n.7 (5th Cir. 1985).

(5th Cir. 2002) (quoting *In re Nat'l Gypsum Co.*, 208 F.3d 498, 505 (5th Cir. 2000)). Section 365(a) of the Bankruptcy Code contains no language regarding the retention of professionals of a debtor's bankruptcy estate. *See* 11 U.S.C. § 365(a).

28.     In light of the "numerous and detailed provisions concerning the employment of professional persons and their compensation and payment," including sections 327, 328, 330, and 503(b)(2), courts have long recognized that Congress did not "contemplate[] that professionals such as attorneys, could enter into executory contracts pre-petition and have the Debtor assume such a contract and thus avoid the scrutiny of the Court and the other creditors under the [previously cited] [Bankruptcy] Code provisions[.]" *In re Marlin Oil Co.*, 83 B.R. 50, 51 (Bankr. D. Colo. 1988); *see also In re Office Prods. of Am., Inc.*, 136 B.R. 675, 688 (Bankr. W.D. Tex. 1992) ("If the trustee were permitted to circumvent the requirements of § 327 by impliedly assuming a prepetition executory contract to hire a professional, Section 327 would be eviscerated. Indeed, even an express assumption of such a contract would override the more specific provisions of § 327, a result which this court eschews.") (internal citations omitted) (alteration in original); *In re Fin. News Network, Inc.*, 134 B.R. 732, 735 (Bankr. S.D.N.Y. 1991); *In re Cutler Mfg. Corp.*, 95 B.R. 230, 231–32 (Bankr. M.D. Fla. 1989). "[P]ermitting the trustee to assume, by implication or otherwise, an executory contract for professional services would render Section 327 meaningless[.]" *Office Prods. of Am.*, 136 B.R. at 688; *see also In re Fin. News Network, Inc.*, 134 B.R. 732, 734 (Bankr. S.D.N.Y. 1991) ("Nevertheless, we conclude that the payment of professional persons is governed by § 327 and its related compensation provisions, and not by § 365. The Bankruptcy Code contains numerous and detailed provisions concerning the employment of professional persons, their compensation and payment."); *In re Delta Petroleum (P.R.)*, 164 B.R. 425, 427 (Bankr. D.P.R. 1994) ("[W]e believe the specific provisions of Code

Section 327 concerning employment of professional persons supersede the Code's section pertaining to executory contracts."); *In re Channel 2 Assocs.*, 88 B.R. 351, 352–53 (Bankr. D.N.M. 1988) ("Without deciding whether this contract is executory and therefore capable of being assumed under § 365, the court holds that § 365 cannot be used to circumvent the requirements of § 327.").

29.     The Consulting Agreement reflects a typical arrangement between a liquidator and a debtor frequently arising in the context of chapter 11 retail liquidations.  *See, e.g.*, *In re Brookstone Holdings Corp.*, 592 B.R. 27, 28 (Bankr. D. Del. 2018) (explaining that "[t]he procedural mechanism by which [Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC] (and the handful of entities that are [their] industry peers) are engaged to perform these services has—with very few exceptions—been by way of assumption of a services contract by motion under §§ 365(a) and 363(b) of the Bankruptcy Code").  It neither contemplated nor provided for the Consultant being retained as a professional of the Debtors' estates or undertaking a mandate akin to that of a professional retained by the Debtors' estates.

30.     In *Brookstone*, the debtors filed a store closing motion,[14] which, among other things, sought authorization to assume a prepetition consulting agreement pursuant to which GBRP—the Movant here—was to serve as one of the liquidation consultants in connection with store closing sales.[15]  *Brookstone*, 592 B.R. at 28.  The consulting agreement in *Brookstone* was remarkably similar to the Consulting Agreement assumed in these Chapter 11 Cases.[16]  At issue in *Brookstone* was whether the liquidation consultants "must be retained as [] professional[s]

---

[14]   *In re Brookstone Holdings Corp.*, Case No. 18-11780 (BLS) (Bankr. D. Del. Aug. 2, 2018) [Docket No. 25].

[15]   *Id.* at Docket No. 25, at 50.

[16]   *See In re Brookstone Holdings Corp.*, Case No. 18-11780 (BLS) (Bankr. D. Del. Aug. 2, 2018) [Docket No. 25, at 50].

pursuant to § 327(a) of the Bankruptcy Code." *Brookstone*, 592 B.R. at 32.  In its brief in support

of the *Brookstone* store closing motion, GBRP forcefully argued that it was not a professional

under section 327(a), pointing to, among other things, the limited scope of its mandate, its lack of

decision-making authority, control, and specialized skill or knowledge.[17]  Instead, GBRP described

itself as a "service provider to the Debtors whose services have a limited purview."[18]  After

thoroughly analyzing the services to be performed by the liquidation consultants under the

consulting agreement, the *Brookstone* court determined that the liquidation consultants were not

"professional[s] for the purposes of the Bankruptcy Code § 327(a), and the Debtor ha[d] otherwise

met its burden to warrant assumption of the Agreement."  *Brookstone*, 592 at 28, 32–39.

31.    Like *Brookstone* and as previously discussed, pursuant to the Store Closing Motion,

the Debtors requested authority to assume the Consulting Agreement and perform thereunder—not

retain the Consultant as a professional of the Debtors' estates.  *See, e.g.*, Store Closing Mot. at ¶ 1.

This is why the Final Store Closing Order did not authorize the Debtors to retain the Consultant as

a professional of the Debtors' estates, but instead merely authorized the assumption of the

Consulting Agreement and the Debtors' performance thereunder, including the payment of the

Consultant's fees.  Final Store Closing Order at ¶ 1.  Through the assumption of the Consulting

Agreement, the Debtors secured the Consultant's performance of the services described in the

Consulting Agreement on a postpetition basis and, pursuant to section 363(b), obtained

authorization for themselves to perform under the Consulting Agreement, including by conducting

store closing sales and making payments to the Consultant outside the ordinary course of business.

That is it.

---

17    *See generally In re Brookstone Holdings Corp.*, Case No. 18-11780 (BLS) (Bankr. D. Del. Aug. 22, 2018) [Docket No. 186, at ¶¶ 33–59].

18    *Id.* at ¶ 48.

32.     The Movant now seeks to side-step the requirements imposed by the Bankruptcy Code and rewrite the Final Store Closing Order, asserting that it was implicitly retained as a professional of the Debtors' estates by virtue of the assumption of the Consulting Agreement and the Debtors' authorization to perform thereunder pursuant to the Final Store Closing Order in a veiled attempt to elevate its claim above other similar situated unpaid administrative creditors. This is not only transparent, but improper.  The Court should find that the assumption of the Consulting Agreement pursuant to the Final Store Closing Order did not effectuate the retention of the Consultant as a professional of the Debtors' estates.

**C.      The Consultant was not Retained as a Professional of the Debtors' Estates Pursuant to Section 363(b) of the Bankruptcy Code**

33.     Multiple courts have held based on the facts of the underlying case that a liquidator is not a professional for the purposes of section 327 of the Bankruptcy Code.  *See Brookstone*, 592 B.R. at 27; *In re Heritage Home Grp. LLC*, No. 18-11736, 2018 Bankr. LEXIS 2944 (Bankr. D. Del. Sep. 27, 2018); *but see In re Borders Grp., Inc.*, 453 B.R. 477 (Bankr. S.D.N.Y.) ("Applications to retain brokers, auctioneers and ***liquidators*** to conduct de minimis asset sales are commonplace; it need not be an expensive or time-consuming process.") (emphasis added).  At the May 14, 2025, scheduling conference held in connection with the Motion (the "**May 14 Scheduling Conference**"), counsel for the Movant conceded that the Consultant is not a professional of the Debtors under section 327 of the Bankruptcy Code.[19]  Instead, as set forth in the Motion, the Movant argues that the Consultant is a professional of the Debtors' estates retained

---

[19]     "MR. FOX:  If I might comment, Your Honor.  Steven Fox.  I think Mr. Feinstein can place [*sic*] the terminology and the defined terms in the cash collateral order of what constitutes an estate professional, which is not limited to Section 327(a), professionals, and the standards applicable to that.  And clearly, we are not that." May 14 Sch. Conf. Hr'g Tr. 9:10–15.

pursuant to section 363(b) of the Bankruptcy Code.  Mot. at ¶¶ 2, 11–13.  The Movant's argument

is, however, inconsistent with both the facts and the law, and should be rejected.

34.     Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he

trustee, after notice and a hearing, may use sell, or lease, other than in the ordinary course of

business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  On its face, this provision permits a

debtor to use estate property outside the ordinary course of business.  *See id.*; *In re McDermott

Int'l, Inc.*, 614 B.R. 244, 249 (Bankr. S.D. Tex. 2020).

35.     However, "[u]nder certain circumstances, courts have permitted the retention of

professionals under sections 363(b) and 105(a) of the Bankruptcy Code."  *In re Genever Holdings,

LLC*, No. 20-12411-JLG, 2021 Bankr. LEXIS 2392, at *28 (Bankr. S.D.N.Y. Sep. 1, 2021);[20] *see

also In re K.G. IM, LLC*, 620 B.R. 469, 478 (Bankr. S.D.N.Y. 2020) ("In addition to the authority

granted in section 327(a), Debtors may retain estate professionals, including CROs, pursuant to

section 363(b) of the Bankruptcy Code."); *In re Express Grain Terminals, LLC*, No. 21-11832-

SDM, 2022 Bankr. LEXIS 188, at *25 (Bankr. N.D. Miss. Jan. 25, 2022) ("On its

face, § 363(b) does not specifically address the employment of professionals, but rather the use of

estate property.  Nevertheless, bankruptcy courts have found that professional employment under

§ 363(b) is permissible.") (citing *In re Nine West Holdings, Inc.*, 588 B.R. 678, 686–87 (Bankr.

S.D.N.Y. 2018)); *McDermott*, 614 B.R. at 249 ("Although [§ 363(b)(1)] has been utilized . . . to

authorize the retention of professional persons, the language itself deals only with the use of estate

property not the conditions under which a professional person may be employed.").

---

[20]     Section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process,
or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

36.     The use of section 363(b) as a basis for the employment of professionals of a debtor's estate is often linked to the implementation of the J. Alix Protocol, which was intended to resolve objections of the United States Trustee to "debtors' applications to retain chief restructuring officers ('CROs') and their firms where the CRO had served in the role prior to the bankruptcy filing. *McDermott*, 614 B.R. at 249–250 (discussing the development and implementation of the J. Alix Protocol). This is why the retention of professionals pursuant to section 363(b) most often arises in the context of a debtor's retention of a chief restructuring officer and its firm. *See, e.g.*, *Nine West Holdings*, 588 B.R. at 686 (citing cases involving the retention of chief restructuring officers and their firms). However, the use of section 363(b) as authority to retain professionals is not without criticism. *See, e.g.*, *McDermott*, 614 B.R. at 250–52; *In re Copenhaver, Inc.*, 506 B.R. 757, 762 (Bankr. C.D. Ill. 2014); *In re Blue Stone Real Estate, Constr. & Dev. Corp.*, 392 B.R. 897, 906–07 (Bankr. M.D. Fla. 2008). Accordingly, section 363(b) does not create a "broad basis for employment of professionals" and "absent unique and compelling circumstances, § 327 controls the employment of professionals." *Copenhaver*, 506 B.R. at 764–65.

37.     In cases where a bankruptcy court has approved retention pursuant to section 363(b), the party seeking such retention has filed a separate application or motion to authorize such retention and employment. *See, e.g.*, *Nine West Holdings*, 588 B.R. at 678; *McDermott*, 614 B.R. at 244. *In re Heritage Home Grp. LLC*, No. 18-11736, 2018 Bankr. LEXIS 2944 (Bankr. D. Del. Sep. 27, 2018) (approving retention of liquidator as a professional of the debtors' bankruptcy estate pursuant to sections 105(a) and 363(b) upon separate application to the court).

38.     Here, no application or motion seeking the retention of the Consultant as a professional of the Debtors' estates pursuant to section 363(b) has ever been filed. Nor has the

retention of the Consultant as a professional of the Debtors' estates pursuant to section 363(b) been approved by this Court.   The Movant's attempt to transmogrify the Store Closing Motion into a retention application pursuant to section 363(b) is without merit.

39.     Indeed, the Final Store Closing Order authorized, among other things, the Debtors to perform, pursuant to section 363(b), under the Consulting Agreement.   Final Store Closing Order at ¶ 1.   This is because, pursuant to the Store Closing Motion and as contemplated by the Consulting Agreement, the Debtors sought to conduct store closing sales pursuant to certain procedures, effectuate a full-chain liquidation, and pay fees and expenses associated therewith, each of which constituted the sale or use of estate property outside the ordinary course of business. *See In re ASARCO LLC*, 441 B.R. 813, 829 (S.D. Tex. 2010) ("Section 363 is meant to 'govern[] the use of funds by the debtor in possession *while it operates its business* after the bankruptcy petition is filed. . . . [U]nder § 363(b), if the debtor in possession wants to use funds from the estate for a transaction outside the ordinary course of business, the debtor must obtain advance approval from the bankruptcy court.'") (quoting *In re Bethlehem Steel Corp.*, 2003 U.S. Dist. LEXIS 12909, at *10 (S.D.N.Y. July 23, 2003)).   Relief under section 363(b) was necessary for the Debtors to complete the actions contemplated by the Store Closing Motion, including paying any fees earned by the Consultant, and the Debtors obtained the requisite authorization pursuant to the Final Store Closing Order.   But the Debtors did not obtain authority to retain the Consultant as a professional of the Debtors' estates.   The Movant cannot now vaguely invoke section 363(b) as a basis for retention as a professional of the Debtors' estates, when such relief was never (i) requested in the Store Closing Motion, (ii) approved by the Final Store Closing Order, or (iii) even considered by this Court.

40.     The Court should reject the Movant's transparent attempt to inappropriately benefit from the Carve-Out and thereby inappropriately and unfairly improve its position relative to other administrative creditors.

**D.     The Consultant Does not Constitute an Estate Professional Covered by the Carve-Out Established by the Cash Collateral Orders**

41.     The Carve-Out only covers the Allowed Professional Fees of Estate Professionals. *See, e.g.*, Fifth Interim Order at ¶ 9.  As previously noted, the term "Estate Professionals" is defined in the Cash Collateral Orders as encompassing, collectively, the "persons or firms retained by the Debtors or the Creditors' Committee pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code." *Id.*  While the Consultant fancies itself as a retained professional of the Debtors' estates pursuant to section 363, the reality, as discussed *supra*, is that the Debtors never retained the Consultant as a professional of their estates.  Without restating the prior arguments set forth above, which the Committee incorporates by reference herein, this is because the retention of the Consultant as a professional of the Debtors' estates was neither contemplated by the Consulting Agreement, part of the relief requested in the Store Closing Motion, approved pursuant to the Final Store Closing Order, nor ever even considered by this Court.

42.     The purpose of the reference to section 363(b) in the Carve-Out is to cover professionals retained by the Debtors or the Committee pursuant to that provision in the event that the Debtors or the Committee sought to do so.  The language of the Carve-Out has been consistent throughout the Cash Collateral Orders.  By way of example, the Debtors could have sought to retain their Chief Restructuring Officer pursuant to section 363(b), but they did not.  In fact, the Debtors have chosen not to seek the retention of any professionals pursuant to section 363(b) as of the date hereof.

43.     Contrary to the Consultant's assertions, the Consultant constitutes a counterparty to a prepetition services contract that was assumed by the Debtors following the Petition Date—nothing more.  As such, the Consultant may avail itself to whatever rights and remedies the Bankruptcy Code affords to similarly situated parties in interest.  However, because the Consultant does not meet the definition of "Estate Professional" as defined in the Cash Collateral Orders, it is unable to take advantage of the Carve-Out and thereby improve its position relative to other similarly situated administrative creditors who do not enjoy the benefits of the Carve-Out.

44.     For the reasons set forth herein, the Court should find that the Consultant does not constitute an Estate Professional as defined by the Cash Collateral Orders, determine that the Consultant is not covered by the Carve-Out, and deny the Movant's relief requested in the Motion.

**IV.**
**RESERVATION OF RIGHTS**

45.     The Committee reserves all rights to amended and/or supplement this Preliminary Objection at any time prior to a hearing on the Motion, including, without limitation, to raise new arguments in connection with the relief requested in the Motion.  Nothing herein is or shall be construed as a waiver of any such rights.

*[Remainder of Page Intentionally Left Blank]*

## V.
## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court enter the proposed

form of order, annexed hereto as **Exhibit A**, denying the Motion, and granting such other and

further relief as this Court deems appropriate.

Dated:    May 22, 2025

*/s/ Theodore S. Heckel*
Michael D. Warner, Esq. (TX. Bar No. 00792304)
Theodore S. Heckel (TX Bar No. 24133488)
**PACHULSKI STANG ZIEHL & JONES LLP**
700 Louisiana Street, Suite 4500
Houston, Texas 77002
Telephone:   (713) 691-9385
Facsimile:   (713) 691-9407
Email:        mwarner@pszjlaw.com
             theckel@pszjlaw.com

- and -

Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Robert J. Feinstein, Esq. (admitted *pro hac vice*)
Shirley S. Cho (admitted *pro hac vice*)
**PACHULSKI STANG ZIEHL & JONES LLP**
1700 Broadway, 36th Floor
New York, New York 10019
Telephone:   (212) 561-7700
Facsimile:   (212) 561-7777
Email:        bsandler@pszjlaw.com
             rfeinstein@pszjlaw.com
             scho@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I certify that on May 22, 2025, a true and correct copy of the foregoing pleading was
served by the Bankruptcy Court's CM/ECF to all parties that are registered to receive such notice
in the above cases.

*/s/ Theodore S. Heckel*
Theodore S. Heckel