## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| PARTY CITY HOLDCO INC., *et al.*,[1] | ) Case No. 24-90621 (ARP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DISCLOSURE STATEMENT FOR THE
## JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
## PARTY CITY HOLDCO INC. AND ITS DEBTOR AFFILIATES

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Kenneth S. Ziman (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
kziman@paulweiss.com
chopkins@paulweiss.com
slascano@paulweiss.com

*Counsel to the Debtors and*
*Debtors-in-Possession*

Dated: June 26, 2025

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
Aaron J. Power (TX Bar No. 24058058)
M. Shane Johnson (TX Bar No. 24083263)
Jordan T. Stevens (TX Bar No. 24106467)
Grecia V. Sarda (TX Bar No. 24132092)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
jhiggins@porterhedges.com
apower@porterhedges.com
sjohnson@porterhedges.com
jstevens@porterhedges.com
gsarda@porterhedges.com

*Co-Counsel to the Debtors and*
*Debtors-in-Possession*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:   Party City Holdco Inc. (9758); Amscan Inc. (1359); Am-Source, LLC (8427); Party City Corporation (3692); Party City Holdings Inc. (3029); PC Intermediate Holdings, Inc. (1229); and Trisar, Inc. (0659).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

17295901

**UNLESS EXTENDED BY THE DEBTORS (SUBJECT TO ANY CONSENT RIGHTS OF THE REQUIRED CONSENTING NOTEHOLDERS), THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>4:00 P.M. (PREVAILING CENTRAL TIME) ON JULY 30, 2025</u> (THE "<u>VOTING DEADLINE</u>").   THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS AND INTERESTS MAY VOTE ON THE PLAN IS <u>JUNE 25, 2025</u> (THE "<u>VOTING RECORD DATE</u>").**

## DISCLOSURE STATEMENT

## SOLICITATION OF VOTES ON THE CHAPTER 11 PLAN OF LIQUIDATION OF PARTY CITY HOLDCO INC. AND ITS DEBTOR AFFILIATES FROM HOLDERS OF OUTSTANDING:

| VOTING CLASS | NAME OF CLASS UNDER PLAN |
|---|---|
| **CLASS 1** | **PRIORITY CLAIMS** |
| **CLASS 3** | **PREPETITION 2L NOTES CLAIMS** |
| **CLASS 4** | **GENERAL UNSECURED CLAIMS** |

Dated: June 26, 2025

**ONLY HOLDERS OF CLASS 1 PRIORITY CLAIMS, CLASS 3 PREPETITION 2L NOTES CLAIMS, AND CLASS 4 GENERAL UNSECURED CLAIMS (THE "<u>VOTING CLASSES</u>") ARE ENTITLED TO VOTE ON THE PLAN AND ARE BEING SOLICITED TO VOTE ON THE PLAN (THE "<u>SOLICITATION</u>") UNDER THIS DISCLOSURE STATEMENT.**

**THE PLAN PROVIDES THAT ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN, (II) ARE DEEMED TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, (III) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, (IV) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, OR (V) DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS**

ii

17295901

iii

**CONTAINED IN ARTICLE VIII.C OF THE PLAN AND THAT IS NOT CONSENSUALLY RESOLVED PRIOR TO CONFIRMATION OR SUPPORT ANY SUCH OBJECTION OR OBJECTOR (IN EACH CASE ONLY SO LONG AS SUCH HOLDER IS PERMITTED TO OPT OUT) ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

17295901

---

**RECOMMENDATION BY THE DEBTORS
AND KEY STAKEHOLDER SUPPORT**

The Board of Directors (the "Board") of Party City Holdco Inc. ("PC Holdco") and the boards of directors, managers, or members, as applicable, of each of its affiliated and subsidiary Debtors (collectively, the "Debtors" and, together with the Non-Debtor Affiliates, "PCHI" or the "Company") (as of the date hereof) have approved the Plan (as defined herein) and recommend that all Holders of Claims whose votes are being solicited submit ballots to **accept** the Plan.

Subject to the terms of the Plan Settlement Term Sheet, as of the date hereof, the Ad Hoc Noteholder Group has already agreed to vote in favor of the Plan.

---

## DISCLAIMERS

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CERTAIN CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING ALL ATTACHED EXHIBITS AND DOCUMENTS INCORPORATED INTO THIS DISCLOSURE STATEMENT, AS WELL AS THE RISK FACTORS DESCRIBED IN ARTICLE VI OF THIS DISCLOSURE STATEMENT.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, AND THE PLAN.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, A SUMMARY OF THE PLAN, CERTAIN EVENTS LEADING UP TO, DURING, AND EXPECTED TO OCCUR IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND THERETO, WHICH ARE INCORPORATED HEREIN BY REFERENCE, OR THAT MAY BE FILED LATER WITH THE PLAN SUPPLEMENT.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT

17295901

SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR RELEVANT STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS, BY REFERENCE TO SUCH DOCUMENTS OR STATUTORY PROVISIONS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT AS OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION AND THE LIQUIDATION ANALYSIS, THE FINANCIAL INFORMATION AND LIQUIDATION ANALYSIS CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

NEITHER THIS DISCLOSURE STATEMENT, THE PLAN, THE CONFIRMATION ORDER, NOR THE PLAN SUPPLEMENT WAIVE ANY RIGHTS OF THE DEBTORS WITH RESPECT TO THE HOLDERS OF CLAIMS OR INTERESTS BEFORE THE EFFECTIVE DATE.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS OR IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT. EXCEPT AS PROVIDED UNDER THE PLAN, THE LIQUIDATING TRUSTEE MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS ON THE TERMS SPECIFIED IN THE PLAN.

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE

v

17295901

STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS SENT.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE COMPANY AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, BEFORE DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE AD HOC NOTEHOLDER GROUP AND/OR ANY OF ITS REPRESENTATIVES, MEMBERS, FINANCIAL OR LEGAL ADVISORS, OR AGENTS, HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN AND DO NOT TAKE ANY RESPONSIBILITY THEREFOR, AND NONE OF THE FOREGOING ENTITIES OR PERSONS MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING THE INFORMATION CONTAINED HEREIN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED (OR WAIVED).

17295901

**TABLE OF CONTENTS**

**ARTICLE I.** INTRODUCTION ................................................................................................ 1

**ARTICLE II.** OVERVIEW OF THE COMPANY'S BUSINESS AND OPERATIONS ............ 6
    A.    The Company's Business.................................................................................. 6
    B.    Debtors' Corporate Organization...................................................................... 6
    C.    The Company's Prepetition Capital Structure ................................................. 7

**ARTICLE III.** KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11
    CASES ...................................................................................................................... 9
    A.    Efforts to Reposition the Business Complicated by Underperforming Sales ......... 9
    B.    September 2024 Hilco Appraisal; Efforts to Obtain Incremental Financing;
              Forbearance Agreement Under the ABL/FILO Facilities ................................... 10
    C.    Selection of Store Closing and Real Estate Consultants..................................... 12

**ARTICLE IV.** THE CHAPTER 11 CASES ....................................................................... 12
    A.    Commencement of the Chapter 11 Cases ........................................................ 12
    B.    First Day Motions ........................................................................................ 12
    C.    Retention of Restructuring and Other Professionals........................................ 13
    D.    Appointment of the Official Committee of Unsecured Creditors........................ 14
    E.    Other Postpetition Operational and Administrative Relief................................ 14
    F.    Section 341 Meeting .................................................................................... 15
    G.    Schedules and Statements and 2015.3 Reports................................................. 15
    H.    Bar Date .................................................................................................... 15
    I.    The WARN Adversary Proceedings ............................................................... 15
    J.    The Gordon Brothers Settlement ................................................................... 16
    K.    The Plan Settlement .................................................................................... 17
    L.    Confirmation Hearing .................................................................................. 18

**ARTICLE V.** CERTAIN UNITED STATES FEDERAL  INCOME TAX
    CONSEQUENCES OF THE PLAN............................................................................ 18
    A.    In General................................................................................................... 18
    B.    Certain U.S. Federal Income Tax Consequences to the U.S. Holders of
              Priority Claims, Other Secured Claims, and General Unsecured Claims............. 20
    C.    Certain U.S. Federal Income Tax Considerations for Non-U.S.
              Beneficiaries of the Liquidating Trust ........................................................... 20
    D.    Backup Withholding and Information Reporting .............................................. 21

**ARTICLE VI.** CERTAIN RISK FACTORS TO BE CONSIDERED...................................... 21
    A.    Certain Bankruptcy Law Considerations ........................................................ 21
    B.    Additional Factors....................................................................................... 26

**ARTICLE VII.** VOTING PROCEDURES AND REQUIREMENTS ..................................... 27
    A.    Voting Instructions and Voting Deadline ....................................................... 27
    B.    Voting Procedures....................................................................................... 28

17295901

|   | C. | Deadline for Returning Administrative Claim / Priority Claim Consent Form | 31 |
|---|---|---|---|
|   | D. | Holders of Claims Entitled to Vote | 31 |
|   | E. | Fiduciaries and Other Representatives | 32 |
|   | F. | Agreements Upon Furnishing Ballots | 32 |
|   | G. | Change of Vote | 32 |
|   | H. | Waivers of Defects, Irregularities, Etc. | 32 |
|   | I. | Miscellaneous | 33 |

**ARTICLE VIII.** CONFIRMATION OF THE PLAN .................................................................. 34

|   | A. | Confirmation Hearing | 34 |
|---|---|---|---|
|   | B. | Objections to Confirmation | 34 |
|   | C. | Requirements for Confirmation of the Plan | 35 |

**ARTICLE IX.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .......................................................... 40

|   | A. | Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law | 40 |
|---|---|---|---|

**ARTICLE X.** CONCLUSION AND RECOMMENDATION .................................................. 41

viii

# ARTICLE I.
# INTRODUCTION

The Debtors submit this Disclosure Statement in connection with the solicitation of votes on the *Joint Chapter 11 Plan of Liquidation of Party City Holdco Inc. and Its Debtor Affiliates*, dated June 26, 2025 (the "Plan") attached hereto as **Exhibit A**.[2]  The Debtors under the Plan are PC Holdco and certain of its affiliates and subsidiaries, certain of which are either borrowers, issuers, or guarantors under the Prepetition ABL Credit Agreement and the Prepetition 2L Notes Indenture.  The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as may be amended from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") on December 21, 2024 (the "Petition Date").  The Debtors' chapter 11 cases (the "Chapter 11 Cases") are jointly administered under Case No. 24-90621 (ARP).

Since emerging from a chapter 11 reorganization in October 2023 (the "Prior Cases"), the Debtors and their non-Debtor affiliates (collectively, "PCHI" or the "Company") focused its efforts on implementing initiatives intended to make the Company a more modern, efficient, and profitable retail enterprise positioned for long-term growth. Those efforts included inventory optimization, right-sizing its workforce, updating its retail pricing methodology, and exiting its historical manufacturing business to focus on retail and wholesale operations. During the 14 months between the Debtors' emergence from chapter 11 and the filing of these Chapter 11 Cases, however, PCHI continued to experience the challenges affecting all major retailers, including, among other things, inflationary pressures, macroeconomic factors affecting consumer discretionary spending, contracting margins, and shifting customer preferences.

These factors placed significant pressure on the Company's business and liquidity position. As a result, in September 2024, PCHI launched an effort to raise incremental capital to fund the Company's business plan and navigate through a projected liquidity trough. A confluence of factors frustrated those efforts, leaving the Company with insufficient runway to effectuate its long-term growth strategy while maintaining the liquidity necessary to operate its business. Among other things, the Company's efforts to obtain additional capital from the ABL/FILO Lenders, the holders of the Company's Prepetition 2L Notes (who are also PCHI's majority owners), and third-party strategic investors and lenders were unavailing. After the Prepetition ABL Agent instituted a $50 million discretionary reserve under the ABL/FILO Facilities, on December 10, 2024, PCHI found itself in default thereunder. Without any prospect for incremental capital or a liquidity infusion from the Company's existing lenders or investors, PCHI was compelled to pivot to a liquidation strategy, to be effected through chapter 11. Negotiations with the ABL/FILO Lenders culminated in the execution of the Forbearance Agreement (as defined herein), which required that PCHI file these cases by December 22, 2024 to effectuate an efficient and value-maximizing sale of the Company's assets and orderly wind down of its business.

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan or the *Declaration of Deborah Rieger-Paganis, Chief Restructuring Officer of Party City Holdco Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 45] (the "First Day Declaration"), as applicable.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

17295901

Since the outset of the Chapter 11 Cases, the Debtors have worked diligently to effect an orderly and value-maximizing liquidation and winddown of their operations.  Pursuant to the *Interim Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 66] and the *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 291], the Debtors have closed all of their stores.  Simultaneously, the Debtors obtained entry of multiple orders permitting the Debtors to sell and otherwise dispose of the Debtors' assets, including the *Order (I) Approving (A) Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Procedures for the De Minimis Sale of Certain of the Debtors' Assets and (C) Assumption and Assignment Procedures, (II) Approving (A) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket Nos. 77 & 94]; the *Order (A) Approving and Authorizing Sale of Certain of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 772] , as well as the *Order (I) Approving the Asset Purchase Agreement Among Debtors and Buyer, (II) Authorizing the Sale of Designation Rights to Certain Leases Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Approving Assignment and Assumption Procedures for the Designation Leases and (IV) Granting Related Relief* [Docket No. 769]; and the *Order (I) Approving the Designation Rights Agreement Among Debtors and Dollar Tree Stores, Inc., (II) Authorizing the Sale of Designation Rights to Certain Leases Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Determining Any Anti-Assignment Provisions of the Designation Leases Are Unenforceable, (IV) Approving Assignment and Assumption Procedures for the Designation Leases, and (V) Granting Related Relief* [Docket No. 818].  To date, the Court has approved numerous sales and assignments of the Debtors' assets (collectively, the "Sales") to various third parties (collectively, the "Purchasers"), including in addition and pursuant to the aforementioned orders. *See, e.g.*, Docket Nos. 759, 760, 761, 769, 772, 818, 857, 858, 859, 881, 915, 964, 965, 966, 967, 1002, 1003, 1004, 1059, 1240].

Notwithstanding the substantial progress made in these Chapter 11 Cases, the Debtors simply have insufficient funds to pay all creditors in full.  However, through hard-fought negotiations, the Debtors achieved a consensus among their secured creditors surrounding the Plan Settlement Term Sheet (as defined below).  The fragile consensus around the Plan relies heavily on consent from Holders of Administrative and Priority Claims to less than full payment of their claims.  It is a condition precedent to the effectiveness of the Plan that the amount of claims attributable to Holders of Administrative and Priority Claims that do not consent to the Administrative/Priority Waterfall Treatment cannot exceed $1 million.  Failure to satisfy this condition precedent will, in all likelihood, result in the conversion of these Chapter 11 Cases to Chapter 7.  Conversion to Chapter 7 will be detrimental to many stakeholders, including Holders of Administrative Claims, Class 1 Priority Claims, and Class 4 General Unsecured Claims, who are all projected to receive no recovery in a chapter 7 case.

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan of liquidation (unless, for reasons discussed in more detail below, such holders are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of

2

claims or interests is deemed to be "impaired" under a plan unless: (a) the plan leaves unaltered the legal, equitable, and contractual rights of the holders of such claims or interests; or (b) notwithstanding any legal right to an accelerated payment of such claims or interests, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claims or interests as they existed before the defaults.

There are three Classes entitled to vote on the Plan whose acceptances thereof are being solicited under this Disclosure Statement: (i) Priority Claims (Class 1); (ii) Prepetition 2L Notes Claims (Class 3) and (iii) General Unsecured Claims (Class 4).

**THE PLAN PROVIDES THAT ALL HOLDERS OF CLAIMS THAT DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

**<u>TREATMENT OF ADMINISTRATIVE AND PRIORITY CLAIMS</u>**

**THE PLAN FURTHER PROVIDES HOLDERS OF ADMINISTRATIVE AND PRIORITY CLAIMS WILL RECEIVE THEIR PRO RATA SHARE OF THE DISTRIBUTABLE PROCEEDS PURSUANT TO THE ADMINISTRATIVE/PRIORITY WATERFALL TREATMENT UNDER THE PLAN AS FOLLOWS (I.E., THE "WATERFALL RECOVERY"): (I) *FIRST*, $5 MILLION DISTRIBUTED PRO RATA AMONG ALLOWED ADMINISTRATIVE AND PRIORITY CLAIMS, (II) *SECOND*, $9.8 MILLION DISTRIBUTED AMONG THE FOLLOWING CLAIMS: (A) 50% DISTRIBUTED PRO RATA AMONG ALLOWED ADMINISTRATIVE AND PRIORITY CLAIMS; AND (B) 50% DISTRIBUTED PRO RATA AMONG PREPETITION 2L NOTES CLAIMS; AND (III) *THIRD*, ANY REMAINING DISTRIBUTABLE PROCEEDS SHALL BE DISTRIBUTED PRO RATA AMONG PREPETITION 2L NOTES CLAIMS.**

**ALL KNOWN HOLDERS OF PRIORITY AND ADMINISTRATIVE CLAIMS (OTHER THAN HOLDERS OF PROFESSIONAL FEE CLAIMS) HAVE BEEN SENT AN ADMINISTRATIVE / PRIORITY CLAIM CONSENT FORM PURSUANT TO WHICH THE DEBTORS ARE SEEKING THE AGREEMENT OF SUCH PARTY TO THE ADMINISTRATIVE/PRIORITY WATERFALL TREATMENT.**

**<u>THE FAILURE OF ANY HOLDER OF ADMINISTRATIVE CLAIMS OR PRIORITY CLAIMS TO OBJECT TO ADMINISTRATIVE/PRIORITY WATERFALL TREATMENT BY THE OBJECTION DEADLINE FOR CONFIRMATION OR OTHERWISE TIMELY RETURN THE ADMINISTRATIVE / PRIORITY CLAIM CONSENT FORM AND OPT OUT OF THE ADMINISTRATIVE/PRIORITY WATERFALL TREATMENT SHALL BE DEEMED TO BE SUCH HOLDER'S CONSENT TO RECEIVE THE ADMINISTRATIVE/PRIORITY WATERFALL TREATMENT AND ACCEPT LESS THAN FULL PAYMENT OF ITS ADMINISTRATIVE CLAIM AS REQUIRED BY SECTION 1129(A)(9) AND AS CONTEMPLATED UNDER SECTIONS 1124 AND 1123(A)(4) OF THE BANKRUPTCY CODE, AND IN FULL AND FINAL SATISFACTION, COMPROMISE, SETTLEMENT, AND RELEASE OF AND IN EXCHANGE FOR EACH ALLOWED ADMINISTRATIVE</u>**

3

17295901

**CLAIM, EACH SUCH HOLDER OF AN ALLOWED ADMINISTRATIVE CLAIM SHALL RECEIVE LIQUIDATING TRUST INTERESTS ENTITLING SUCH HOLDER TO ITS PRO RATA SHARE OF THE DISTRIBUTABLE PROCEEDS PURSUANT TO THE WATERFALL RECOVERY.** IF SUCH HOLDER DOES NOT TIMELY OPT OUT OR OTHERWISE OBJECT TO SUCH THE ADMINISTRATIVE/PRIORITY WATERFALL TREATMENT, SUCH HOLDER SHALL BE DEEMED A RELEASED PARTY FOR ALL PURPOSES HEREUNDER.

The following table summarizes: (a) the treatment of Claims and Interests under the Plan; (b) which Classes are Impaired by the Plan; (c) which Classes are entitled to vote on the Plan; and (d) the estimated recoveries for Holders of Claims and Interests.  The following table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claims or Interests | Treatment | Impaired or Unimpaired | Entitlement to Vote |
|---|---|---|---|---|
| 1 | Priority Claims | All known Holders of Priority Claims shall be sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the Administrative/Priority Waterfall Treatment afforded to such Holder hereunder. **The failure of any Holder of Priority Claims to object to Administrative/Priority Waterfall Treatment by the objection deadline for Confirmation or otherwise timely return the Administrative / Priority Claim Consent Form and opt out of the Administrative/Priority Waterfall Treatment shall be deemed to be such Holder's consent to receive the Administrative/Priority Waterfall Treatment and accept less than full payment of its Administrative Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code, and in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Claim, each such Holder of an Allowed Administrative Claim shall receive Liquidating Trust Interests entitling such Holder to its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery.** If such Holder does not timely opt out or otherwise object to the Administrative/Priority Waterfall Treatment by the objection deadline for Confirmation, such Holder shall be deemed a Released Party for all purposes hereunder. If a Holder of an Allowed Priority Claim timely opts out of the Administrative/Priority Claim Consent Form or otherwise objects to | Impaired | Yes |

4

17295901

| Class | Claims or Interests | Treatment | Impaired or Unimpaired | Entitlement to Vote |
|---|---|---|---|---|
| | | the Administrative/Priority Waterfall Treatment by the objection deadline for Confirmation, then such Holder's Claim will receive the treatment required by section 1129(a)(9) of the Bankruptcy Code (unless otherwise agreed by such Holder and the Debtors, with the consent of the Ad Hoc Noteholder Group), *provided* that pursuant to Article VIII.A.8 of the Plan, it is a condition to Consummation of the Plan that the aggregate amount of asserted Administrative Claims and Priority Claims (including both Allowed and Disputed Claims) held by Holders who have timely opted out of the Administrative / Priority Claim Consent Form or who have otherwise timely objected to the Administrative/Priority Waterfall Treatment shall be less than $1 million. | | |
| 2 | Other Secured Claims | In full and final satisfaction of each Allowed Other Secured Claim, except to the extent that the Debtors and a Holder of an Allowed Other Secured Claim agree to less favorable treatment, each Holder thereof will receive: (a) payment in full in Cash of such Holder's Allowed Other Secured Claim; (b) delivery of the collateral securing any such Holder's Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Holder's Allowed Other Secured Claim; or (d) other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | Unimpaired | No (Presumed to Accept) |
| 3 | Prepetition 2L Notes Claims | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed Prepetition 2L Notes Claim shall receive Liquidating Trust Interests entitling such Holder to (i) its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery and (ii) its Pro Rata share of the GUC Distributable Proceeds pursuant to the GUC Waterfall Recovery. | Impaired | Yes |
| 4 | General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the Debtors and the applicable Holder agree to a less favorable treatment), each Holder of an Allowed General Unsecured Claim shall receive Liquidating Trust Interests entitling such Holder to its Pro Rata share of the GUC Distributable | Impaired | Yes |

5

17295901

| Class | Claims or Interests | Treatment | Impaired or Unimpaired | Entitlement to Vote |
|---|---|---|---|---|
| | | Proceeds pursuant to the GUC Waterfall Recovery. | | |
| 5 | Intercompany Claims | In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will be cancelled and released. | Impaired | No (Deemed to Reject) |
| 6 | Intercompany Interests | Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests. | Impaired | No (Deemed to Reject) |
| 7 | Interests in PCHI | In full and final satisfaction of each Allowed Interest in PCHI, each Allowed Interest in PCHI shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in PCHI shall be entitled to any recovery or distribution under the Plan on account of such Interests. | Impaired | No (Deemed to Reject) |

## ARTICLE II.
## OVERVIEW OF THE COMPANY'S BUSINESS AND OPERATIONS

### A.      The Company's Business

PCHI was a global leader in the celebrations industry, with its offerings sold in more than 70 countries around the world at its peak. The Company's retail and consumer products operations have made it easy for customers to create unforgettable memories through one-stop-shopping for all things celebration, including Halloween, Christmas, New Year's, graduations, and birthdays.

As of the Petition Date, the Company's business was comprised of two primary business lines: (a) retail operations, including owned and franchised stores and e-commerce sales, and (b) consumer products, which involves the design, sourcing, and distribution operations that ultimately result in sales to third-party wholesale customers and retailers, including the PCHI retail business. The Company's retail stores were located in the United States and its consumer products operations were located in the United States and Asia, supplying goods throughout the world in more than 70 countries.

For a detailed description of the Company's historical business, see the First Day Declaration.

### B.      Debtors' Corporate Organization

PC Holdco and six (6) of its direct and indirect subsidiaries are Debtors in these Chapter 11 Cases:

6

17295901

i.      PC Intermediate Holdings, Inc. ("PC Intermediate"), a Delaware corporation and guarantor under the Prepetition ABL Credit Agreement; and

ii.     Party City Holdings Inc., a Delaware corporation and wholly-owned subsidiary of PC Intermediate, as well as a borrower under the Prepetition ABL Credit Agreement, guarantor of the ABL/FILO Facilities, and guarantor of the Prepetition 2L Notes Indenture, owns many wholly-owned subsidiaries, of which the following four (4) are Debtors:

a.      Party City Corporation, a Delaware corporation, a borrower under the Prepetition ABL Credit Agreement, guarantor of the ABL/FILO Facilities, and guarantor of the Prepetition 2L Notes Indenture;

b.      Amscan Inc. ("Amscan"), a New York corporation and guarantor under the Prepetition ABL Credit Agreement and Prepetition 2L Notes Indenture;

c.      Am-Source, LLC, a Rhode Island LLC and guarantor under the Prepetition ABL Credit Agreement and Prepetition 2L Notes Indenture; and

d.      Trisar, Inc., a California corporation and guarantor under the Prepetition ABL Credit Agreement and Prepetition 2L Notes Indenture.

An organizational chart of Company entities is attached to the First Day Declaration as Exhibit A.

## C.      The Company's Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $400 million in total debt obligations. The following table depicts the Debtors' prepetition capital structure:

| Debt Obligations | Maturity | Approximate Outstanding Principal Amount as of the Petition Date |
|---|---|---|
| **Secured Debt** | | |
| ABL Facility | October 2028 | $149,165,942 |
| FILO Facility | October 2028 | $13,311,969 |
| Prepetition 2L Notes Claims | January 2029 | $267,527,394 |
| | **Total Secured Debt** | **$399,005,305** |

### 1.      Secured Debt Obligations

#### a.      The ABL/FILO Facilities

Party City Holdings Inc. and Party City Corporation, as borrowers, and JPMorgan Chase Bank, N.A., as administrative agent (the "ABL Agent"), are party to that certain ABL Credit Agreement, dated as of October 12, 2023 (the "ABL Credit Agreement"). The ABL Credit

7

17295901

Agreement, as amended pursuant to that certain Forbearance Agreement, dated as of December 17, 2024 (the "Forbearance Agreement"), provides for an asset-based lending revolving credit facility in an amount up to $250 million, including $40 million in swingline loans and $60 million in letters of credit (the "ABL Facility"). The ABL Credit Agreement also provides for an asset-based revolving credit facility providing for an additional $17.1 million of revolving commitments on a first-in, last-out basis (the "FILO Facility" and, together with the ABL Facility, the "ABL/FILO Facilities"; the lenders under the ABL/FILO Facilities, the "ABL/FILO Lenders"). Each of the other Debtors guarantees the ABL/FILO Facilities.

The maturity date on the ABL/FILO Facilities is October 12, 2028, and the obligations thereunder are secured by first liens on substantially all of the Debtors' assets. As of the Petition Date, approximately $118 million in principal amount was outstanding under the ABL Facility, as well as an additional approximately $31 million in letters of credit, and a further approximately $13 million was outstanding under the FILO Facility.

### b.   The Prepetition 2L Notes Claims

On October 12, 2023, PCHI issued approximately $232.4 million in aggregate principal amount of 12.00% senior secured second lien PIK toggle notes due 2029 (the "Prepetition 2L Notes Indenture") under an Indenture with the other Debtors, as guarantors, and Wilmington Savings Fund Society, FSB, as trustee, collateral trustee, paying agent, and registrar (the "Prepetition 2L Notes Indenture Trustee"). The maturity date of the Prepetition 2L Notes Indenture is January 20, 2029, and the Prepetition 2L Notes Claims are secured by second-priority liens on all assets of PCHI and the guarantors, which are junior to the first-priority security interests securing the ABL/FILO Facilities. As of the Petition Date, approximately $268 million in aggregate principal amount of Prepetition 2L Notes Indenture was outstanding.

### c.   The Intercreditor Agreement

The ABL Agent and the Prepetition 2L Notes Indenture Trustee, together with Party City Holdings Inc., PCHI, and Party City Corporation, entered into that certain Intercreditor Agreement, dated as of October 12, 2023 (the "Intercreditor Agreement"). The Intercreditor Agreement sets forth the agreements between the ABL Agent and the Prepetition 2L Notes Indenture Trustee with respect to the priority of liens on the collateral securing the ABL/FILO Facilities and the Prepetition 2L Notes Indenture, and the respective rights and remedies of the various lenders, among other things. The Intercreditor Agreement generally provides that the ABL/FILO Lenders have primacy over the holders of Prepetition 2L Notes Indenture in all matters regarding collateral.

### 2.   Common Equity

PCHI transitioned from a publicly traded to a privately-held company upon its emergence from the Prior Cases, when it issued new common equity to the holders of its prepetition secured debt and debtor in possession financing facility on account of their claims. Over 97% of the Company's equity is owned by four holders of Prepetition 2L Notes Claims (the "Ad Hoc Noteholder Group"), who also hold over 99% of the Prepetition 2L Notes Claims, and the remaining balance is held by other investors.

17295901

### 3. Governance

Upon the Company's emergence from the Prior Cases, a new board of directors of PCHI (the "Board") was appointed. As of the Petition Date, the Board is composed of three members: Bob Hull, Neal Goldman, and Patrick Bartels (the "Independent Directors"). The Independent Directors have supervised and guided the Company's efforts to find additional capital or implement a strategic alternative that could have avoided this liquidation, and have reviewed and authorized these chapter 11 cases.

**ARTICLE III.**
**KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES**

## A. Efforts to Reposition the Business Complicated by Underperforming Sales

### 1. Strategic Initiatives Since the Prior Cases

Following the Prior Cases, the Company's management team, together with its new owners, set forth on a plan to prioritize long-term growth by transforming the business into a streamlined, modern, and more profitable retail operation.

*Inventory Management Initiative*. The Company launched an "Inventory Management Initiative," developed to address two main obstacles to PCHI's long-term growth: (a) PCHI possessed excess older, lower quality, and/or dated inventory, the sale of which was inconsistent with management's plan to modernize and improve the Company's business, and (b) PCHI's prices had risen as a result of macroeconomic pressures post-pandemic. Accordingly, the Inventory Management Initiative involved the sale of older, lower quality, and/or dated inventory at a significant discount, which management anticipated would right-size PCHI's inventory position from $450 million to a more sustainable $300 million over approximately one year. This initiative was expected to fuel PCHI's long-term growth by expanding its market share and building and retaining customer goodwill. However, the Inventory Management Initiative involved certain short-term sacrifices: it both required sales of inventory at decreased margins relative to historical levels and meant that, as PCHI's inventory base contracted, its borrowing base under the ABL/FILO Facilities—and thus the amount of available liquidity—would also decrease over time.

*Divesting Manufacturing Businesses*. The Company also determined to wind down or sell substantially all of its owned manufacturing businesses, shifting its focus to retail and wholesale design and sourcing operations—its most profitable business lines. Specifically, until 2024, the Company operated manufacturing facilities that produced paper and plastic plates and cups, paper napkins, foil balloons, piñatas, and other party and novelty items. PCHI also divested the costume manufacturing portion of its wholesale business operations based in Asia.

The Company also separated its balloon business—"Anagram"—shortly after it emerged from the Prior Cases. Although the entities comprising the Anagram business (Anagram Holdings, LLC, Anagram International, Inc., and Anagram International Holdings, Inc. (collectively, the "Anagram Entities")) were wholly-owned subsidiaries of PCHI during the Prior Cases, the Anagram Entities had their own funded debt (on which PCHI was not obligated), faced their own financial difficulties, and filed their own chapter 11 cases following the Prior Cases. In connection with the Anagram Entities' chapter 11 plan confirmation process, PCHI and the Anagram Entities

9

entered into a comprehensive Omnibus Commercial Arrangement Agreement, dated December 29, 2023, to govern the parties' commercial relationship post-separation.

***Focusing on Profitable Wholesale Partnerships***. PCHI has historically had long-term relationships with many types of consumer products customers, including party superstores (in addition to its owned retail stores and franchised stores operating principally as PCHI) and unaffiliated specialty retailers, mass merchants, e-commerce merchandisers, craft stores, grocery retailers, and dollar stores. In 2024, the Company terminated unprofitable relationships with certain wholesale customers. The Company's consumer products business has since been focused on supplying independent party goods retailers and Canadian Tire, a Canadian retail conglomerate to which PCHI sold its Canadian business in 2019.

***Closing Unprofitable Store Locations***. As noted above, PCHI closed 48 unprofitable and/or underperforming retail locations in connection with the Prior Cases. To effectuate these store closings, the Company retained Gordon Brothers Retail Partners, LLC (together with its affiliate, Gordon Brothers Commercial & Industrial, LLC, "Gordon Brothers") as liquidation consultant. Since the Prior Cases, PCHI has, in consultation with Gordon Brothers, continued to close 27 additional retail locations that are either unprofitable or no longer consistent with its long-term business plan to streamline its store portfolio.

### 2.   **Mitigating Declining Performance**

Despite these actions, which, together, were expected to reposition the Company for long-term success, the Company's sales and store traffic turned out to be significantly lower than anticipated during the year following the Prior Cases. Specifically, PCHI's comparative store sales declined 9.5% year-over-year from July 2023 to July 2024. Sales of PCHI's consumer products division also declined 24.8% in the same period, due partially to lower intercompany sales to PCHI's retail division. At the same time, the purchases of PCHI's key consumer products partner, Canadian Tire, dropped dramatically.

This unanticipated underperformance placed significant strain on the Company's balance sheet. In both January and September 2024, the Company made the difficult decision to implement a reduction in force, affecting 280 corporate employees in total. In fall 2024, the management team also began developing plans for a similar approach to maximize efficiency with respect to its retail operations, in order to ease the financial pressure on the Company and afford management the necessary time and resources with which to implement its long-term growth and revitalization strategy.

### B.   **September 2024 Hilco Appraisal; Efforts to Obtain Incremental Financing; Forbearance Agreement Under the ABL/FILO Facilities**

Confronting these unexpected challenges, PCHI's management determined that the Company should seek incremental financing to support its ongoing operations and the fulsome implementation of its new business strategies over the next few years. To facilitate these efforts, in September 2024, the Company retained Hilco Valuation Services, LLC ("Hilco") to conduct a reappraisal of its inventory. The ABL Agent also later retained the same Hilco team to conduct the annual inventory appraisal required under the ABL/FILO Facilities. Hilco delivered a preliminary

10

17295901

appraisal report to PCHI on or around November 12, 2024, in which Hilco determined to significantly reduce the net orderly liquidation value of the key asset categories supporting the Company's borrowing base under the ABL/FILO Facilities as compared to the Company's historical appraisals.

The Company disagreed with key material components of Hilco's methodology and conclusions in its draft report. It promptly initiated discussions with Hilco to address factual inaccuracies and advocate for adjustments aimed at mitigating such inaccuracies in a bid to reduce the decline in net orderly liquidation value. While those conversations were ongoing, on November 18, 2024, the ABL Agent exercised its contractual right under the ABL/FILO Facilities and instituted a $50 million discretionary reserve against the Company's availability thereunder. The Company's efforts with Hilco ultimately resulted in Hilco delivering a revised appraisal to the Company, in which the net orderly liquidation value was increased as compared to the preliminary report. The ABL Agent nonetheless determined to maintain the discretionary reserve. As a result, the Company faced a significant, steep liquidity trough that required immediate engagement with the Ad Hoc Noteholder Group for a new capital investment under an exceptionally accelerated timeline. These discussions did not bear fruit, and without access to new capital from the ABL/FILO Lenders, the Ad Hoc Noteholder Group, or a third party, the Company lacked any meaningful runway to continue exploring going-concern options. Without sufficient time and liquidity, the Company was forced to conserve its remaining cash by ceasing new inventory orders and delaying the payment of rent and other operating costs to preserve funds essential to operate PCHI's business in the immediate term.

These events caused the Company to reengage Paul, Weiss, Rifkind, Wharton & Garrison LLP, Porter Hedges LLP, and AlixPartners to review its strategic options and commence contingency planning. PCHI and its advisors intensified the Company's efforts to seek additional financing, engaging with the ABL/FILO Lenders, the Ad Hoc Noteholder Group, and various third-party financing sources. However, by late November 2024, PCHI learned that the Ad Hoc Noteholder Group was not in a position to provide incremental financing to the Company. Likewise, the ABL/FILO Lenders were not in a position to provide the Company with any incremental liquidity or reduce the discretionary reserve to free up existing liquidity. The Company nevertheless pursued potential third-party sources of financing, but such efforts failed to result in a viable new money alternative in the extremely limited time period available.

Notwithstanding the extreme measures PCHI's management team undertook to conserve cash by halting new orders and delaying rent and vendor payments, on December 10, 2024, the Debtors' available liquidity dropped below the required minimum liquidity under the ABL/FILO Facilities, which gave rise to an event of default, triggering the ABL/FILO Lenders' right to exercise remedies, including sweeping the Company's cash as provided in the ABL Credit Agreement. Lacking the time to continue their search for a liquidity infusion from a third party, in order to maximize the value of the Company's assets for the benefit of all stakeholders, the Company and its advisors pivoted to preparing for a potential chapter 11 filing to conduct the orderly wind down of its business while simultaneously negotiating a forbearance agreement and access to chapter 11 funding with the ABL Agent and ABL/FILO Lenders.

On December 17, 2024, the Company and the ABL/FILO Lenders entered into the Forbearance Agreement. The ABL/FILO Lenders conditioned their willingness to enter into the

11

Forbearance Agreement on the Company's assent to certain milestones contained therein, pursuant to which the Company was required to, among other things, (a) limit disbursements to those set forth in an agreed-upon budget and (b) meet milestones that required, among other things, the Company to (i) retain a liquidation consultant on or before December 16, 2024 and (ii) commence these cases on or before December 22, 2024. As noted above, certain of the Debtors' secured lenders considered it essential to commence store closing sales before the Christmas and New Year's selling season to maximize the proceeds of such sales for the benefit of all stakeholders. In connection with the commencement of these cases, prior to the Petition Date, the Debtors implemented a reduction in force, affecting approximately 400 corporate employees.

**C.      Selection of Store Closing and Real Estate Consultants**

In December 2024, given the Company's liquidity position and uncertainty around its ability to attract new capital, the Company solicited proposals from potential third-party store closing consultants to facilitate a potential liquidation process. Initially, PCHI contacted Gordon Brothers, on account of Gordon Brothers' existing knowledge of the Company's operations and business due to its historic relationship with the Company. PCHI also solicited bids from four other potential liquidation consultants to create a competitive bidding process in pursuit of the most favorable terms for the Company and its stakeholders. PCHI ultimately received two formal proposals, one from Gordon Brothers and another from Hilco. After extensive negotiation, and in consultation with the ABL Agent and ABL/FILO Lenders, PCHI determined that the Gordon Brothers proposal presented the value-maximizing transaction for the Company, including because (a) the proposed economic terms were more competitive and (b) of the minimal execution risk associated with the proposal, given Gordon Brothers has facilitated going out of business sales for PCHI since 2017, including in connection with the Prior Cases, and thus is familiar with its business, operations, inventory, and key stakeholders. On December 16, 2024, PCHI entered into a Consulting Agreement with Gordon Brothers to ensure its store closing sales could commence promptly following the Petition Date.

Following a competitive proposal process, in which the Company and its advisors negotiated for favorable economic terms, on December 19, 2024, PCHI also renewed its previous engagement of A&G Real Estate Partners, LLC, who served as an advisor to the Company in connection with its Prior Cases, to assist the company in monetizing its lease portfolio.

**ARTICLE IV.**
**THE CHAPTER 11 CASES**

**A.      Commencement of the Chapter 11 Cases**

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on December 21, 2024, *i.e.*, the Petition Date, in the Bankruptcy Court.  Since the Petition Date, the Debtors have continued to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B.      First Day Motions**

The filing of the petitions commenced the Chapter 11 Cases, at which time the Debtors were afforded the benefits and became subject to the limitations of the Bankruptcy Code.  On and

12

shortly after the Petition Date, the Debtors filed several motions requesting that the Bankruptcy Court grant various relief designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth liquidation through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations (the "First Day Motions").[3]   The Bankruptcy Court granted all of the First Day Motions.

## C.   Retention of Restructuring and Other Professionals

### 1.   Employment and Compensation of Restructuring Professionals

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in these Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Debtors to retain and employ the following advisors: (a) Paul, Weiss, as counsel to the Debtors;[4] (b) Porter Hedges LLP, as co-counsel to the Debtors;[5] (c) AlixPartners, as financial advisor to the Debtors;[6] (d) A&G Realty Partners, LLC, as a real estate consultant and advisor to the Debtors;[7] and (e) TPS-West LLC as accountant to the Debtors.[8] On January 22, 2025, the Bankruptcy Court entered an order authorizing procedures for the interim compensation and reimbursement of expenses for retained professionals in these Chapter 11 Cases.[9]

### 2.   Ordinary Course Professionals

As of the Petition Date, the Debtors employed various professionals in the ordinary course of business, consisting of various law firms, attorneys, auditors, tax professionals, and other non-attorney professionals.  The Debtors filed, and the Bankruptcy Court granted, a motion seeking the authority to retain and compensate such ordinary course professionals.[10]

---

[3]   *See* First Day Motions filed at docket nos. 2, 3, 6, 7, 8, 9, 16, 17, 18, 24, 25, 26, 28, 43 and 44, and the orders granting the First Day Motions at docket nos. 4, 5, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 280, 291, 293, 468, 1127, 1178 and 1333.

[4]   *See Order Authoring the Retention and Employment of Paul, Weiss, Rifkind, Wharton & Garrison LLP as Attorneys for the Debtors and Debtors in Possession* [Docket No. 514].

[5]   *See Order Authoring the Retention and Employment of Porter Hedges LLP as Co-Counsel for the Debtors and Debtors in Possession* [Docket No. 513].

[6]   *See Order (I) Authoring the Debtors to (A) Employ and Retain AP Services, LLC and (B) Designate Deborah Rieger-Paganis as Chief Restructuring Officer, Each Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 511].

[7]   *See Order Authoring the Retention and Employment of A&G Realty Partners, LLC as a Real Estate Consultant and Advisor to the Debtors and Debtors in Possession* [Docket No. 512].

[8]   *See Order Authorizing the Retention and Employment of TPS-West LLC as an Accountant to the Debtors and Debtors in Possession* [Docket No. 1510].

[9]   *See Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 307].

[10]   *See Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 305].

17295901

**D.       Appointment of the Official Committee of Unsecured Creditors**

On January 6, 2025, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (as reconstituted from time to time, the "Creditors' Committee").[11]  As of the date the Creditors' Committee was appointed, the members of the Creditors' Committee were:  (i) Simon Property Group, Inc. (Co-Chair); (ii) Nassau Candy (Co-Chair); (iii) McLane Company, Inc.; (iv) King Zak Industries, Inc.; (v) M&J Trimming Co./Papillon Accessories; and (vi) Kimco Realty Corporation.  The Creditors' Committee has retained Pachulski Stang Ziehl & Jones LLP, as counsel and M3 Advisory Partners, L.P., as financial advisor.

**E.       Other Postpetition Operational and Administrative Relief**

**1.       Assumption and Rejection of Executory Contracts and Unexpired Leases**

The Debtors were party to thousands of contracts and leases, which include agreements with vendors for the supply of goods and services and leases for real and personal property.  To date, the Debtors have obtained Bankruptcy Court approval to reject substantially all of their executory contracts and unexpired leases as part of their efforts to winddown their operations and liquidate their assets through these Chapter 11 Cases.  The Debtors sought, and the Bankruptcy Court granted, authority to establish certain procedures to reject or assume executory contracts and unexpired leases, incorporating modifications requested by the Creditors' Committee.[12]

As discussed herein, the Debtors' analysis of their contracts and leases during these Chapter 11 Cases and their negotiations with the numerous landlords and other counterparties thereto have culminated in the Debtors' decision to reject certain unexpired leases and executory contracts.  The Debtors' analysis of the remaining unexpired leases and executory contracts, and their negotiations with the counterparties thereto, remain ongoing, and the Debtors may identify additional unexpired leases and executory contracts to reject, or assume on modified terms, prior to the conclusion of these Chapter 11 Cases.

**2.       The Debtors' Use of Cash Collateral**

On December 22, 2024, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Use Cash Collateral, and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 44] (the "Cash Collateral Motion").

To date, the Court has issued six Orders granting the Cash Collateral Motion on an interim basis (collectively, the "Interim Cash Collateral Orders").  *See* Docket Nos. 65, 468, 1127, 1178, 1333 & 1480.

---

[11]   *See Notice of Appointment of Creditors' Committee* [Docket No. 167].

[12]   *See Order (I) Authorizing and Approving Procedures to Reject, Assume, or Assume and Assign Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 287].

17295901

**F.      Section 341 Meeting**

On January 24, 2025, and March 6, 2025, the Debtors attended meetings of their creditors pursuant to section 341 of the Bankruptcy Code and addressed inquiries from the U.S. Trustee and certain creditors regarding, among other topics, the Debtors' operations and finances and other issues related to these Chapter 11 Cases.

**G.      Schedules and Statements and 2015.3 Reports**

On February 18, 2025, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs, and on February 6, 2025, the Debtors filed their 2015.3 Reports.

**H.      Bar Date**

On January 22, 2025, the Bankruptcy Court entered an order establishing March 21, 2025 at 11:59 p.m. (prevailing Central Time) (the "Claims Bar Date") as the general bar date for filing proofs of claim against the Debtors and June 18, 2025 at 11:59 p.m. (prevailing Central Time) (the "Governmental Bar Date") as the deadline for filing governmental claims.[13]  In addition, with respect to any claims arising from the Debtors' rejection of executory contracts and unexpired leases, the order established the later of (i) the Claims Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (prevailing Central Time) on the date that is 30 days following entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease as the bar date for filing proofs of claims against the Debtors on account of rejection damages (the "Rejection Damages Bar Date").

**I.      The WARN Adversary Proceedings**

On December 22, 2024,  a class action adversary proceeding complaint was filed against Debtors by Gwendolyn Hanlon, on behalf of herself and an estimated 400 other similarly employees, alleging they were terminated on December 20, 2024 as part of, or as the foreseeable result of mass layoffs or plant shutdowns without being provided 60 days advance written notice of their terminations as required under the federal and New Jersey WARN Acts (*Gwendolyn Hanlon, et al. v. Party City Holdco, Inc*., *et al*. Adv. Pro. No. 24-03273).  On December 31, 2024, a second class action adversary complaint against Debtors was filed by Plaintiff Craig Smith and others alleging on behalf of themselves and other similarly situated employees the same violations and other state law violations.  (*Craig Smith, et al. v. Party City Holdco, Inc.*, et al. Adv. Pro. No. 24-03277).

On February 3, 2025, Debtors moved to dismiss Plaintiff Hanlon's claims under the New Jersey WARN Act.  The Court denied the motion.

On February 19, 2025, Plaintiff Hanlon moved for class certification.  On April 21, 2025, the Court appointed Hanlon's counsel, Raisner Roupinian LLP, as Interim Class Counsel while the motion for class certification is pending.  On February 19, 2025, Plaintiff Hanlon moved for partial summary judgment

---

[13]    *See Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 306].

15

17295901

against Debtors' affirmative defenses to the federal WARN Act.  The Court's decision on the motion is pending.

Interim Class Counsel estimates the Debtors' maximum liability with respect to the federal and New Jersey WARN claims is $6,000,000, exclusive of attorneys' fees and expenses. The Debtors dispute the alleged estimate of Interim Class Counsel and further assert that there is no liability based on its defenses and exceptions under the WARN Act.  Interim Class Counsel asserts that payment in full of any Allowed Priority or Administrative WARN Act Claim is due on the effective date, unless the holder(s) of the Allowed Priority WARN Act claim agree to accept less favorable treatment.

## J.       The Gordon Brothers Settlement

The Plan provides for the settlement of certain claims asserted by Gordon Brothers against the Debtors.  Specifically, on May 9, 2025, Gordon Brothers filed *Gordon Brother's Retail Partners, LLC's Motion Seeking Carve-Out Determination and Granting Related Relief* [Docket No. 1367] (the "Gordon Brothers Motion"), by which Gordon Brothers sought a declaration from the Court that amounts owed under a certain Asset Disposition Consulting Agreement dated as of December 16, 2024, totaling $6,629,337.03 fit within the "Carve-Out" for the "Allowed Professional Fees" of "Estate Professionals" created by the Interim Cash Collateral Orders.  On May 22, 2025, the Creditors' Committee filed the *Preliminary Objection of the Official Committee of Unsecured Creditors to Gordon Brothers Retail Partners, LLC's Motion Seeking Carve-Out Determination and Granting Related Relief* [Docket No. 1472], which opposed the Gordon Brothers Motion.

Thereafter, the Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee engaged in discussions with Gordon Brothers in an effort to resolve the issues raised by the Gordon Brothers Motion.  Ultimately, the parties reached an agreement, which is memorialized in Article II.C of the Plan (the "Gordon Brothers Settlement").  The key components of the Gordon Brothers Settlement are as follows:

(i)      Gordon Brothers will retain, and proportionally reduce its claims by, the $1,500,000.00 "Deposit" provided for in that certain Asset Disposition Consulting Agreement, which assumed by the *Interim Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 66] and the *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 291];

(ii)     Gordon Brothers will receive a payment from Distributable Proceeds of $2,250,000.00 representing Allowed Professional Fees pursuant to the Interim Cash Collateral Orders to be paid prior to the Waterfall Recovery (the "Initial GB Payment"); *provided* that such payment may be made on or after the Effective Date;

(iii)    Gordon Brothers shall receive an Allowed Administrative Claim totaling $2,729,333.03 (the "Gordon Brothers Administrative Claim"); and

(iv)     Gordon Brothers agrees that it consents to, and shall not opt out of, the releases provided for in the Plan, including in Article VIII.C.

16

17295901

The Debtors believe that the Gordon Brothers Settlement avoids the costly, time consuming and wasteful litigation that could have arisen out of reconciling and litigating the characterization of the Gordon Brothers Motion, and as a result, will increase recoveries to holders of Allowed Claims. Accordingly, the Debtors believe that the Gordon Brothers Settlement should be approved pursuant to Bankruptcy Rule 9019 as it balances the risks and provides an equitable solution that is reasonable, fair, and efficient.

## K.     The Plan Settlement

The Plan is premised upon and incorporates the proposed settlement between the Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee (the "Plan Settlement"), which is reflected in a Settlement Term Sheet (the "Plan Settlement Term Sheet"). Among other things, the Plan Settlement provides for (i) the allowance of Class 2 Prepetition 2L Notes Claims in the amount of $267,703,631.42; (ii) support for the Plan; (iii) the Ad Hoc Noteholder Group's support of the Debtors' continued use of Cash Collateral; (iv) the establishment of a Wind-Down Budget; and (v) the establishment and funding of a Liquidation Trust, distributions from which will be shared pro rata by Holders of Prepetition 2L Notes Claims, Allowed Administrative and Priority Claims, and Allowed General Unsecured Claims in accordance with the Waterfall Recovery and GUC Waterfall Recovery set forth in the Plan.

The Debtors believe that the Plan Settlement is a fair and equitable resolution of all of these issues and the Debtors' Chapter 11 Cases, and in the best interests of all creditors. The Plan further constitutes a motion pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 seeking approval of the Plan Settlement. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such motion and each of the compromises or settlements contained in the Plan. Furthermore, the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and fair and equitable.

More particularly, the Plan Settlement (and, in turn, the Plan) relies heavily on the consent of Holders of Administrative and Priority Claims to the Administrative/Priority Waterfall Treatment provided for in the Plan. It is a condition precedent to the effectiveness of the Plan that the amount of claims attributable to Holders of Administrative and Priority Claims that do not consent to the Administrative/Priority Waterfall Treatment cannot exceed $1 million. Failure to satisfy this condition precedent will, in all likelihood, result in the conversion of these Chapter 11 Cases to Chapter 7. Should that occur, given the amount of Prepetition 2L Notes Claims relative to the value of the Debtors' estates, it unlikely that Holders of Claims in Classes 1, 2, 4, 5, 6, or 7 will see any recovery. With respect to Holders of Administrative and Priority Claims specifically, while the Administrative/Priority Waterfall Treatment may not afford payment in full of such Claims, the alternative is, in all likelihood, no payment at all. Similarly, given the payment priorities under Chapter 7, conversion would virtually eliminate all potential of distributions to Holders of Class 4 General Unsecured Claims. The Plan Settlement is the only avenue of avoiding the various value-destructive alternatives to confirmation while also affording more Holders an opportunity to receive meaningful distributions.

17

The Plan Settlement thus represents a true compromise, and one which the Debtors believe is fair, equitable, and in the best interests of their Estates and all stakeholders.

## L.   Confirmation Hearing

The Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing on or about August 5, 2025, subject to the Court's availability, to consider confirmation of the Plan.  Any objections to confirmation of the Plan must be filed by July 30, 2025, at 4:00 p.m. (prevailing Central Time).

**ARTICLE V.**
**CERTAIN UNITED STATES FEDERAL**
**INCOME TAX CONSEQUENCES OF THE PLAN**

## A.   In General

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "Service"). There can be no assurance that the Service will not take a contrary view or that such a contrary view would not be sustained by a court. No ruling from the Service has been or will be sought, nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth in the Plan. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to U.S. Holders (as defined below) or the Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described in the Plan.

The following summary is for general information only. The tax treatment of a U.S. Holder may vary depending upon such U.S. Holder's particular situation. This summary does not address the tax consequences of receiving distributions of property with respect to a Claim in multiple tax years. This summary addresses only to a limited extent the tax consequences of the disposition of assets held by the Liquidating Trust and tax consequences that may be relevant to holders other than U.S. Holders. This summary does not address all of the tax consequences that may be relevant to a U.S. Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a U.S. Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or U.S. Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, partnerships and other pass-through entities, U.S. Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction, U.S. Holders that have a "functional currency" other than the United States

18

dollar, U.S. Holders subject to special tax accounting rules as a result of any item of gross income with respect to the Claims being taken into account in an applicable financial statement and U.S. Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by U.S. Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the U.S. Holder in exchange for the Claim and whether the U.S. Holder receives distributions under the Plan in more than one taxable year; (iii) whether the U.S. Holder falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the U.S. Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the U.S. Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the U.S. Holder. Therefore, each U.S. Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such U.S. Holder of the transactions contemplated by the Plan.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Claim that for U.S. federal income tax purposes, is or is treated as:

an individual who is a citizen or resident of the United States;

a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the IRC), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS**

19

17295901

**STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.**

**B.      Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Priority Claims, Other Secured Claims, and General Unsecured Claims**

A U.S. Holder of a Priority Claim, an Other Secured Claim, or a General Unsecured Claim should generally be treated as receiving its distributions of Cash and, if applicable, other property under the Plan (including deemed distributions associated with receiving an interest in the Liquidating Trust) in a taxable exchange under Section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) amount of Cash and fair market value of other property actually or constructively received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the IRC.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the U.S. Holder of such Claim; (iii) whether such Claim has been held for more than one year; (iv) the extent to which the U.S. Holder previously claimed a loss or bad debt deduction with respect to such Claim; and (v) whether such Claim was acquired at a market discount. A U.S. Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such U.S. Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

U.S. Holders, including U.S. Holders of Disputed Claims after such Claims become Allowed Claims, should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis. Additionally, although not free from doubt, U.S. Holders of Disputed Claims should generally recognize gain or loss in an amount equal to the amount deemed realized on the date such Claim becomes an Allowed Claim, less the adjusted tax basis of such Claim. However, it is possible that, on the Effective Date, U.S. Holders of Disputed Claims may be required to recognize such U.S. Holders' allocable shares of (i) the Liquidating Trust Assets and (ii) the fair market value of the Liquidating Trust assets as an amount received for purposes of computing gain or loss.

**C.      Certain U.S. Federal Income Tax Considerations for Non-U.S. Beneficiaries of the Liquidating Trust**

Depending on the specific nature of the assets and activities of the Liquidating Trust, non-U.S. beneficiaries may be considered to be engaged in a trade or business within the United States and therefore obligated to file U.S. federal income tax returns (and possibly state and local income tax returns) and pay tax on their share of the net income derived from the Liquidating Trust Assets.

20

Alternatively, non-U.S. beneficiaries of the Liquidating Trust may be subject to U.S. federal withholding tax at a rate of 30% (subject to reduction by applicable treaties) on their share of the gross income derived from certain assets of the Liquidating Trust. Non-U.S. holders of Claims should consult their tax advisors concerning the tax consequences of the Plan.

### D.       Backup Withholding and Information Reporting

A U.S. Holder of an Allowed Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan. Certain Holders (including corporations) generally are not subject to backup withholding. A U.S. Holder that is not otherwise exempt generally may avoid backup withholding by providing such Holder's taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the U.S. Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE DEBTORS, THE COMMITTEE, NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

### ARTICLE VI.
### CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. NEW FACTORS, RISKS, AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS, AND UNCERTAINTIES.

### A.       Certain Bankruptcy Law Considerations

#### 1.       Risk of Non-Confirmation of Plan under the Bankruptcy Code

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the

21

17295901

Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.

Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all holders of Claims entitled to vote in favor of the Plan vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation (including under section 1129 of the Bankruptcy Code) are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan.

### 2.    Non-Consensual Confirmation

In the event any Impaired Class of Claims entitled to vote on the Plan does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the proponent's request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes. Should any Class vote to reject the Plan, these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements, to the extent applicable.

### 3.    Risk of Non-Occurrence of the Effective Date

There can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Allowed Claims and Interests would remain unchanged.

### 4.    Alternatives

If the Plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Debtors thereafter will more than likely be forced to convert the cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 5.    Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Parties in interest may object to the Debtors' classification of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the

22

17295901

Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 6.        Impact of these Chapter 11 Cases on the Debtors

Because of the public disclosure of these Chapter 11 Cases and concerns vendors may have about the Debtors' liquidity and/or the Debtors' ability to obtain or maintain normal credit terms with vendors may be impaired.  Also, the Debtors' transactions that are outside of the ordinary course of business are generally subject to the approval of the Bankruptcy Court during the pendency of the Chapter 11 Cases, which may limit the Debtors' ability to respond on a timely basis to certain events or take advantage of certain opportunities.  As a result, the effect that the Chapter 11 Cases will have on the Debtors' business, financial conditions, and results of operations cannot be accurately predicted or quantified at this time.  This could adversely affect the Liquidating Trustee's efforts to liquidate the Liquidating Trust Assets.

### 7.        Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Released Parties.  The releases, injunctions, and exculpations provided in the Plan may not be approved.  If the releases, injunctions, and exculpations are not approved, certain Released Parties may withdraw their support for the Plan.  The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' liquidation because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' liquidation  efforts and have agreed to make further contributions, including by the Ad Hoc Noteholder Group and its members agreeing to compromise by way of a less advantageous position in the Waterfall Recovery, but only if they receive the full benefit of the Plan's release and exculpation provisions.

### 8.        Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions that might ultimately prove to be incorrect and projections that may be materially different from actual future experiences.  Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Wind-Down Debtors, including the timing, confirmation, and consummation of the Plan, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court, including any natural disasters, geopolitical events,

17295901

or health epidemics may affect the actual financial results achieved by the Debtors. Such results may vary significantly from the forecasts and such variations may be material.

9. **Claims Could Be More than Projected**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. Some assumptions may not materialize, and unanticipated events and circumstances may affect the ultimate outcomes. Therefore, the actual amount of Allowed Claims may vary from estimates included in a liquidation analysis (the "Liquidation Analysis") attached hereto as **Exhibit B**, and the variation may be material.

10. **Impact of Interest Rates**

Changes in interest rates may affect the fair market value of the Wind-Down Debtors' assets or the distributions to Holders of Claims under the Plan.

11. **Contingencies May Affect Distributions to Holders of Allowed Claims**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated and turned over to other Allowed Claims. The occurrence of any and all such contingences could affect distributions under the Plan.

12. **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Before Confirmation**

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and with the consent of the Ad Hoc Noteholder Group, to amend or modify the Plan before the entry of the Confirmation Order or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable Law and the Bankruptcy Court. If the Debtors seek to modify the Plan after receiving sufficient acceptances but before the Bankruptcy Court's entry of an order confirming the Plan, the previously solicited acceptances will be valid only if (a) all Classes of adversely affected Holders accept the modification in writing, or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims, or is otherwise permitted by the Bankruptcy Code.

13. **Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of liquidation to the Plan. Under the Bankruptcy Code, a debtor in possession

24

initially has the exclusive right to propose and solicit acceptances of a plan of reorganization or liquidation for a period of 120 days from the petition date, which may be extended with Bankruptcy Court approval for a period not to exceed 18 months.  However, such exclusivity period can also be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of liquidation in these Chapter 11 Cases.

If another party in interest were to propose an alternative plan of liquidation following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims than the Debtors' Plan.

**14.    The Expected Valuations of the Liquidating Trust Assets are Inherently Uncertain**

The estimated valuations of the Wind-Down Debtor' Assets reflect estimates of future value based on limited information available to the Debtors as of the date of this Disclosure Statement. The estimated valuations reflect numerous assumptions with respect to future events, including general litigation risks and other matters specific to such assets, many of which are difficult to predict and/or beyond the Debtors' control.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court and that the Effective Date will occur, there can be no assurance that the value realized on account of the Liquidating Trust Assets will be consistent with any estimates herein, and actual results may differ materially from any such estimates contained in this Disclosure Statement. Particularly, realizing the value of the Debtors' assets may take multiple years. Such estimates, by their nature, may fluctuate and/or become subject to greater uncertainty over time. In addition, whether actual financial results, litigation, and any other future developments are ultimately consistent with the Debtors' expectations and assumptions as reflected herein may depend on factors outside of the Debtors' control that could adversely affect the value of such assets.

**15.    Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases**

The Plan contemplates that the Liquidating Trustee will collect on certain present and future Claims and Causes of Action preserved in the Plan and distribute recovered amounts to General Unsecured Claims. The Debtors cannot predict with certainty the outcome or effect of the resolution of claims arising from such pending and future litigation. An adverse outcome in any litigation on which distributions under the Plan depend could materially affect the recovery of Holders of General Unsecured Claims.

**16.    Liquidating Trustee Expenses May Exceed Current Expectations**

The ultimate amount of Cash available to satisfy the amount of Allowed Claims in Class 1, Class 3, and Class 4 depends, in part, on the manner in which the Liquidating Trustee administration of the Liquidating Trust Assets that it incurs. Such expense may include, without limitation, the reasonable and necessary expenses of administering the Liquidating Trust Assets, including the costs to liquidate the Liquidating Trust Assets, investigate and prosecute the

17295901

preserved Causes of Action, prosecute objections to Claims, and make distributions. The expenses of the Liquidating Trustee will be paid from the Liquidating Trust Assets. As a result, if the Liquidating Trustee incurs professional or other expenses in excess of current expectations, the amount of distributable assets remaining to satisfy Allowed Claims in Class 1, Class 3, and Class 4 will decrease.

### 17.     Administrative Insolvency and the Amount of Allowed Priority Claims

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (i.e., Allowed Priority Claims) receive Cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment. To the extent that a Debtor is unable to pay such Claims in full or otherwise agree to treatment with the applicable holder, such Debtor may be unable to confirm a chapter 11 plan. Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of 503(b)(9) Claims, ongoing litigation, and professional fees, which may also impact the Debtors' ability to confirm a chapter 11 plan. Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a) of the Bankruptcy Code (i.e., allowed priority tax claims) receive regular installment payments in Cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan. Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as Cash equal to the full allowed amount of such claim).

To the extent that the Debtors are unable to pay section 507(a)(2) and (a)(3) claims in full or otherwise agree to treatment with the applicable Holder, the Debtors may be unable to achieve the Effective Date of the Plan.  It is possible that the amount of Allowed Priority Claims will be higher than the range the Debtors have estimated to date, and thus recoveries could be materially reduced or eliminated.  Additionally, the Debtors cannot guarantee the number of Holders that will properly submit an Administrative / Priority Claim Consent Form opting out and withholding consent to less than full payment of their respective Allowed Priority Claims. The Plan is conditioned on no more than $1 million in Allowed Priority Claims timely opting out and withholding consent.  If more Holders of in Allowed Priority Claims in an aggregate amount of $1 million properly opt out of and withhold consent to the Administrative/Priority Waterfall Treatment afforded to such Holder under the Plan, the Plan's Effective Date may not occur.

## B.     Additional Factors

### 1.     Debtors Could Withdraw Plan

The Debtors can revoke or withdraw the Plan before the Confirmation Date.

### 2.     Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that

17295901

date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.        No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.        No Legal or Tax Advice Is Provided by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder should consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim and/or Interest.  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.        No Representation Made

Nothing contained herein or in the Plan shall constitute a representation of the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

### 6.        Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain Holders of Claims in connection with the implementation of the Plan as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan, see Article V hereof.

## ARTICLE VII.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each Holder of a Priority Claim (Class 1), Prepetition 2L Notes Claim (Class 3), or General Unsecured Claim (Class 4), in each case, as of June 25, 2025 (the "Voting Record Date", and each such Holder as of the Voting Record Date, a "Record Holder") should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan set forth in their entirety therein.

### A.        Voting Instructions and Voting Deadline

All Record Holders will be sent a ballot (each, a "Ballot") together with this Disclosure Statement.  Such Record Holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

27

The Debtors have engaged Kroll Restructuring Administration LLC as their solicitation agent (the "Notice and Claims Agent") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE NOTICE AND CLAIMS AGENT AT THE ADDRESS SET FORTH BELOW, OR ELECTRONICALLY SOLELY AS DESCRIBED BELOW, ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING CENTRAL TIME) ON JULY 30, 2025, UNLESS EXTENDED BY THE DEBTORS.**

IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE NOTICE AND CLAIMS AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CALL THE RESTRUCTURING HOTLINE AT:

DOMESTIC (TOLL-FREE): (877) 510-9565

INTERNATIONAL (TOLL): +1 (646) 798-8469

OR EMAIL PCHI2024INQUIRIES@RA.KROLL.COM

Additional copies of this Disclosure Statement are available upon request made to the Notice and Claims Agent at the telephone numbers or email address set forth immediately above. The Disclosure Statement and related solicitation materials, as well as all documents filed on the Court's docket in the Debtors' Chapter 11 cases, are also available for review and download, free of charge, on the Debtors' restructuring website at https://cases.ra.kroll.com/PCHI/Home-DocketInfo.

## B.    Voting Procedures

The Debtors are providing copies of this Disclosure Statement (with all exhibits thereto, including the Plan), a Ballot, and related materials (collectively, a "Solicitation Package") to Record Holders or, in the case of Beneficial Holders[14] of Prepetition 2L Notes Claims (Class 3), to the bank, broker, or other intermediary through which they hold their positions in such securities in 'street name' (each such intermediary, a "Nominee"), as applicable. Any Record Holder of Priority Claims (Class 1) or General Unsecured Claims (Class 4), who has not received an applicable Ballot should contact the Notice and Claims Agent. Any Beneficial Holder of Prepetition 2L Notes Claims (Class 3) who has not received a Ballot or Solicitation Package should contact their Nominee for further assistance.

---

[14]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees.

17295901

### 1.     Holders of Priority Claims

Holders of Priority Claims should provide all of the information requested by the Ballot and ***promptly*** return all Ballots received in the self-addressed, postage-paid envelope provided with each such Ballot, or by regular mail, overnight courier, or hand delivery, to the Notice and Claims Agent by the Voting Deadline.

Alternatively, such Holders may submit their Ballots electronically through the Notice and Claims Agent's online portal, which can be accessed at https://cases.ra.kroll.com/PCHI2024/EBallot-Home.  Holders should click on the "Submit E-Ballot" section of the website and follow the instructions to submit their Ballot electronically. Each Holder will receive a unique e-ballot identification number with which to access and submit the customized, electronic version of their Ballot on the Notice and Claims Agent's online portal.

The Notice and Claims Agent's online portal is the sole manner in which Class 1 Ballots will be accepted via electronic or online transmission.  **Such Class 1 Ballots submitted by facsimile, email or other means of electronic transmission will not be counted**.  Holders of Priority Claims who cast a Ballot using the Notice and Claims Agent's online portal should <u>NOT</u> also submit a paper Ballot.

### 2.     Holders of General Unsecured Claims (Class 4)

Holders of General Unsecured Claims in Class 4 should provide all of the information requested by the Ballot and ***promptly*** return all Ballots received in the self-addressed, postage-paid envelope provided with each such Ballot, or by regular mail, overnight courier, or hand delivery, to the Notice and Claims Agent by the Voting Deadline.

Alternatively, such Holders may submit their Ballots electronically through the Notice and Claims Agent's online portal, which can be accessed at https://cases.ra.kroll.com/PCHI2024/EBallot-Home.  Holders should click on the "Submit E-Ballot" section of the website and follow the instructions to submit their Ballot electronically. Each Holder will receive a unique e-ballot identification number with which to access and submit the customized, electronic version of their Ballot on the Notice and Claims Agent's online portal.

The Notice and Claims Agent's online portal is the sole manner in which Class 4 Ballots will be accepted via electronic or online transmission.  **Such Class 4 Ballots submitted by facsimile, email or other means of electronic transmission will not be counted**.  Holders of General Unsecured Claims who cast a Ballot using the Notice and Claims Agent's online portal should <u>NOT</u> also submit a paper Ballot.

### 3.     Beneficial Holders of Prepetition 2L Notes Claims (Class 3)

<u>Beneficial Holders of Prepetition 2L Notes Claims in Class 3 held in "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such Holder's Nominee):</u>

- Complete and sign the enclosed beneficial holder ballot (or submit your Plan vote otherwise in accordance with your Nominee's instructions).  Return the beneficial holder

29

ballot to your Nominee as promptly as possible and in sufficient time to allow such Nominee to process your instructions and return a completed master ballot to the Notice and Claims Agent by the Voting Deadline. If no self-addressed, postage-paid envelope was enclosed for this purpose, contact your Nominee for instructions; or

- Complete and sign the pre-validated beneficial holder ballot (as described below) provided to you by your Nominee. Return the pre-validated beneficial holder ballot to the Notice and Claims Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Your Plan vote, whether submitted via a beneficial holder ballot or otherwise according to your Nominee's instructions, will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and timely delivers to the Notice and Claims Agent a master ballot casting the vote(s) of its beneficial holder client(s).

If any Holder holds Prepetition 2L Notes Claims through more than one Nominee, such Holder may receive multiple mailings containing beneficial holder ballots. The Holder should submit a separate Plan vote, whether by beneficial holder ballot, or otherwise according to its Nominee's instructions, for each block of Prepetition 2L Notes Claims that it holds through any particular Nominee and return each beneficial holder ballot to the respective Nominee in the return envelope provided therewith, or otherwise according to the Nominee's instructions. Holders who execute multiple beneficial holder ballots with respect to Prepetition 2L Notes Claims held through more than one Nominee must indicate on each beneficial holder ballot the names and DTC participant numbers of all such other Nominees and the additional amounts of such Prepetition 2L Notes Claims so held and voted.

A Nominee that, on the Voting Record Date, is the Record Holder of the Prepetition 2L Notes Claims for one or more Holders can obtain the votes of the Holders of such Prepetition 2L Notes Claims, consistent with the Nominee's customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

**a.**     Pre-Validated Ballots

The Nominee may "pre-validate" a beneficial holder ballot by: (i) signing the beneficial holder ballot and indicating on the beneficial holder ballot the name of the Nominee and DTC participant number; (ii) indicating on the beneficial holder ballot the amount and the account number of the Prepetition 2L Notes Claims, as applicable, held by the Nominee for the Holder; and (iii) including a medallion guarantee stamp on the ballot or attaching an authorized signatory list validating the Beneficial Holder's position as of the Voting Record Date; and (iv) forwarding such beneficial holder ballot—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to the Notice and Claims Agent, and other materials requested to be forwarded—to the Holder for voting. The Holder must then complete the remaining portions of the beneficial holder ballot and return the beneficial holder ballot directly to the Notice and Claims Agent in the pre-addressed, postage-paid return envelope so that it is actually received by the Notice and Claims Agent on or before the Voting Deadline. A list of the Holders to whom "pre-validated" beneficial holder ballots were delivered should be maintained by Nominees for inspection for at least one year from the Voting Deadline.

30

**b.**     Master Ballots

If the Nominee elects not to pre-validate beneficial holder ballots, the Nominee may obtain the votes of Holders by forwarding to the applicable Holders the unsigned beneficial holder ballots—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such Holder must then indicate its vote on the beneficial holder ballot, complete the information requested on the beneficial holder ballot, review the certifications contained on the beneficial holder ballot, execute the beneficial holder ballot, and return the beneficial holder ballot to the Nominee.  After collecting the beneficial holder ballots, the Nominee should, in turn, complete a master ballot compiling the votes and other information from the beneficial holder ballots, execute the master ballot, and deliver the master ballot to the Notice and Claims Agent so that it is ***actually received*** by the Notice and Claims Agent on or before the Voting Deadline.  All beneficial holder ballots returned by Holders should be retained by Nominees for inspection for at least one year from the Voting Deadline. Nominees are authorized to transmit documents and solicitation information to, and to collect Plan votes from, their beneficial holder clients according to their customary practices, including through electronic methods and the use of a "voting information form" in lieu of, or in addition to, a beneficial holder ballot.

EACH NOMINEE SHOULD ADVISE ITS APPLICABLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW THE NOMINEE TO PREPARE AND RETURN THE MASTER BALLOT TO THE NOTICE AND CLAIMS AGENT SO THAT IT IS ***ACTUALLY RECEIVED*** BY THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.

> **If you have any general questions about the solicitation or voting process, or if you need additional solicitation materials, including a beneficial holder ballot, please contact the Notice and Claims Agent at (888) 905-0493 (Domestic, toll-free) or +1 (646) 440-4580 (International, toll) or via electronic mail to PCHI2024ballots@ra.kroll.com (with "Party City Solicitation Inquiry" in the subject line). Please direct questions about how to complete and submit your beneficial holder ballot or your Nominee's voting instructions to your Nominee.  Please note that, although the Notice and Claims Agent can send you a beneficial holder ballot, you must vote according to instructions received from your Nominee.**

**C.     Deadline for Returning Administrative Claim / Priority Claim Consent Form**

**The Deadline for returning Administrative Claim / Priority Claim Consent Form is July 30, 2025, at 4:00 p.m. (prevailing Central Time)**. To be effective, all Administrative / Priority Claim Consent Forms must be properly executed, completed, and delivered as directed, so that it is **actually received** by the Notice and Claims Agent on or before July 30, 2025, at 4:00 p.m. (prevailing Central Time).

**D.     Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan.  Classes

31

17295901

of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject the plan.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code as necessary.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests.  Under section 1129(b) of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see <u>Article X.A.3</u> of this Disclosure Statement.

The Claims in Classes 1, 3, and 4 are impaired under the Plan and entitled to vote to accept or reject the Plan.

**E.      <u>Fiduciaries and Other Representatives</u>**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, including a nominee on behalf of beneficial holders of Claims, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act.

UNLESS A BALLOT IS SUBMITTED TO THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; <u>PROVIDED</u>, <u>HOWEVER</u>, THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW ANY SUCH BALLOTS TO BE COUNTED.

**F.      <u>Agreements Upon Furnishing Ballots</u>**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the Holder with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Article VIII therein.  All parties in interest retain their right to object to confirmation of the Plan.

**G.      <u>Change of Vote</u>**

Any party who has previously submitted to the Notice and Claims Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Notice and Claims Agent before the Voting Deadline a subsequent, properly completed, valid Ballot for acceptance or rejection of the Plan.

**H.      <u>Waivers of Defects, Irregularities, Etc.</u>**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be

32

17295901

determined by the Notice and Claims Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of the respective Holders not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of the Holders. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## I.        **Miscellaneous**

All Ballots must be signed by the Record Holder of the Prepetition 2L Notes Claims, or any person who has obtained a properly completed Ballot proxy from the Record Holder of Prepetition 2L Notes Claims on such date. For purposes of voting to accept or reject the Plan, the Record Holders of the Prepetition 2L Notes Claims will be deemed to be the "Holders" of such Claims. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Notice and Claims Agent attempt to contact such Holders to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If a Holder returns more than one Ballot voting Prepetition 2L Notes Claims, the Ballots are not voted in the same manner, and the Holder does not correct this before the Voting Deadline, the last Ballot received by the Notice and Claims Agent will be the Ballot counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Holders will reflect the principal amount of such Holder's Claim or Interest; however, when tabulating votes, the Notice and Claims Agent may adjust the amount of such Holder's Claim or Interest by multiplying the principal amount by a factor that reflects all amounts accrued between the Voting Record Date and the Petition Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders of Priority Claims, Prepetition 2L Notes Claims, and General Unsecured Claims, as applicable, who actually vote to accept or reject the Plan will be counted. The failure of a Holder to deliver a duly executed Ballot to the Notice and Claims Agent will be deemed to constitute an abstention by such Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless a Ballot is received by the Notice and Claims Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors

33

17295901

may, in their sole discretion, reject such Ballot as invalid, and therefore decline to count it in connection with seeking confirmation of the Plan.

## ARTICLE VIII.
## CONFIRMATION OF THE PLAN

### A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing to confirm a plan of reorganization or liquidation upon appropriate notice to all required parties. Notice of the Confirmation Hearing will be provided to all known creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for these Chapter 11 Cases.

### B.      Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of Texas, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

    i.        counsel to the Debtors, (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Kenneth S. Ziman and Christopher J. Hopkins), and (b) Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002 (Attn: John F. Higgins, Aaron J. Power, M. Shane Johnson, and Megan Young-John);

    ii.       counsel to the Ad Hoc Noteholder Group, Davis Polk & Wardwell LLP, 450 Lexington Ave., New York, NY 10017 (Attn: Adam L. Shpeen and Abraham Bane);

    iii.     counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Fl., New York, NY 10017 (Attn: Robert J. Feinstein, Bradford J. Sandler, Shirley S. Cho, and Steven W. Golden); and

    iv.     the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002 (Attn: Jayson Ruff).

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

34

17295901

**C.**      **Requirements for Confirmation of the Plan**

**1.**      **Requirements of Section 1129(a) of the Bankruptcy Code**

**a.**      **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

i.      the Plan complies with the applicable provisions of the Bankruptcy Code;

ii.      the Debtors have complied with the applicable provisions of the Bankruptcy Code;

iii.      the Plan has been proposed in good faith and not by any means forbidden by law;

iv.      any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

v.      the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Wind-Down Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Holders of Claims or Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Wind-Down Debtors, and the nature of any compensation for such insider;

vi.      with respect to each Class of Claims or Interests, each Holder of an impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

vii.      except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

viii.      except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments

17295901

over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

ix.     at least one Class of impaired Claims or Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest in such Class;

x.     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

xi.     all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

b.     **Best Interests Test**

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7").  This requirement is referred to as the "best interests test."

This test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under Chapter 7.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Liquidation Analysis is being prepared solely for purposes of estimating proceeds available in a liquidation under Chapter 7 of the Debtor's Estates and will be filed in advance of the hearing to conditionally approve this Disclosure Statement at 9:00 a.m. prevailing Central Standard Time on June 27, 2025.  The Liquidation Analysis is based on estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies that are beyond the control of the Debtors or a trustee under Chapter 7.  Furthermore, the actual amounts of Claims against and Interests in the Debtors' Estates could vary materially from the estimates set forth in the Liquidation Analysis, depending on, among other things, the claims asserted during Chapter 7.  Accordingly, while the information contained in the Liquidation Analysis is necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized or the claims estimates assumed would not change if the Debtors were in fact liquidated, nor can assurances be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

As set forth in detail on the Liquidation Analysis, the Debtors believe that the Plan will produce a greater recovery for the Holders of Claims and Interests than would be achieved in a

17295901

Chapter 7 liquidation.  Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' business, will provide a substantially greater ultimate return to the Holders of Claims or Interests than would a Chapter 7 liquidation.

####     c.        **Feasibility**

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  This condition is often referred to as the "feasibility" of the Plan.  The Debtors believe that the Plan satisfies this requirement.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be made in compliance with the Administrative Claims Bar Date Order or by the Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not timely request payment on account of Administrative Claims by the Administrative Claims Bar Date or as set forth in the Administrative Claims Bar Date Order shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, Wind-Down Debtors, the Liquidating Trust, or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date.**

All known Holders of Administrative Claims and Priority Claims (other than Holders of Professional Fee Claims) have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such Holder to the Administrative/Priority Waterfall Treatment afforded to such Holder under the Plan.

**The failure of any Holder of Administrative Claims to object to Administrative/Priority Waterfall Treatment by the objection deadline for Confirmation or otherwise timely return the Administrative / Priority Claim Consent Form and opt out of the Administrative/Priority Waterfall Treatment shall be deemed to be such Holder's consent to receive the Administrative/Priority Waterfall Treatment and accept less than full payment of its Administrative Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code, and in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Claim, each such Holder of an Allowed Administrative Claim shall receive Liquidating Trust Interests entitling such Holder to its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery.** If such Holder does not timely opt out or otherwise object to such the Administrative/Priority Waterfall Treatment, such Holder shall be deemed a Released Party for all purposes hereunder.

With respect to any Holder of a Priority Claim (including a claim under 503(b)(9) of the Bankruptcy Code) that (i) does not object to the Plan on account of the treatment contemplated hereby or (ii) does not validly return the Administrative / Priority Claim Consent Form indicating they do not agree with the treatment contemplated under the Plan, as of the Effective Date of the

17295901

Plan, the Debtors, the Wind-Down Debtors, the Liquidating Trustee, and any successor-in-interest will waive and release (to the extent not already waived and released) any and all claims, Causes of Action, and other rights against the any such Holder on account of any and all estate causes of action pursuant to chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law including fraudulent transfer laws.

If a Holder of an Allowed Administrative Claim timely opts out of the Administrative / Priority Claim Consent Form or otherwise objects to the Administrative/Priority Waterfall Treatment by the objection deadline for Confirmation, then such Holder's Claim will receive the treatment required by section 1129(a)(9) of the Bankruptcy Code (unless otherwise agreed by such Holder and the Debtors, with the consent of the Ad Hoc Noteholder Group), *provided* that pursuant to Article VIII.A.8 of the Plan, it is a condition to Consummation of the Plan that the aggregate amount of asserted Administrative Claims and Priority Claims (including both Allowed and Disputed Claims) held by Holders who have timely opted out of the Administrative / Priority Claim Consent Form or who have otherwise timely objected to the Administrative/Priority Waterfall Treatment shall be less than $1 million.

The treatment of Priority and Administrative Claims (other than Professional Fee Claims) under the Plan is consistent with applicable law and similar approaches have been adopted by other debtors facing administrative insolvency and have been approved by bankruptcy courts under such circumstances. *See e.g.*, *In re Steward Health Care System LLC*, Case No. 24-90213 (CML) (Bankr. S.D. Tex. June 2, 2025) [Docket No. 5036] (conditionally approving a disclosure statement which described an "Administrative Expense Claims Consent Program" and stated, *inter alia*, that "the Plan provides for a compromise whereby the holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program (as defined herein) will: (i) receive a pro-rated portion of a distribution . . . and (ii) have their Allowed Administrative Expense Claims deemed satisfied in full once the applicable holder has received payment in cash equal to 50% of the applicable Claim"); *In re Gemstone Sols. Grp., Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. March 13, 2020) [Docket No. 1426] (approving disclosure statement and election form providing that failure to return the election form would be deemed as consent to partial payment of allowed administrative claims in accordance with the administrative claim settlement terms contemplated in the debtors' chapter 11 plan); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Dec. 19, 2019) [Docket No. 612] (approving a disclosure statement that provided in relevant part "The treatment afforded to Holders of Administrative Claims under the Plan is only available if each such Holder agrees to such treatment. The failure to return the Administrative / Priority Claim Consent Form or to object to confirmation of the Plan . . . shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9)"); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) [Docket No. 5370] (confirming chapter 11 plan where holders of administrative expense claims who did not opt out of the administrative expense claims consent program would be deemed to have had their claims satisfied in full once they received payment in cash equal to 80% of the applicable allowed administrative claims); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Aug. 8, 2018) [Docket No. 4083] (approving opt-out procedures where administrative claim holders were given the opportunity to affirmatively opt-out of the administrative claims settlement and forego treatment thereunder); *In re MSR Hotels & Resorts, Inc.*, Case No. 13-11512 (SHL) (Bankr. S.D.N.Y. Dec. 20, 2013) (approving a disclosure statement that provided in relevant

38

17295901

part, "General Administrative Claims, Other Priority Claims, and Priority Tax Claims are impaired under the Plan. Failure to object to the Plan will be deemed consent to such treatment under the Plan"); *In re Teligent*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002) (confirming a plan where administrative and priority claims would be paid through a claim fund and provided notice to administrative creditors via a consent form); *In re Trans World Airlines, Inc. III*, Case No. 01-00056 (PJW) (D. Del. Feb. 15, 2002) (confirming a plan that provided that any administrative expense convenience claims (as defined in the plan) were entitled to 50 percent of their allowed claim and any such creditors that failed to object would be deemed to accept such treatment). The rights of these administrative claimants to object to this treatment have been fully preserved.

### 2.   Equitable Distribution of Voting Power

Pursuant to section 1123(a)(6) of the Bankruptcy Code, to the extent applicable to these Chapter 11 Cases, the New Organizational Documents of the Wind-Down Debtors will prohibit the issuance of non-voting equity securities.

### 3.   Additional Requirements for Non-Consensual Confirmation

As mentioned above, in the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

#### a.   Unfair Discrimination Test

The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe that the Plan satisfies the "unfair discrimination" test. Claims or Interests of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

#### b.   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class.

17295901

The Debtors believe that the Plan satisfies the "fair and equitable" test. The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank in priority. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## ARTICLE IX.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (a) the preparation and presentation of an alternative plan of liquidation, or (b) a liquidation under chapter 7 of the Bankruptcy Code.

### A.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Liquidation Analysis sets forth the effect a Chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests.

As noted in the Liquidation Analysis, the Debtors believe that liquidation under Chapter 7 would result in lower distributions to creditors than those provided for under the Plan. Given the value of Class 3 Prepetition 2L Notes Claims and their seniority to both Claims in Classes 1, 2, 4, 5, 6, and 7 and Administrative Claims, conversion to Chapter 7 would eliminate virtually any possibility that Holders of these Claims would receive any recovery. The problems facing Holders of Class 1, 2, 4, 5, 6, or 7 Claims and Administrative Claims would be further compounded by the delay created by the conversion of the Chapter 11 Cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, who would take time and incur expenses to become familiar with the many legal and factual issues in these Chapter 11 Cases. Although the Plan requires a vast majority of the Holders of Administrative Claims and Class 1 Priority Claims to agree to the Administrative/Priority Waterfall Treatment, the Plan still represents a compromise by the Holders of Class 3 Prepetition 2L Notes Claims that affords Holders of other Claims a chance of recovery that would otherwise not exist in a liquidation under Chapter 7.

17295901

## ARTICLE X.
## CONCLUSION AND RECOMMENDATION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Voting Classes to vote in favor thereof. Any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses, ultimately resulting in smaller distributions to the Holders of Allowed Claims and Interests than those set forth in the Plan.

Dated:   June 26, 2025

PARTY CITY HOLDCO INC. (for itself and on behalf of each of the other Debtors and Debtors-in-Possession)

_/s/ Ian Heller_

Name:  Ian Heller
Title:   Chief Wind Down Officer

41

17295901